# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

JANE DOE and CHARLES BOONE,       :
                                  :

        Plaintiffs,           :

    v.                           : **C.A. No. 10-0473-LPS**

                                 :

WILMINGTON HOUSING AUTHORITY and    :
FREDERICK S. PURNELL, SR., in his official  :
capacity as executive director of the Wilmington  :
Housing Authority,                :

                                 :

        Defendants.          :

---

## BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS

Richard L. Horwitz (Del. Bar No. 2246)
Laurie Selber Silverstein (Del. Bar No. 2396)
Suzanne Hill Holly (Del. Bar No. 4414)
Potter Anderson & Corroon LLP
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6027
Facsimile: (302) 658-1192

Adam K. Levin
S. Chartey Quarcoo
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
Telephone: (202) 289-7319
Facsimile: (202) 898-0059

*Counsel for Amicus Curiae*

Dated:  February 21, 2011

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

INTEREST OF *AMICUS* ................................................................................................ 3

LEGAL BACKGROUND ............................................................................................... 4

ARGUMENT .................................................................................................................. 6

I.   The WHA Firearms And Weapons Regulations Do Not Implicate Protected Second Amendment Activity. ................................................. 6

    A.   The WHA Firearms And Weapons Regulations Do Not Implicate Protected Second Amendment Activity Because They Do Not Impact The Right To Possess Firearms In The Home Protected In *Heller* and *McDonald*. ................................................................. 6

    B.   The Second Amendment Right Should Not Be Extended To Prevent Communities From Restricting Or Prohibiting Carrying Guns In Public. ................................................................................ 11

II.  Even If The WHA Firearms And Weapons Regulations Did Implicate Protected Second Amendment Activity, They Would Withstand The Appropriate Level Of Scrutiny. ......................................................... 16

    A.   The Reasonable Regulation Test Is The Appropriate Standard Of Review. ......................................................................................... 17

    B.   The PHA Regulations Demand Appropriate Deference............................ 20

    C.   The WHA Firearms And Weapons Regulations Are Constitutionally Permissible................................................................ 21

CONCLUSION ............................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adderley v. Florida,*
    87 S. Ct. 242 (1966)......................................................................................................1, 8

*Bleiler v. Chief, Dover Police Dep't,*
    927 A.2d 1216 (N.H. 2007)..........................................................................................18, 19

*Chavez v. Hous. Auth. of El Paso,*
    973 F.2d 1245 (5th Cir. 1992) .......................................................................................2, 11

*Commonwealth v. Robinson,*
    600 A.2d 957 (Pa. 1991)...................................................................................................15

*Commonwealth v. Romero,*
    673 A.2d 374 (Pa. 1996)...................................................................................................15

*Daniel v. City of Tampa,*
    38 F.3d 546 (11th Cir. 1994) .......................................................................................1-2, 11

*Dep't of Revenue of Ky. v. Davis,*
    553 U.S. 328 (2008) .........................................................................................................20

*Digiacinto v. George Mason Univ.,*
    2011 WL 111584 (Va. Jan. 13, 2011) ..............................................................................13

*District of Columbia v. Heller,*
    128 S. Ct. 2783 (2008)...............................................................................................passim

*Dorr v. Weber,*
    2010 WL 1976743 (N.D. Iowa May 18, 2010) ................................................................12

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) .........................................................................................................20

*Gonzalez v. Village of West Milwaukee,*
    2010 WL 1904977 (E.D. Wis. May 11, 2010) .................................................................12

*Greer v. Spock,*
    96 S. Ct. 1211 (1976).........................................................................................................8

*Heller v. District of Columbia ("Heller II"),*
    698 F. Supp. 2d 179 (D.D.C. 2010)............................................................................passim

*Howerton v. United States,*
    964 A.2d 1282 (D.C. 2009) .................................................................................. 12

*In re Factor,*
    2010 WL 1753307 (N.J. Sup. Ct. Apr. 21, 2010) ................................................. 12

*Jackson v. State,*
    68 So.2d 850 (Ala. Ct. App. 1953) ................................................................. 18, 19

*Kelley v. Johnson,*
    425 U.S. 238 (1976) .......................................................................................... 20

*Kennedy v. Louisiana,*
    128 S. Ct. 2641 (2008) ....................................................................................... 17

*Knolls Action Project v. Knolls Atomic Power Lab,*
    771 F.2d 46 (2d Cir. 1985) ................................................................................... 8

*Little v. United States,*
    989 A.2d 1096 (D.C. 2010) ................................................................................ 12

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) .......................................................................................... 17

*McDonald v. City of Chicago,*
    130 S. Ct. 3020 (2010) ................................................................................. passim

*People v. Dawson,*
    934 N.E.2d 598 (Ill. App. Ct. 2010) ................................................................. 11

*People v. Flores,*
    169 Cal. App. 4th 568 (2008) ............................................................................ 22

*People v. Perkins,*
    62 A.D.3d 1160 (N.Y App. Div. 2009) ............................................................. 12

*People v. Yarbrough,*
    169 Cal. App. 4th 303 (2008) ............................................................................ 14

*Planned Parenthood v. Casey,*
    505 U.S. 833 (1992) .......................................................................................... 17

*Queenside Hills Realty Co. v. Saxl,*
    328 U.S. 80 (1946) ............................................................................................ 20

*Richmond v. J.A. Croson Co.,*
    488 U.S. 469 (1989) .......................................................................................... 21

*Richmond Tenants Org. v. Richmond Redev. & Hous. Auth.*
  751 F. Supp. 1204 (E.D. Va. 1990) .................................................................11

*Riddick v. United States,*
  995 A.2d 212 (D.C. 2010) ............................................................................12

*Robertson v. City & County of Denver,*
  874 P.2d 325 (Colo. 1994).......................................................................18, 19

*Sims v. United States,*
  963 A.2d 147 (D.C. 2008) ............................................................................12

*State v. Cole,*
  665 N.W.2d 328 (Wis. 2003) .................................................................18-19, 22

*State v. Comeau,*
  448 N.W.2d 595 (Neb. 1989) ........................................................................18

*State v. Dawson,*
  159 S.E.2d 1 (N.C. 1968) .............................................................................19

*State v. Hamdan,*
  665 N.W.2d 785 (Wis. 2002) ........................................................................19

*State v. Knight,*
  218 P.3d 1177 (Kan. Ct. App. 2009) ...............................................................11

*State v. Sieyes,*
  225 P.3d 995 (Wash. 2010) ..........................................................................21

*Teng v. Town of Kensington,*
  2010 WL 596526 (D.N.H. Feb. 17, 2010)...........................................................12

*Terry v. Ohio,*
  392 U.S. 1 (1968) ......................................................................................17

*Thompson v. Ashe,*
  250 F.3d 399 (6th Cir. 2001) ..................................................................1, 10-11

*Trinen v. City of Denver,*
  53 P.3d 754 (Colo. Ct. App. 2002) ..................................................................19

*Turner Broad. Sys., Inc. v. FCC,*
  520 U.S. 180 (1997) ...................................................................................21

*United States v. Bjerke,*
  796 F.2d 643 (3d Cir. 1986) ...........................................................................8

*United States v. Bledsoe,*
   2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) .................................................................. 19, 21

*United States v. Dorosan,*
   2009 WL 3294733 (5th Cir. Oct. 14, 2009) ..................................................................... 1, 8

*United States v. Engstrum,*
   609 F. Supp. 2d 1227 (D. Utah 2009) .................................................................................. 21

*United States v. Hart,*
   726 F. Supp. 2d 56 (D. Mass. 2010) ..................................................................................... 12

*United States v. Hayes,*
   129 S. Ct. 1079 (2009) ............................................................................................................ 4

*United States v. Marzzarella,*
   2010 WL 2947233 (3d Cir. July 29, 2010) .......................................................... 5, 6, 19, 21

*United States v. Masciandaro,*
   648 F. Supp. 2d 779 (E.D. Va. 2009) ................................................................................... 22

*United States v. McCane,*
   573 F.3d 1037 (10th Cir. 2009) ....................................................................................... 21-22

*United States v. Miller,*
   604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ................................................................ 19, 20, 21

*United States v. Radencich,*
   2009 WL 127648 (N.D. Ind. Jan. 20, 2009) ........................................................................ 22

*United States v. Schultz,*
   2009 WL 35225 (N.D. Ind. Jan. 5, 2009) ............................................................................ 22

*United States v. Skoien,*
   2010 WL 2735747 (7th Cir. July 13, 2010) ........................................................................... 5

*United States v. Tooley,*
   717 F. Supp. 2d 580 (S.D. W.Va. 2010) .............................................................................. 12

*United States v. Walker,*
   380 A.2d 1388 (D.C. 1977) .................................................................................................. 14

*United States v. Yanez-Vasquez,*
   2010 WL 411112 (D. Kan. Jan. 28, 2010) .................................................................... 19, 21

*Williams v. State,*
   2011 WL 13746 (Md. Ct. App. Jan. 5, 2011) ...................................................................... 12

*Young v. American Mini Theatres, Inc.*,
    427 U.S 50 (1976) ...................................................................................................21


**STATUTES**

24 C.F.R. 960.204(a) ....................................................................................................10

18 U.S.C. § 922 ............................................................................................................19

18 U.S.C. § 922(g)(9) .....................................................................................................4

18 U.S.C. § 930 ..............................................................................................................9

42 U.S.C. § 1437c-1(d)(14) ..........................................................................................10

Housing Act of 1937, 42 U.S.C. §§ 1437 *et seq.* .......................................................20


**OTHER AUTHORITIES**

Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007)..................18

Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun
    Assault*, Amer. J. Pub. Health, vol. 99, No. 11 (Nov. 2009) ...................................15

D.W. Webster, *et al.*, *Effects of State-Level Firearm Seller Accountability Policies on
    Firearm Trafficking*, 86 J. Urban Health: Bulletin of the N.Y. Acad. Of Med. 525
    (2009)..........................................................................................................................20

D.W. Webster, *et al.*, *Relationship Between Licensing, Registration, and Other State Gun
    Sales Laws and the Source State of Crime Guns*, 7 Injury Prevention 184 (2001).................20

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An
    Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009)..................17

Firearms, Vehicle Towing, Guests, and Security Deposits on Leased Property, Tenn. Op.
    Att'y. Gen. No. 09-170 (Oct. 26, 2009) .....................................................................14

Jamie Wershbale, *The Second Amendment under a Government Landlord: Is There a
    Right to Keep and Bear Legal [Fire]arms in Public Housing*, 84 St. Johns L. Rev.
    (forthcoming)................................................................................................................9

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social
    Welfare Perspective*, 56 UCLA L. Rev. 1041, 1081 (2009) .....................................15

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*,

J. Pub. Econ. 379, 387 (2006)...................................................................................................16

Possession of Firearms on Publicly Owned Property, Tenn. Opp. Att'y Gen. No. 04-020
(Feb. 9, 2004)..........................................................................................................................9

Press Release, U. S. Conference of Mayors, The Nation's Mayors Oppose Thune
Amendment, Actions to Weaken Gun Safety Laws (July 20, 2009)...........................13-14, 16

U.S. Dept. of Hous. & Urban Dev., *In the Crossfire: The Impact of Gun Violence on
Public Housing Communities* (1999) ....................................................................2, 10, 13, 16

Violence Policy Center, *Law Enforcement and Private Citizens Killed by Concealed
Handgun Permit Holders,* July 2009 ....................................................................................15

Weil & Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of
Handguns,* 275 J. Am. Med. Assoc. 1759 (1996) ................................................................22

## INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the risks that it presents. 128 S. Ct. 2783 (2008). Guns are designed to kill, and gun possession and use subject others to a serious risk of harm that is all too often deadly. While the Supreme Court has held that the Second Amendment protects a limited right of law-abiding, responsible people to possess a gun in the home for self-defense, the Court has never recognized a broad right to carry or use guns on state-owned and managed property. Nor, certainly, has it ever recognized a constitutional right to use or discharge firearms on state property, or *anywhere*, for reasons *other* than self-defense. On the contrary, the Court has long recognized that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 87 S. Ct. 242, 247 (1966). This includes, as *Heller* noted, the authority to maintain the safety of its grounds by restricting gun carrying in "government buildings." *Heller*, 128 S. Ct. at 2816-17.

Plaintiffs ask this Court to prohibit the state from restricting the carry, use, and even *discharge* of guns on public housing property for reasons other than self-defense. Such a ruling would do more than elevate a right, *never before recognized*, to use guns for non-defensive purposes on government grounds. It would, in fact, strip the state of its authority, as landlord and owner, to regulate the terms and use of its own property. That authority is well established, *id.; Adderley v. Florida,* 87 S. Ct. at 242, and courts post-*Heller* have specifically recognized the government's power to restrict gun use on its property. *See United States v. Dorosan*, 2009 WL 3294733, at *1 (5th Cir. Oct. 14, 2009). So too have they have repeatedly upheld states' constitutional authority to regulate use of their public housing facilities in interests of safety and crime prevention. *See Thompson v. Ashe*, 250 F.3d. 399, 407 (6th Cir. 2001); *Daniel v. City of*

*Tampa*, 38 F.3d 546, 550 (11th Cir. 1994); *see also Chavez v. Hous. Auth. of El Paso*, 973 F.2d 1245. 1248-49 (5th Cir. 1992).

Plaintiffs' position runs afoul of that authority, and at grave costs. Not only would it eviscerate the state's authority to manage its property, but it would severely hinder decades-long efforts by federal, state, and local governments to stem the tide of gun violence in public housing. A study by the U.S. Department of Housing and Urban Development concluded that "[p]ersons residing in public housing are over twice as likely to suffer from firearm-related victimization" and that "[g]un related violence poses a direct threat to the 2.6 million residents of public housing – including over 1 million children and 360,000 elderly persons." U.S. Dept. of Hous. & Urban Dev., *In the Crossfire: The Impact of Gun Violence on Public Housing Communities*, 14 (1999), *available at* http://www.ncjrs.gov/pdffiles1/nij/181158.pdf. The numbers speak for themselves. Public housing safety must not be forsaken in the drive for new, and ever-expanding, gun rights. Plaintiffs gamble that their individual interests trump the responsibility of the state to protect its citizens and tenants. This is a losing hand.

An extension of the Second Amendment to fashion a new right to carry and use firearms, *for non-defensive purposes* on *government property* defies logic and legal precedent. And it runs counter to the Court's repeated "assurances" that "reasonable firearms regulations" will remain permissible under the Court's recent Second Amendment rulings in *Heller* and *McDonald*, as well as the Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010); *Heller*, 128 S. Ct at 2816-17, 2871 & n. 26. The Wilmington Housing Authority ("WHA") firearms and weapons policy provides precisely such reasonable regulations. Far from expansive, they restrict (1) the "display or carry" of firearms

"in any *common area*, except where the firearm . . . is being transported to or from the tenant's unit, or is being *used in self-defense*" and (2) the discharge of any firearm "*except when done in self-defense.*" (emphasis added). In short, the regulations fully preserve Plaintiffs' right to keep and use guns in the home for self-defense.

The WHA regulations do not implicate protected Second Amendment activity and even if they did, requiring individuals to refrain from discharging firearms on public housing property except for self-defense is a reasonable, justified, and permissible exercise of the state's police powers.[1]  While Plaintiffs may disagree with the regulations, their recourse is through the legislative process, not the judiciary.  This Court  should not usurp the functions of legislatures and local law enforcement by declaring a new Second Amendment right that the Supreme Court has not acknowledged and by striking down regulations that so plainly satisfy the state's interest in protecting the safety of its citizens.

## INTEREST OF *AMICUS*

*Amicus* the Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws.  *Amicus* brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

---

[1] Plaintiffs state that the regulations govern one public housing facility "managed" by the WHA, and one "owned and administered" by the WHA. Am. Compl. ¶¶ 2-3, 18. The same arguments apply to both.

## LEGAL BACKGROUND

Recent Supreme Court Second Amendment Jurisprudence: In *Heller*, the Supreme Court recognized an individual's right to keep and bear arms in the home for the purpose of self-defense. 128 S. Ct. at 2818. While the Court could have simply decided whether the District's handgun ban was unconstitutional, it went out of its way to assure courts that its holding did not "cast doubt" on other gun laws – even approving of the constitutionality of a number of laws and then making clear that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive." *Id.* at 2816-17, 2871 & n. 26. Those "presumptively lawful" measures included laws restricting, and even banning, the carrying of weapons or concealed weapons in public spaces and on government property. *Id.* [2]

In *McDonald*, the Court incorporated the Second Amendment to the states, but also "repeat[ed]" the "assurances" it made in *Heller* regarding its limited effect on other gun laws, and agreed that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment." 130 S. Ct. at 3047 (internal citation omitted). Once again, the Court did not extend the Second Amendment right beyond self-defense in the home.

The Open Question: Standard of Review: Neither *Heller* nor *McDonald* articulated a standard of review for Second Amendment challenges, though the Court in *Heller* explicitly rejected the "rational basis" test and implicitly rejected the "strict scrutiny test." *See Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) (the "strict scrutiny standard of review would not square with the [*Heller*] majority's references to 'presumptively lawful regulatory measures' . . . ."). The Court's reasoning also foreclosed any form of

---

[2] The narrow scope of the Court's ruling in *Heller* was also apparent in the Court's 2009 opinion in *United States v. Hayes*, 129 S. Ct. 1079 (2009), in which the Court upheld a broad reading of 18 U.S.C. § 922(g)(9) – which prohibits possession of firearms by persons convicted of misdemeanor crimes of domestic violence – without even mentioning the Second Amendment.

heightened scrutiny that would require the government to ensure that firearms legislation has a tight fit between means and ends, as *Heller* recognized that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 130 S. Ct. at 2822, listed as examples a host of "presumptively lawful" existing firearms regulations without subjecting those laws to any such analysis, *id.* at 2816-17 & n. 26, and *McDonald* allowed for "reasonable firearms regulation." 130 S. Ct. at 3047 (internal citation omitted).

*Heller* and *McDonald* thus left lower courts with the task of determining an appropriate standard of review for Second Amendment claims: one that is less rigorous than strict scrutiny, "presumes" the lawfulness of a wide gamut of gun laws currently in force, allows for "reasonable firearms regulations," and permits law-abiding, responsible citizens to keep guns in their homes for self-defense. As discussed below, the "reasonable regulation" test, overwhelmingly applied by courts throughout the country construing right to keep and bear arms provisions in the states, is the most appropriate standard of review for the regulations at issue here.

The Two-Pronged Approach: In the wake of *Heller* and its progeny, the Third Circuit and others have begun to utilize a two-pronged approach to Second Amendment claims. *See, e.g.*, *United States v. Marzzarella*, 2010 WL 2947233 at *2 (3d Cir. July 29, 2010); *United States v. Skoien*, 2010 WL 2735747 (7th Cir. July 13, 2010); *Heller II*, 698 F. Supp. 2d at 188. Under this approach, courts ask: (1) does the law or regulation at issue implicate protected Second Amendment activity, and (2) if so, does it withstand the appropriate level of scrutiny? *See, e.g.*, *Heller II*, 698 F. Supp. 2d at 188; *Marzzarella*, 2010 WL 2947233, at *2. If the challenged law or regulation does not implicate protected Second Amendment activity, then the analysis ends and it is deemed constitutional. Even if the law or regulation implicates protected activity,

however, it still will be deemed constitutional if it passes muster under the appropriate level of scrutiny. *Marzzarella*, 2010 WL 2947233, at *2.

This two-pronged approach represents an appropriate manner in which to approach the issues presented by Second Amendment claims. *Amicus* advocates its use by this Court in analyzing the constitutionality of the WHA firearms and weapons regulations.

<strong>ARGUMENT</strong>

For at least two principal reasons, the WHA firearms and weapons regulations are constitutional. First, the regulations do not implicate protected Second Amendment activity. Second, even if they did, they are reasonable regulations that further important governmental interests established by federal, state, and local authorities.

**I.    THE WHA FIREARMS AND WEAPONS REGULATIONS DO NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.**

In analyzing the pending motion to dismiss, *amicus* respectfully suggests that the Court use the two-prong approach to Second Amendment claims and hold that the WHA firearms and weapons regulations not implicate protected Second Amendment activity because Plaintiffs have no general Second Amendment right to carry or use firearms outside of the home on state owned and managed property for reasons other than self-defense.

**A.    The WHA Firearms and Weapons Regulations Do Not Implicate Protected Second Amendment Activity Because they Do Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*.**

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." *Heller*, 128 S. Ct. at 2821 (emphasis added). In the course of its lengthy majority opinion, the Court had ample opportunity to state that Mr. Heller had a right to use or carry guns for reasons

other than self-defense, or to do so on government property, or in common spaces open to others. After all, the Court did not limit itself to the constitutionality of the D.C. law at issue, but expounded at length on the limited nature of the Second Amendment right. Yet, it found no such broad rights. Instead, the Court specifically limited its holding to the right to keep firearms in the home for self-defense: "[i]n sum, we hold that the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of *immediate self-defense.*" *Id.* at 2821-22 (emphasis added). The Court based its conclusion on the historical recognition of the right of individuals "to keep and bear arms to *defend their homes*, families or themselves," *id.* at 2810 (emphasis added), and the continuing need to keep and use firearms "*in defense* of hearth and home." *Id.* at 2821 (emphasis added). At the same time, the Court took pains to note that "the right secured by the Second Amendment is not unlimited" and in no way authorizes the "carry of any weapon . . . in any manner whatsoever and for whatever purpose." *Id.* at 2816.

Ignoring the Court's extensive and careful language limiting the right to keep and bear arms, Plaintiffs seemingly ask the Court to conclude that *Heller* embraced a right (a) to carry and use guns for non-defensive purposes and (b) to do so on government property. They must, to prevail, for the WHA regulations expressly permit residents to carry and use guns in their apartments, and in common spaces open to others, in self-defense. However, *Heller* supports no such conclusion. Quite the opposite, the Court expressly approved "longstanding prohibitions" on the "carrying of firearms . . . in government buildings." *Id.* at 2816-17. Indeed, Plaintiffs cannot explain why Justice Scalia would be so explicit about the fact that the Second Amendment was "not unlimited" and that a (non-exhaustive) host of gun laws remained "presumptively lawful" yet keep his supposed ruling that the Second Amendment protected a

right to carry firearms on public housing or for non-defensive purposes hidden and implicit. *Id.* at 2817 n. 26.

Fundamental tenets of judicial restraint counsel this Court not to reach for an interpretation of *Heller* that would cast aside longstanding judicial support for restrictions on the use of guns on government grounds, or the government's authority to regulate its public housing property – especially given *Heller*'s embrace of those restrictions and repeated statements limiting its holding to *self-defense* in the home.

First, the state's constitutional authority to regulate the use of its property is well-established. In *Adderley v Florida*, the Supreme Court expressly proclaimed "[t]he United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose." 87 S. Ct. at 247. Upholding Florida's enforcement of state trespass laws, the Court articulated the state's authority, as landowner, to govern its grounds. It directly asserted that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 242; *see also Greer v. Spock*, 96 S. Ct. 1211, 1217 (1976); *United States v. Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986); *Knolls Action Project v. Knolls Atomic Power Lab*, 771 F.2d 46, 50 (2d Cir. 1985).

Gun owners bear no special exemption from this authority. In fact, courts pre- and post-*Heller* have applied similar reasoning to uphold restrictions on gun carrying on government property. Most recently, the Fifth Circuit dismissed a Second Amendment challenge to regulations banning handgun carrying on Postal Service property. *United States v. Dorosan*, 2009 WL 3294733, at *1. The court did not merely rely on general principles of public safety. Rather, as in *Adderley*, it cited the government's additional proprietary interest in regulating its grounds. Thus, the court held that the Postal Service's permissible "restrictions on guns

stemmed from *its constitutional authority as property owner.*" *Id.* (emphasis added); *see also*

Jamie Wershbale, *The Second Amendment under a Government Landlord: Is There a Right to*

*Keep and Bear Legal [Fire]arms in Public Housing*, 84 ST. JOHNS L. REV. (forthcoming)

(manuscript at 24), *available at* http://ssrn.com/abstract=1555405 ("[The *Dorosan*] ruling

confirms that a government landowner may regulate its property as it sees fit.").

Recognition of government authority to regulate gun carrying on its property is hardly

novel. *Heller* highlighted it. Federal statutes codify it. *See* 18 U.S.C. § 930 (prohibiting gun

carrying in work "building[s] or part[s] thereof owned or leased by the Federal government").

And state officials recognize it. As a 2004 Tennessee Attorney General's opinion stated, for

instance:

> [State law] authorizes local, state, or federal government entities to prohibit
> anyone, *even persons with a valid handgun carrying permit*, from carrying
> weapons otherwise authorized to be possessed . . . at meetings conducted by, or
> on property owned, operated, managed by the entity, or under its control.

Possession of Firearms on Publicly Owned Property, Tenn. Opp. Att'y Gen. No. 04-020

(February 9, 2004) (emphasis added).

The fact of the matter is that state control of gun use on its property is neither new nor

unique. Nor should it be. Yet with the weight of law against them, Plaintiffs assert that WHA

exceeded its authority and contravened state law by enforcing restrictions on the use of guns for

non-defensive purposes on its property. But they cite no case, statute, or regulation that would

divest the state, through its public housing authority ("PHA"), of the power to regulate its

property as its sees fit. Nor do they articulate any grounds upon which to establish a

constitutional right to use guns on government property. And, as elaborated below, they take no

account of WHA's federally mandated duty to effectuate crime prevention regulations on its

public housing properties. They do not, because they cannot.

Plaintiffs' reach for a constitutional right to carry and use guns on public housing property fails for a second reason. PHAs are statutorily empowered – and required – to impose conditions on the use of their grounds in the interests of safety and crime prevention. And courts have repeatedly affirmed their constitutional to right to exercise that right by, among other things, enforcing restrictions on the use of guns.

PHAs are governed by unique combinations of federal, state, and local regulations. Jointly overseen by HUD, state and local authorities, they bear responsibility for day-to-day management of their developments, and are required under federal law to design crime prevention plans in conjunction with local government. *See* 42 U.S.C. 1437c-1(d)(14) (requiring PHAs to devise a "safety and crime prevention plan" that "shall provide, on a project-by-project or jurisdiction-wide basis, for measures to ensure the safety of public housing residents"). Contrary to Plaintiffs' representation, they play a fundamental role in establishing public housing safety and crime prevention policy – without which, the regulatory scheme would not function. In that capacity, they enforce admission requirements to screen out persons with criminal backgrounds, including those engaged in illegal drug use or drug-related criminal activity and registered sex offenders. *See* 24 C.F.R. 960.204(a). And they have expended significant human and financial resources to prevent public housing crime. *See* U.S. Dept. of Hous. & Urban Dev., *Crossfire*, at 21 (recognizing that PHAs "spent well over $4 billion on crime reduction and prevention efforts" over the span of a decade). Plaintiffs' assertion that they lack authority to regulate gun use on the grounds fails to recognize PHAs' statutory mandate, and the breadth of their efforts to prevent crime and protect residents.

Furthermore, courts have repeatedly upheld states' constitutional authority to enforce terms of use of their public housing facilities in the interests of safety. *See Thompson v. Ashe*,

250 F.3d. at 407 (recognizing the constitutionality and "legitimate governmental purpose" and "goal" of regulations aimed at "the suppression and prevention of crime in public housing"); *Daniel v. City of Tampa*, 38 F.3d at 550 (upholding constitutionality of housing authority trespass regulations as "a reasonable means of combating drug and crime problems on the property"); *see also Chavez v. Hous. Auth. of El Paso*, 973 F.2d at 1248-49.

That authority includes the right to enforce specific gun restrictions. In *Richmond Tenants Org. v. Richmond Redev. & Hous. Auth.*, for example, the court held that a PHA ban on "the use and/or possession on Management's property of guns, firearms (operable or inoperable), nunchucks, or similar instruments" would be constitutional. 751 F. Supp. 1204, 1214 (E.D. Va. 1990). In support, it explained:

> The prohibition on the use and/or possession of various firearms is rationally related to the strong [PHA] interest in reducing crime and violence. There is substantial evidence that eliminating guns will reduce crime in the developments and reduce accidental death. Despite conflicting expert testimony, this Court finds that a prohibition of firearms from public housing is a reasonable lease term within the meaning of [the Housing Act of 1937].

*Id.* Courts have long recognized state authority to control its grounds, and PHA authority to regulate public housing safety. This Court should follow suit, and uphold the WHA regulations.

### B. The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public.

Numerous courts – both state and federal – have held that the right recognized in *Heller* and *McDonald* is confined to the home. *See, e.g., People v. Dawson*, 934 N.E.2d 598, 605-606 (Ill. App. Ct. 2010) ("*Heller* specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home, not the right to possess handguns outside of the home in case of confrontation. . . . The *McDonald* Court refused to expand on this right."); *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009) ("[i]t is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the

- 11 -

home for self-defense purposes."); *Gonzalez v. Village of West Milwaukee*, 2010 WL 1904977, at *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *United States v. Hart*, 726 F. Supp. 2d 56, 60 (D. Mass. 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Williams v. State*, 2011 WL 13746, at *7 (Md. Ct. App. Jan. 5, 2011) ("[*Heller*] reiterated that regulatory schemes . . . prohibiting wearing, carrying, or transporting handguns in various public places outside of the home, were permissible"); *Dorr v. Weber*, 2010 WL 1976743, at *8 (N.D. Iowa May 18, 2010) ("A right to carry a concealed weapon under the Second Amendment has not been recognized to date"); *Teng v. Town of Kensington*, 2010 WL 596526 (D. N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright prohibition on carrying concealed weapons" as "presumptively lawful". . . far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.") (internal citation omitted); *People v. Perkins*, 62 A.D.3d 1160, 1161 (N.Y App. Div. 2009) ("New York's licensing requirement remains an acceptable means of regulating the possession of firearms" because it "does not effect a complete ban on handguns and is, therefore not a "severe restriction" improperly infringing upon defendant's Second Amendment rights"); *Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008) (Second Amendment does not "compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined."); *Riddick v. United States*, 995 A.2d 212, 222 (D.C. 2010) (same); *Howerton v. United States*, 964 A.2d 1282, 1287 (D.C. 2009) ("In *Heller*, the issue was the constitutionality of the District of Columbia's ban on "the possession of usable handguns *in the home*"); *Little v. United States*, 989 A.2d 1096, 1101 (D.C. 2010) (same); *In re Factor*, 2010 WL 1753307, at *3 (N.J. Sup. Ct. Apr. 21, 2010) ("[T]he United States Supreme Court has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons."); *see also United States v. Tooley*, 717 F. Supp. 2d 580, 596 (S.D. W.Va. 2010); ("Additionally, possession of a firearm outside of the home or for purposes other than self-defense in the

- 12 -

home are not within the "core" of the Second Amendment right as defined by *Heller.* "). And in *Digiacinto v. George Mason Univ.*, 2011 WL 111584, at *4 (Va. Jan. 13, 2011), the court held that regulations restricting the carrying of firearms in sensitive places are "presumptively legal."

There are, in addition, profound public safety rationales for restricting the carry and use of guns on public housing grounds for non-defensive purposes. Gun violence has and continues to pose a unique threat to public housing residents. In a comprehensive analysis of public housing gun violence in the late 1990s, HUD found that "public housing residents are suffering greatly from the effects of firearm-related crimes and in numbers out of proportion to their overall representation in society as a whole." U.S. Dept. of Hous. & Urban Dev., *Crossfire*, at 14. The study noted that by decade's end, "66 of the Nation's 100 largest public housing authorities . . . [experienced an] average of nearly one gun-related homicide per day." *Id.* Even as HUD and PHA anti-crime initiatives helped foster a decline, the study concluded, gun violence persisted at unacceptably high rates:

> Public housing authorities and their residents, however, continue to experience significant gun violence. The widespread availability and easy access to firearms particularly among youthful offenders, have fueled crime rates in public housing communities that are higher than national averages and are often higher than crime rates in the surrounding municipalities. . . . For too may of the nation's 2.6 million residents of public housing, the continuing high incidence of gun-related violence imposes a devastating number of deaths, as well as injuries and physical and physic trauma. These effects are particularly destructive for the over 1 million children and 360,00 elderly residents.

*Id.* at 5. In light of improving, but still troubling statistics, local officials nationwide have since rallied to support PHA regulations on gun use. In 2009, the United States Conference of Mayors declared efforts to "bar public housing authorities from restricting gun ownership among public housing residents" a "mov[e] in the wrong direction" that would undermine "a practice that has been in place in some areas for a decade or more and has helped to make these projects a safer place to live." Press Release, U.S. Conference of Mayors, The Nation's Mayors Oppose Thune Amendment, Actions to Weaken Gun Safety Laws (July 20, 2009), *available at*

- 13 -

http://usmayors.org/pressreleases/uploads/RELEASENICKELSONTHUNEGUNAMENDMEN T72009.pdf; *see also* Firearms, Vehicle Towing, Guests, and Security Deposits on Leased Property, Tenn. Op. Att'y. Gen. No. 09-170 (Oct. 26, 2009) (noting generally that "[a] landlord can prohibit tenant, including those who hold handgun carry permits, from possessing firearms within the leased premises"). This position is prescient. The persistence of gun violence, and well-being of public housing residents, counsels *against* needless expansion of gun carrying on PHA grounds. And certainly not for reasons other then self-defense, which lie far beyond the scope of the Second Amendment.

The dangers here are compounded, because Plaintiffs not only seek a broad right to carry on public housing grounds, but to do so in common areas *outside* their apartments and more easily accessible to the public. In other words, they do not seek a limited right to use in the confines of their own individual homes. This raises a separate concern, as courts post-*Heller* recognize, because gun carrying in more public spaces presents unique dangers:

> Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means of preventing physical harm to persons other than the offender. A person who carries a concealed firearm on his person . . . which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety.

*People v. Yarbrough*, 169 Cal. App. 4th 303, 314 (2008) (internal quotations and citations omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (there is an "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor"). The carrying of firearms in public or common spaces poses a number of issues and challenges not presented by the possession of firearms in one's apartment. Three issues, in particular, are worthy of note.

First, when firearms are carried in more public spaces, the safety of a broader range of individuals is threatened. While firearms kept inside one's home are primarily a threat to their owners, family members, friends, and houseguests, firearms carried in common areas are a threat to unrelated bystanders, including children, other tenants, other visitors, law enforcement officers

and random passersby.  One study has shown, for instance, that "[b]etween May 2007 and April

2009, concealed handgun permit holders shot and killed 7 law enforcement officers and 42

private citizens."  Violence Policy Center, *Law Enforcement and Private Citizens Killed by*

*Concealed Handgun Permit Holders*, July 2009.  States, therefore, have a stronger need to

protect their citizens from individuals carrying guns in common areas, than they do from

individuals keeping guns inside their homes.

Second, the carrying of firearms in more public spaces is not a useful or effective form of

self-defense and, in fact, has been shown in a number of studies to *increase* the chances that one

will fall victim to violent crime.  One study, for instance, found that "gun possession by urban

adults was associated with a significantly increased risk of being shot in an assault," and that

"guns did not protect those who possessed them from being shot in an assault."  Charles C.

Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, AMER. J. PUB.

HEALTH, vol. 99, No. 11 at 1, 4 (Nov. 2009).  Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of
> running into an armed victim was very or somewhat important in their own choice
> to use a gun.  Currently, criminals use guns in only about 25 percent of
> noncommercial robberies and 5 percent of assaults.  If increased gun carrying
> among potential victims causes criminals to carry guns more often themselves, or
> become quicker to use guns to avert armed self-defense, the end result could be
> that street crime becomes more lethal.

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare*

*Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms has other negative implications for a number of social

issues and societal ills that are not impacted by the private possession of handguns inside the

home.  As courts recognize, when carrying is restricted, "possession of a concealed firearm by an

individual in public is sufficient to create a reasonable suspicion that the individual may be

dangerous, such that an officer can approach the individual and briefly detain him in order to

investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957,

959 (Pa. 1991); *see also Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. 1996) ("officer's

observance of an individual's possession of a firearm in a public place in Philadelphia is

sufficient to create reasonable suspicion to detain that individual for further investigation"). PHAs and HUD have worked diligently with law enforcement officials to implement crime prevention plans. Their efforts have been credited with helping to decrease public housing gun violence. *See* U.S. Dept. of Hous. & Urban Dev., *Crossfire*, at 7-8; Press Release, U.S. Conference of Mayors. Yet law enforcement's ability to protect the public could be greatly restricted if officers were required to effectively presume that a person carrying a firearm well outside his apartment, and in the presence of unrelated bystanders, was doing so lawfully. Under such a legal regime, it is possible that an officer would not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public. And an increase in gun prevalence in such spaces may cause an intensification of criminal violence. Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379, 387 (2006).

The regulations at issue here lessen many of these risks, without implicating the Second Amendment activity protected in *Heller*. WHA tenants who are not otherwise disqualified by operation of law and who can demonstrate that they can possess and use firearms responsibly are allowed to maintain handguns to protect themselves in the home. *Heller* simply provides no basis for expanding that authority into a broad constitutional right to carry and use guns for non-defensive purposes on state-owned and managed public housing property.

## II.    EVEN IF THE WHA FIREARMS AND WEAPONS REGULATIONS DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, THEY WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.

In choosing a level of scrutiny appropriate for Second Amendment challenges, courts need not – and should not – limit themselves to the choices utilized in First Amendment jurisprudence: strict scrutiny, intermediate scrutiny, or rational basis review. While these levels of scrutiny may seem to be the easiest and most obvious options in picking a standard of review, key differences between the First and Second Amendments suggest that using one of these three levels of scrutiny is *not*, in fact, an appropriate choice. The exercise of Second Amendment

rights creates unique risks that threaten the safety of the community and can be far more lethal than even the most dangerous speech. While "words can never hurt me," guns are designed to inflict grievous injury and death – and often do. To protect the public from the risks of gun violence – unlike the significantly more modest risks posed by free speech – states must be allowed wide latitude in exercising their police power authority. Otherwise, the exercise of Second Amendment rights could infringe on the most fundamental rights of others – the preservation of life.

The Supreme Court, moreover, has not limited itself to these three levels of scrutiny in the past, but has instead fashioned a wide variety of standards of review that are tailored to specific constitutional inquiries.[3] For all these reasons, a standard of review specific to the Second Amendment context is warranted here, particularly given the Supreme Court's recognition that an individual's right to bear arms must be evaluated in light of a state's competing interest in public safety. To that end, *amicus* respectfully suggests that this Court apply the test that state courts throughout the country have crafted and utilized for over a century in construing the right to keep and bear arms under state constitutions: the "reasonable regulation" test.

**A.     The Reasonable Regulation Test is the Appropriate Standard of Review.**

While courts are just beginning to grapple with a private right to arms under the federal Constitution, courts have construed analogous state provisions for over a century. Over forty states have constitutional right-to-keep-and-bear-arms provisions, and despite significant differences in the political backdrop, timing, and texts of these provisions, the courts in these states have, with remarkable unanimity, coalesced around a single standard for reviewing

---

[3] *See, e.g., Kennedy v. Louisiana*, 128 S. Ct. 2641, 2649 (2008) (affirming that the Eighth Amendment's prohibition of cruel and unusual punishment should be measured by an "evolving standards of decency" test); *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) (applying an "undue burden" test to determine whether a statute jeopardized a woman's right to choose); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that determinations of procedural due process require a balancing of three competing interests); *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (upholding a "stop and frisk" under the Fourth Amendment where an officer had "reasonable grounds" to believe a suspect was armed and dangerous).

limitations on the right to bear arms: the "reasonable regulation" test. *See* Adam Winkler,

*Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 686-87, n. 12 (2007) (describing

"hundreds of opinions" by state supreme courts with "surprisingly little variation" that have

adopted the "reasonableness" standard of review for right-to-bear-arms cases). Under the

reasonable regulation test, a state "may regulate the exercise of [the] right [to bear arms] under

its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City*

*& County of Denver*, 874 P.2d 325, 328, 333 n. 10 (Colo. 1994).[4]  More demanding than rational

basis review, but more deferential than intermediate scrutiny, this "reasonable regulation" test

protects Second Amendment activity without unduly restricting states from protecting the public

from gun violence. The test recognizes "the state's right, indeed its duty under its inherent police

power, to make reasonable regulations for the purpose of protecting the health, safety, and

welfare of the people." *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989). The reasonable

regulation test, which was specifically designed for cases construing the right to keep and bear

arms and has been adopted by the vast majority of states, remains the standard of review best-

suited for Second Amendment cases after *Heller* and for the case at hand.

The reasonable regulation test is a more heightened form of scrutiny than the rational

basis test that the majority opinion in *Heller* rejected (and is more demanding than the "interest

balancing" test suggested by Justice Breyer in dissent) because it does not permit states to

prohibit all firearm ownership. *See* Eugene Volokh, *Implementing the Right to Keep and Bear*

*Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV.

1443, 1458 (2009). Instead, it "focuses on the balance of the interests at stake, rather than

merely on whether any conceivable rationale exists under which the legislature may have

concluded the law could promote the public welfare." *State v. Cole*, 665 N.W. 2d 328, 338 (Wis.

---

[4] *See also Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007) (the relevant inquiry is "whether the statute at issue is a 'reasonable' limitation upon the right to bear arms"); *Jackson v. State*, 68 So.2d 850, 852 (Ala. Ct. App. 1953) ("It is uniformly recognized that the constitutional guarantee of the right of a citizen to bear arms, in defense of himself and the State . . . is subject to reasonable regulation by the State under its police power.").

2003). Laws and regulations governing the use and possession of firearms thus must meet a higher threshold under the reasonable regulation test than they would under rational basis review.

Although the reasonable regulation test may be more deferential than intermediate or strict scrutiny, it is not toothless. Under the test, laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of a Second Amendment right, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), must be struck down. Laws that are reasonably designed to further public safety, by contrast, are upheld. *See, e.g., Robertson v. City & County of Denver*, 874 P.2d at 328, 330 n. 10 ("The state may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable."); *Jackson*, 68 So.2d at 852 (same); *Bleiler v. Chief, Dover Police Dep't*, 927 A.2d at 1223 (same).

Nor would adopting the reasonable regulation test here be at odds with district or Third Circuit courts that have elected to use intermediate scrutiny following *Heller*. In virtually every such post-*Heller* case, the court adopting intermediate scrutiny was evaluating a particular provision of 18 U.S.C. § 922, the federal firearms statute that imposes restrictions on broad classes of individuals and types of arms. *See, e.g., Marzzarella*, 2010 WL 2947233 at *1 (evaluating § 922(k) barring possession of a handgun with an obliterated serial number); *United States v. Yanez-Vasquez*, 2010 WL 411112 (D. Kan. Jan. 28, 2010) (evaluating § 922(g)(5) barring illegal aliens from possessing firearms); *United States v. Miller*, 604 F. Supp. 2d 1162, 1164 (W.D. Tenn. 2009) (evaluating § 922(g) barring felons from possessing firearms); *United States v. Bledsoe*, 2008 WL 3538717, *1 (W.D. Tex. 2008) (evaluating § 922(x) barring juveniles from possessing firearms). [5] By contrast, the WHA regulations do not bar any types of

---

[5] The only exception appears to be a recent case in the United States District Court for the District of Columbia, *Heller v. District of Columbia* ("*Heller II*"), in which the plaintiffs challenged (1) the District of Columbia's firearm registration procedures, (2) the District's prohibition on assault weapons, and (3) the District's prohibition on large capacity ammunition feeding devices. 698 F. Supp. 2d 179, 181 (D.D.C. 2010). But even in that case, two of the three provisions that the district court was evaluating were broad restrictions on entire classes of firearms. *Id.*

legal weapons or prohibit any category of person from possessing a firearm. They merely require that those who use and carry guns on public housing property, including common spaces, do so for self-defense. Heightened scrutiny – like intermediate scrutiny – is less appropriate here.

**B.    The PHA Regulations Demand Appropriate Deference**

As stated above, PHAs operate pursuant to federal, state, and local regulations. And they are mandated by Congress to exercise crime prevention duties. The origins of this collaborative state-federal-local framework date back to the Housing Act of 1937, 42 U.S.C. 1437 *et seq.*, and continue to propel the nation's efforts to provide safe and affordable housing. As the state entity most engaged in the day-to-day operations of public housing facilities, PHAs have a vested, and statutorily supported, interest in maintaining the safety of the housing facilities they oversee.

Further, as a state entity, they share the state's profound governmental interest in regulating the possession and use of firearms. States have "cardinal civil responsibilities" to protect the health, safety, and welfare of their citizens. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008); *see also Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946) ("[T]he legislature may choose not to take the chance that human life will be lost . . . ."). States are thus generally afforded "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . ." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted). Regulations on the carrying of firearms are an essential exercise of those powers, for the "promotion of safety of persons and property is unquestionably at the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

While individuals and organizations may differ on the net risks posed by guns in our society, such disagreement underlines that firearm regulation is best suited for the legislative arena, not the courts. *See United States v. Miller*, 604 F. Supp. 2d 1162, 1172 n. 13 (W.D. Tenn. 2009) ("[D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches."). Indeed, legislatures are designed to make empirical judgments about the need for and efficacy of regulation, even when that regulation

affects the exercise of constitutional rights. *See, e.g., Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (legislatures are "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon legislative questions."); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) ("Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good within their respective spheres of authority.") (internal quotations and citations omitted). State governments "must [thus] be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.*, 427 U.S 50, 71 (1976).

Here, PHAs do not act in vacuum. Rather, their regulatory authority, and implementing measures, realize the federal, state, and local goal of fostering safe affordable housing. Congress, and state and local legislatures, have long relied on this framework – the burden would be too great for any one level of government to sustain. The risks posed by invalidating or unduly restricting PHA judgments on firearms regulations are severe, and courts should review them with an appropriate amount of deference. Here, too, therefore, the reasonable regulation test is better situated than either intermediate or strict scrutiny. It would allow for different PHA regulations depending on the needs of the particular state or locale, and recognizes the strong interest of the state in protecting its citizens rather than being overly focused on a narrow means-end nexus of the challenged regulation.

**C.    The WHA Firearms and Weapons Regulations are Constitutionally Permissible.**

The WHA firearms and weapons regulations pass the reasonable regulation test, and would also pass more demanding levels of scrutiny,[6] as they demonstrate the required fit

---

[6] Indeed, a number of courts have found that the protection of the public from firearm violence is an important government interest, *see, e.g., Heller II*, 698 F. Supp. 2d at 186; *Miller*, 604 F.Supp.2d at 1171; *Bledsoe*, 2008 WL 3538717 at *4, and upheld statutes that impose much broader restrictions on an individual's ability to possess and carry firearms. *See, e.g., Marzzarella*, 2010 WL 2947233 at *7; *Heller II*, 698 F. Supp. 2d at 197; *State v. Sieyes*, 225 P.3d 995, 995 (Wash. 2010); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1233 (D. Utah 2009); *Yanez-Vasquez*, 2010 WL 411112 at *3; *Miller*, 604 F.Supp.2d at 1171-72; *United States*

between the law and the interest served.  In fact, Courts have repeatedly recognized a compelling

"interest in protecting the public from the hazards involved with certain types of weapons, such

as guns," *State v. Cole*, 665 N.W. 2d 328, 344 (Wis. 2003), particularly given "the danger [posed

by the] widespread presence of weapons in public places and [the need for] police protection

against attack in these places." *Id.* (internal quotations omitted).

Indeed, as discussed above, there is strong sociological and statistical evidence which

suggests that restrictions that make it more difficult for someone to carry a gun in spaces open to

the public reduce both the number of gun deaths and criminal access to firearms. *See, e.g.*, D.W.

Webster, *et al.*, *Relationship Between Licensing, Registration, and Other State Gun Sales Laws

and the Source State of Crime Guns*, 7 INJURY PREVENTION 184 (2001); D.W. Webster, *et al.*,

*Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J.

URBAN HEALTH: BULLETIN OF THE N.Y. ACAD. OF MED. 525 (2009); Weil & Knox, *Effects of

Limiting Handgun Purchases on Interstate Transfer of Handguns*, 275 J. AM. MED. ASSOC. 1759

(1996).  Moreover, as noted above, these provisions do not amount to an outright ban on

qualified adults possessing or carrying firearms on WHA grounds, and thus do not even

approach the blanket prohibition on handgun ownership that the Supreme Court struck down in

*Heller*. *See Heller*, 128 S. Ct. at 2788.  Plaintiffs remain free to own handguns and exercise the

right, enunciated in *Heller*, to keep and use those guns for self-defense in the home.  The

regulations at issue only require them to refrain from discharging, or carrying and using them in

common areas, for non-defensive purposes.  These are reasonable restrictions designed to ensure

---

*v. McCane*, 573 F.3d 1037, 1050 (10th Cir. 2009); *United States v. Masciandaro*, 648 F. Supp.
2d 779, 789-91 (E.D. Va. 2009); *United States v. Radencich*, 2009 WL 127648 (N.D. Ind. Jan.
20, 2009); *United States v. Schultz*, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009); *People v. Flores*,
169 Cal. App. 4th 568, 574-75 (2008).

that individuals who carry concealed weapons can do so safely and responsibly.  The Court should uphold them.

## CONCLUSION

For all the foregoing reasons, the Court should find that WHA firearms and weapons regulations are constitutional.

Dated: February 21, 2011                     Respectfully submitted,

                                             POTTER ANDERSON & CORROON LLP


                                              */s/ Suzanne Hill Holly*
                                             Richard L. Horwitz (Del. Bar No. 2246)
                                             Laurie Selber Silverstein (Del. Bar No. 2396)
                                             Suzanne Hill Holly (Del. Bar No. 4414)
                                             Hercules Plaza
                                             1313 North Market Street, 6th Floor
                                             Wilmington, DE 19801
                                             Telephone: (302) 984-6027
                                             Facsimile: (302) 658-1192

                                             Adam K. Levin
                                             S. Chartey Quarcoo
                                             Hogan Lovells US LLP
                                             555 13th Street, NW
                                             Washington, DC 20004
                                             Telephone: (202) 637-5600
                                             Facsimile: (202) 637-5910

                                             Jonathan E. Lowy
                                             Daniel R. Vice
                                             Brady Center to Prevent Gun Violence
                                             Legal Action Project
                                             1225 Eye Street, NW, Suite 1100
                                             Washington, DC 20005
                                             Telephone: (202) 289-7319
                                             Facsimile: (202) 898-0059

                                             *Counsel for Amicus Curiae*