## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JANE DOE and CHARLES BOONE, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 1:10-cv-00473-LPS |
| | : | |
| WILMINGTON HOUSING AUTHORITY and | : | **PUBLIC VERSION FILED:** |
| FREDERICK S. PURNELL, SR., in his official | : | **FEBRUARY 25, 2011** |
| capacity as executive director of the | : | |
| Wilmington Housing Authority, | : | |
| | : | |
| Defendants. | : | |

## OPENING BRIEF IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

FOX ROTHSCHILD LLP
Francis G.X. Pileggi (Del. Bar No. 2624)
Austen C. Endersby (Del. Bar No. 5161)
Citizens Bank Center
919 North Market Street, Suite 1300
Wilmington, Delaware  19801
(302) 655-3667

*Attorneys for Plaintiffs Jane Doe*
*and Charles Boone*

Dated:  February 21, 2011

## TABLE OF CONTENTS

**Page**

I.      NATURE AND STAGE OF THE PROCEEDINGS ..........................................................1

II.     SUMMARY OF ARGUMENT .....................................................................................2

III.    STATEMENT OF UNDISPUTED FACTS ....................................................................2

        A.    The Parties ...........................................................................................................2

        B.    The Firearms Policies at Issue ............................................................................3

IV.     ARGUMENT

        A.    Legal Standard:  Summary Judgment ..................................................................5

        B.    The Original Policies and the New Policy Violate the U.S. Constitution ..............5

              1.    *The Second Amendment* ............................................................................5

              2.    *The Original Policies Violate the U.S. Constitution* ...................................8

              3.    *The New Policy Violates the U.S. Constitution* ........................................10

                    a.    *The Common Area Provision does not pass constitutional
                          muster under strict scrutiny* ..........................................................10

                    b.    *The Common Area Provision does not pass constitutional
                          muster under intermediate scrutiny* ...............................................13

                    c.    *The New Policy is constitutionally infirm because it
                          requires Plaintiffs to trade a fundamental right for a
                          government benefit* ........................................................................14

        C.    A Judicial Determination on the Constitutionality of the Original
              Policies is Warranted ........................................................................................15

        D.    The Original Policies and the New Policy Violate the Delaware
              Constitution......................................................................................................17

        E.    The Original Policies and the New Policy are Preempted by State Law ...............18

V.      CONCLUSION....................................................................................................20

## **TABLE OF AUTHORITIES**

<u>CASE</u>                                                                                                                        <u>PAGE</u>

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996).........................................................................................................15

*Cantinca v. Fontana,*
    884 A.2d 468 (Del. 2005) ..............................................................................................18

*City of Chicago v. Morales,*
    527 U.S. 41 (1999).........................................................................................................13

*City of Mesquite v. Aladdin's Castle, Inc.,*
    455 U.S. 283 (1982).......................................................................................................16

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)............................................................................................. *passim*

*Elrod v. Burns,*
    427 U.S. 347 (1976).......................................................................................................15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC),*
    528 U.S. 167 (2000).......................................................................................................16

*Holt v. Richmond Redev. & Hous. Auth.,*
    266 F. Supp. 397 (E.D. Va. 1966) .................................................................................15

*Korematsu v. United States,*
    323 U.S. 214 (1944).........................................................................................................9

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986).........................................................................................................5

*McDonald v. City of Chicago,*
    130 S.Ct. 3020 (2010)........................................................................................4, 6, 8, 10

*National Rifle Ass'n of America, Inc. v. Nagin,*
    2005 WL 2428840 (E.D. La. Sept. 23, 2005) ...............................................................15

*People Against Police Violence v. City of Pittsburgh,*
    520 F.3d 226 (3d Cir. 2008)...........................................................................................16

*Planned Parenthood of Central New Jersey v. Farmer,*
    220 F. 3d 127 (3d Cir. 2000)..........................................................................................12

*Radulski v. Del. State Hosp. ex rel. Div. of Alcoholism, Drug Abuse, & Mental Health,*
    541 A.2d 562 (Del. 1988) ..............................................................................................16

*Terry v. Ohio*,
    392 U.S. 1 (1968) ........................................................................................................19

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*,
    450 U.S. 707 (1981) ....................................................................................................10

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ................................................................................. *passim*

*United States v. Skoien*,
    587 F.3d 803 (7th Cir. 2009) ................................................................................11, 14

*Valhal Corp. v. Sullivan Assocs., Inc.*,
    44 F.3d 195 (3d Cir. 1995) .............................................................................................5

*Watson v. Stone*,
    4 So.2d 700 (Fla. 1941) ................................................................................................8

*Wilmington Housing Authority v. Williamson*,
    228 A. 782 (Del. 1967) ................................................................................................2


**CONSTITUTIONAL PROVISIONS**

DEL. CONST. art. I, § 20 ......................................................................................................17

U.S. CONST. amend II ................................................................................................. *passim*

U.S. CONST. amend. XIV .....................................................................................................6

U.S. CONST. art. III, § 2 .....................................................................................................16


**STATUTES AND RULES**

9 *Del. C.* § 330(c) ..............................................................................................................20

11 *Del. C.* §§ 1441 .......................................................................................................18, 19

11 *Del. C.* §§ 1441A ....................................................................................................18, 19

11 *Del. C.* §§ 1442 .......................................................................................................18, 19

11 *Del. C.* § 1444 ..............................................................................................................19

11 *Del. C.* § 1448 ..............................................................................................................19

WM1A 989394v1 02/25/11

11 *Del. C.* § 1448A ......................................................................................................................19

22 *Del. C.* § 111 ..........................................................................................................................19

24 *Del. C.* §§ 901 ......................................................................................................................18

24 *Del. C.* §§ 902 ......................................................................................................................18

24 *Del. C.* § 903 ........................................................................................................................18

24 *Del. C.* §§ 904 ......................................................................................................................18

24 *Del. C.* §§ 904A ....................................................................................................................18

31 *Del. C.* § 4302 ....................................................................................................................3, 7

31 *Del. C.* § 4308 ........................................................................................................................2

42 U.S.C. § 1983 ..........................................................................................................................1

FED. R. CIV. P. 56 ........................................................................................................................5

## OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (2d pocket ed. 2001) ........................................................................13

RANDY J. HOLLAND, THE DELAWARE CONSTITUTION:  A REFERENCE GUIDE (2002) ...................17

REPORT OF THE JOINT COMMITTEE ON RECONSTRUCTION, H.R. REP. NO. 30, 39th Cong.,
     1st Sess. (1866) ....................................................................................................................8

I.      **NATURE AND STAGE OF THE PROCEEDINGS**

On May 26, 2010, Plaintiffs Jane Doe ("Ms. Doe") and shortly thereafter Charles Boone ("Mr. Boone") (collectively, "Plaintiffs"), residents of residential properties managed or operated by Defendant Wilmington Housing Authority ("WHA"), brought this civil rights action against the WHA and the WHA's Executive Director Frederick S. Purnell, Sr. ("Purnell") (collectively, "Defendants") pursuant to 42 U.S.C. § 1983,[1] seeking to invalidate firearms policies promulgated by Defendants which infringe Plaintiffs' fundamental right to keep and bear arms guaranteed by the Second Amendment to the Constitution of the United States ("Second Amendment"), and pursuant to State law for violations of the Delaware Constitution.[2]  Plaintiffs filed a Motion for Partial Summary Judgment on August 27, 2010.  (D.I. 25.)

On September 7, 2010, this Court stayed this action "in light of the upcoming October 15, 2010 hearing of the [WHA] Board of Commissioners to consider proposed revisions to Defendant's policies relating to gun possession."  (D.I. 29.)  Because Defendants' revised policy continues to violate Plaintiffs' constitutional rights, Plaintiffs filed a Second Amended Complaint ("Complaint") on December 6, 2010.  (D.I. 40.)  Defendants filed their Second Amended Answer and Affirmative Defenses ("Answer") on December 20, 2010.  (D.I. 47.)  The parties served written discovery in December 2010 and January 2011, and conducted depositions in January 2011.  On February 21, 2011, Plaintiffs filed a Motion for Summary Judgment.  This is Plaintiffs' Opening Brief in support of their Motion for Summary Judgment.

---

[1]  Section 1983 provides in pertinent part:  "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress . . . ."  42 U.S.C. § 1983.
[2]  This action was originally filed in the Court of Chancery, but was removed to this Court on June 1, 2010.

## II.   SUMMARY OF ARGUMENT

Plaintiffs are challenging the constitutionality of: (1) Defendants' original firearms policies, which imposed a complete ban on all firearms in residential units managed or operated by WHA; and (2) Defendants' revised policy, which curtails Plaintiffs' right to defend themselves with lawfully possessed firearms in the "common areas" of their places of residence.

1.   Defendants' original policies and revised policy violate Plaintiffs' fundamental right to keep and bear arms guaranteed by the Second Amendment.  Defendants' policies do not pass constitutional muster under strict or intermediate scrutiny.

2.   This Court should rule on the constitutionality of the original policies that Defendants have revised, otherwise Plaintiffs will have no judicial protection if Defendants return to their prior unconstitutional conduct.

3.   Defendants' policies violate the Delaware Constitution.

4.   Defendants' policies are preempted by the comprehensive state regulatory scheme enacted by the Delaware General Assembly which governs the use and possession of firearms.

## III.   STATEMENT OF UNDISPUTED FACTS

### A.   The Parties

Defendant WHA "is a non-profit organization that provides housing to thousands of low-income families and individuals in the City of Wilmington."  (Declaration of Frederick S. Purnell, Sr. (D.I. 20), at ¶ 1.)  The WHA is a "state agency" upon which the legislature has conferred "extensive powers," including "the power to acquire property, to remove substandard conditions, to construct facilities, to borrow money, and to sue and be sued."  *See Wilmington Housing Authority v. Williamson,* 228 A. 782, 786-787 (Del. 1967); *see also* 31 *Del. C.* § 4308. The WHA was created to exercise these powers in furtherance of its legislative purpose, which

includes, *inter alia*, "engag[ing] in low-rent housing" and "operat[ing] housing accommodations." *See* 31 *Del. C.* § 4302.

Defendant Purnell is the Executive Director of the WHA. He is "responsible for oversight of the entire WHA organization as well as the administration and application of WHA's policies." (*See* D.I. 20 at ¶ 1.)

Plaintiff Ms. Doe is an elderly, law-abiding resident of The Park View, a high-rise building managed by WHA which houses "residents . . . age[d] 62 and older." (*See id.* at ¶¶ 2-3; *see also* D.I. 40 at ¶¶ 1, 12.) Plaintiff Mr. Boone is an elderly, law-abiding resident of Southbridge Apartments, a public housing facility owned and administered by the WHA. (*See* D.I. 40 at ¶¶ 2, 25.)

**B.      The Firearms Policies at Issue**

Residents of The Park View are required to abide by the facility's "House Rules." The original lease that Ms. Doe signed with The Park View contained a provision called House Rule 24 which provided that: "Tenant is <u>not permitted to display or use any firearms</u>, BB guns, pellet guns, slingshots, or other weapons on the premises." (emphasis added) (*See* D.I. 20-5 at 6) ("Original House Rule 24") (Exhibit A). Residents of Southbridge Apartments must abide by the provisions set forth in the standard WHA lease agreement. The original WHA lease agreement that Mr. Boone signed for the Southbridge Apartments contained a provision which obligated residents "[n]ot to display, use, or possess or allow members of Resident's household or guests to display, use or possess any firearms, (operable or inoperable) or other dangerous instruments or deadly weapons as defined by the laws of the State of Delaware anywhere on the property of the Authority." (*See* WHA lease, Section IX.P) ("Original WHA Policy")[3]

---

[3] Together, the "Original House Rule 24" and "Original WHA Policy" shall hereinafter be referred to as the "Original Policies."

3

(Exhibit B).   The WHA and Park View leases contained provisions when this suit was filed which would have prevented Plaintiffs from using a lawfully possessed firearm in their homes for self-defense through the threat of eviction.[4]

After Plaintiffs initiated this lawsuit and filed a Motion for Preliminary Injunction, and after Defendants filed their original Answer denying all claims, Defendants announced on July 29, 2010 that they had reevaluated the constitutionality of the Original WHA Policy in light of "the U.S. Supreme Court decision in *MacDonald* [sic] *v. City of Chicago*."   (D.I. 20 at ¶ 21.) Defendants further stated that they "ha[d] amended House Rule 24" and that they would not enforce the Original WHA Policy "with respect to possession and use of firearms for self-defense in public housing units" pending the adoption of a new policy governing the use of firearms.   (*See* D.I. 20 at ¶¶ 13, 22, 25.)

On October 14, 2010, "WHA held a public hearing . . . to obtain comments concerning the proposed policy revisions."   (D.I. 32 at 1.)   Following the public hearing, on October 25, 2010, Defendants adopted the WHA Firearms and Weapons Policy ("New Policy") (Exhibit C) and implemented it in all WHA-operated dwellings, including Southbridge Apartments.   (*See id.*) On December 13, 2010, Defendants replaced The Park View's Original House Rule 24 with the New Policy.   (D.I. 47 at ¶ 18.)   The New Policy states, in relevant part:

> Residents, members of a resident's household, and guests:
> . . .
> (3) Shall not display or carry a firearm or other weapon in any common area, except where the firearm or other weapon is being transported to or from the resident's unit, or is being used in self-defense (hereinafter, "Common Area Provision");

---

[4]   *See* Park View Lease (Ex. A) at ¶ 19(c)(1) ("The Landlord may terminate this Agreement prior to the expiration of the lease for:   (1) The Tenant's material noncompliance with the terms of this lease including the general restrictions and rules . . . ."); *see also* WHA lease (Ex. B), Section XIV(A) ("This Lease may be terminated for serious <u>or</u> repeated violations of material terms of the Lease, or failure to fulfill Resident obligations set forth in Section IX and other terms and conditions herein, or for other good cause.") (emphasis in original).

4

> (4) Shall have available for inspection a copy of any permit, license, or other documentation required by state, local, or federal law for the ownership, possession, or transportation of any firearm or other weapon, including a license to carry a concealed weapon as required by 11 *Del. C.* § 1441, upon request, when there is reasonable cause to believe that the law or this Policy has been violated. (hereinafter, "Reasonable Cause Provision").

(*See* Ex. C at ¶¶ 3 and 4.)[5]  Violations of the New Policy could result in eviction. (*Id.* at 2.)

## IV.    ARGUMENT

### A.    Legal Standard:  Summary Judgment

Summary judgment should be granted where the evidence establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See* FED. R. CIV. P. 56(c); *see also Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 200 (3d Cir. 1995).[6]  Here, there are no genuine issues of material fact, and as explained below, Plaintiffs are entitled to judgment as a matter of law.

### B.    The Original Policies and the New Policy Violate the U.S. Constitution

#### 1.    *The Second Amendment*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the U.S. Supreme Court announced that the Second Amendment protects an individual right to possess and use a firearm for self-defense within the home and for other lawful purposes.  The *Heller* Court invalidated a

---

[5]  Plaintiff is challenging only paragraphs 3 and 4 of the New Policy.
[6]  Further, in determining whether there is a genuine issue of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party.  *See Valhal*, 44 F.3d at 200.  To survive a motion for summary judgment, "the non-moving party must come forward with specific facts showing that there is a genuine issue for trial."  *See* FED. R. CIV. P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

District of Columbia gun control law which "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Heller*, 554 U.S. at 628.

As to the D.C. law's prohibition of handguns, the Court held that "[u]nder any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights, banning from the home [a handgun] for protection of one's home and family would fail constitutional muster." *Id.* (quotation omitted).  The Court further concluded that the D.C. law's requirement that lawful firearms be kept inoperable at all times "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." *Id.* at 630.

In so holding, the Court noted that "it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right" to keep and bear arms.  *Id.* at 592 (emphasis in original).  In addition, the Court emphasized that "the inherent right of self-defense has been central to the Second Amendment right," and that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms <u>in defense of hearth and home</u>." *Id.* at 628, 635 (emphasis added).

In *McDonald v. Chicago*, the Supreme Court held that "the Due Process Clause of the Fourteenth Amendment[7] incorporates the Second Amendment right recognized in *Heller*." 130 S.Ct. 3020, 3050 (2010).  Thus, "the Second Amendment is fully applicable to the States." *Id.* at 2036.  State agencies such as the WHA accordingly are subject to federal constitutional

---

[7] The Fourteenth Amendment to the Constitution of the United States provides:  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV.

challenges if they take action that infringes on the fundamental right to keep and bear arms guaranteed by the Second Amendment.[8]

Although the Supreme Court made clear in *Heller* that a complete ban on handguns in the home for protection would fail constitutional muster "[u]nder any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights," *Heller*, 554 U.S. at 628, and that rational basis review would never be appropriate in the Second Amendment context, *see id.* at 628 n.27, the Court did not establish in *Heller* or *McDonald* a rigid test for determining whether strict or intermediate scrutiny would apply in a given Second Amendment challenge. In *United States v. Marzzarella*, a case regarding the constitutionality of a regulation which criminalized the possession of a firearm with an obliterated serial number, the Third Circuit adopted the following framework for determining the appropriate standard of review:

> As we read *Heller*, it suggests a two-pronged approach to Second Amendment challenges. First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. . . . If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.

614 F.3d 85, 89 (3d Cir. 2010) (citations omitted). Acknowledging that "the right to free speech, an undeniably enumerated fundamental right, . . . is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue," the court reasoned that there is "no reason why the Second Amendment would be any different." *See id.* at 96-97.

The court concluded that strict scrutiny review is appropriate where the challenged law "severely limit[s] the possession of firearms," such as the D.C. law in *Heller* which "did not just

---

[8] WHA owns and operates the Southbridge Apartments, and manages The Park View. Residents of both properties are required to abide by WHA's policies. WHA—a state agency subject to the Fourteenth Amendment—is therefore "engaging in low-rent housing" and "operating housing accommodations" within the meaning of 31 *Del. C.* § 4302.

regulate possession of handguns; it prohibited it, even for the stated fundamental interest protected by the right – the defense of hearth and home." *See id.* at 97. Laws that "regulat[e] . . . the manner in which persons may lawfully exercise their Second Amendment Rights," however, "should merit intermediate, rather than strict, scrutiny." *See id.* (applying intermediate scrutiny to law prohibiting possession of firearm with obliterated serial number).

## 2.    *The Original Policies Violate the U.S. Constitution*

The Original Policies prohibited outright the lawful use and possession of firearms on all premises operated and managed by the WHA, including within residential units.[9] Through the threat of eviction, those policies prevented Plaintiffs from using a lawfully-possessed firearm in self-defense in their own homes.

Defendants have all but conceded that the Original Policies are unconstitutional, stating:

> On June 28, 2010, the Supreme Court issued a decision entitled *McDonald v. City of Chicago*. That decision holds that the Second Amendment to the United States Constitution is applicable to State and local governments. As a result, questions were raised about the permissibility of the ban on the use and possession of firearms imposed by the WHA's public housing lease.[10] In response, WHA

---

[9] In discussing the history and purpose of the Fourteenth Amendment, the Court in *McDonald* traced the post-Civil War history of prohibitions on firearms in the South, noting: "The laws of some States formally prohibited African Americans from possessing firearms." *McDonald*, 130 S.Ct. at 3038; *see also id.* at 3039 (citing Report of the Joint Committee on Reconstruction, H.R. Rep. No. 30, 39th Cong., 1st Sess. (1866)). That 1866 Report described peonage contracts in which plantation employers agreed to furnish each family with quarters on their plantations, but forbade them from "hav[ing] fire-arms in their possession, even for proper purposes." H.R. REP. No. 30, pt. 2, at 240 (1866). *McDonald* explained that the Fourteenth Amendment was designed to remedy such discriminatory practices, noting that "[i]n debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection." *McDonald*, 130 S.Ct. at 3041. The Original Policies and the New Policy are reminiscent of the firearms ban imposed by the peonage contracts and other post-Civil War deprivations of rights, and thus contravene Congress's intent in adopting the Fourteenth Amendment. *See generally Watson v. Stone*, 4 So.2d. 700, 703 (Fla. 1941) (Buford, J., concurring) (discussing disparate impact on minorities of restrictions on Second Amendment rights, indicative of post-Civil War efforts to limit the right to bear arms).

[10] In truth, "questions were raised" regarding the constitutionality of the Original Policies, and their compliance with state law well before the *McDonald* decision, and Purnell admitted in an e-mail months before *McDonald* that the Original Policies violate pre-existing state law. *See infra* at 18.

8

> drafted and distributed for public comment a new firearms and
> weapons policy.

(D.I. 32 at 4).  It is clear that Defendants abandoned their Original Policies and adopted the New

Policy because they had grave doubts as to the constitutionality of the Original Policies.

Indeed, under *Heller* and *Marzzarella*, the Original Policies fail to pass constitutional

muster.  Keeping in mind that "the Second Amendment protects the right of law-abiding citizens

to possess [handguns] for self-defense in the home," *see Marzzarella*, 614 F.3d at 92, it is

indisputable that the Original Policies "impose[d] a burden on conduct falling within the scope of

the Second Amendment's guarantee." *See id*. at 89.  And because the Original Policies imposed

a complete ban on the lawful use and possession of firearms in the home, strict scrutiny is the

appropriate standard of review. *See id*. at 97.

"For a law to pass muster under strict scrutiny, it must be 'narrowly tailored to serve a

compelling state interest.'" *Id*. at 99 (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 465

(2007)).  A state interest is "compelling" if it involves issues of "[p]ressing public necessity. . . ."

*See, e.g.*, *Korematsu v. United States*, 323 U.S. 214, 216 (1944).

Defendants simply cannot meet this standard.  Instead, Defendants abandoned their

Original Policies in favor of the New Policy, which they purportedly <u>hoped</u> would be free from

constitutional infirmities.  (It is not.)  Indeed, Defendants have not articulated a single reason—

let alone a "compelling" one—for having implemented a policy which prohibited WHA tenants

from using lawfully-possessed firearms for self-defense in their own residential units.

Even if Defendants were able to identify a "compelling" state interest which justified

implementing the Original Policies, any argument by Defendants that the Original Policies were

narrowly tailored, or provided the "least restrictive means"[11] of accomplishing their goal, would defy logic, as Defendants eventually amended their policy to remove the complete ban.

In sum, the Original Policies "fail constitutional muster" "[u]nder any of the standards of scrutiny that [the Supreme Court has] applied to enumerated constitutional rights," as they "ban[ned] from the home [a firearm] for protection of one's home and family. . . ." *See Heller*, 554 U.S. at 628.   Accordingly, this Court should hold that the Original Policies violate the Plaintiffs' fundamental right to keep and bear arms guaranteed by the Second Amendment.[12]

### 3.   *The New Policy Violates the U.S. Constitution*

Defendants' New Policy continues to violate Plaintiffs' Second Amendment rights.[13] Under the New Policy's Common Area Provision, residents are forbidden from "display[ing] or carry[ing] a firearm or other weapon in any common area, except where the firearm or other weapon is being transported to or from the resident's unit, or is being used in self-defense." (*See* Ex. C at ¶ 3).  This provision contravenes the Supreme Court's "central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 130 S.Ct. at 3044.

        a.   *The Common Area Provision does not pass constitutional muster under strict scrutiny*

Under *Marzzarella*, the New Policy's Common Area Provision unquestionably

---

[11]  *See, e.g., Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").

[12]  As discussed in Section IV.C, the issue of the constitutionality of the Original Policies is not moot.

[13]  Paragraph 1 of the New Policy provides that WHA residents "Shall comply with all local, state, and federal legal requirements applicable to the ownership, possession, transportation, and use of firearms or other weapons. . . ." (*See* Ex. C at ¶ 1.)  Defendants should have stopped there; it was unnecessary for Defendants to further restrict Plaintiffs' possession and use of firearms by adding the Common Area Provision.  Indeed, in response to a Second Amendment challenge, the San Francisco Housing Authority amended its firearms policy to prohibit only those activities which violate applicable law.  (*See* Stipulation Re: Settlement and Dismissal of Defendants San Francisco Housing Authority and Henry Alvarez III Without Prejudice; *see also* San Francisco Housing Authority Dwelling Lease or Hope VI Developments, at ¶ 15) (Exhibit D).

"impose[s] a burden on conduct falling within the scope of the Second Amendment's guarantee." *See Marzzarella*, 614 F.3d at 89.  That provision therefore must be "evaluate[d] . . . under some form of means-end scrutiny."  *See id.*  The Common Area Provision is subject to strict scrutiny because it does not merely "regulat[e] the manner in which persons may lawfully exercise their Second Amendment Rights."  *See id.* at 97.  Rather, it effectively eliminates a WHA resident's ability to defend herself with a firearm in the "common areas" of her residential facility, "mak[ing] it [virtually] impossible for [her] to use [arms] for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.  Accordingly, strict scrutiny is warranted.[14]  *See United States v. Skoien*, 587 F.3d 803, 812 (7th Cir. 2009) (vacated on other grounds) (strict scrutiny applies to laws that "severely burden the core Second Amendment right of armed defense").

As with the Original Policies, Defendants cannot meet their burden to show that the New Policy's Common Area Provision is narrowly tailored to serve a compelling state interest, and, thus, that provision does not pass constitutional muster under strict scrutiny.  First, Defendants have not identified a compelling state interest that the Common Area Provision purportedly was designed to address.

Second, even if Defendants were able to articulate a compelling state interest, the Common Area Provision would not satisfy the "narrow tailoring" requirement because it is nonsensical on its face, and it produces an absurd result in practice.  As it is written, the Common Area Provision prohibits residents from carrying a firearm in the common areas unless it is being transported to or from the resident's unit, <u>or</u> is being used in self-defense.  But because residents are not permitted to carry firearms in the common areas in the first place (except for the

---

[14]   In the analogous First Amendment context, a hypothetical lease provision forbidding residents from speaking aloud in common areas unless traveling to and from their apartment would be reviewed under the strict scrutiny standard, as such a provision would serve to suppress all speech in common areas, despite one negligible exception.

11

limited purpose of transporting them to or from residential units), it would be impossible for a resident to use a firearm in self-defense in the common areas should the need arise, and be in compliance with the New Policy.  Defendants even admitted that residents cannot use firearms in self-defense in common areas under the New Policy.[15]  The Third Circuit has struck down similarly nonsensical statutes.  *See Planned Parenthood of Central New Jersey v. Farmer*, 220 F. 3d 127, 144 (3d Cir. 2000) (invalidating the New Jersey Partial-Birth Abortion Ban Act of 1997, noting that "[e]stablishing the cervix as the demarcation line between abortion and infanticide is nonsensical on its face as well as inaccurate because that line may be crossed in any number of abortion procedures which the Legislature concedes are constitutionally protected").

Indeed, there are only two circumstances in which a resident may use his firearm in self-defense in the common areas without running afoul of the New Policy: (1) if, while he is transporting his firearm to or from his unit, he is attacked in a common area, and while in transit uses the firearm in self-defense; or (2) if he is attacked in a common area, flees to his apartment, is chased down by the attacker, and manages to retreive his firearm just in time to use it in self-defense.[16]  The Common Area Provision therefore produces an absurd result in practice, as it affords Plaintiffs the full scope of their Second Amendment rights only when transporting a firearm to or from their units, yet denies those same protections when they prepare meals in the communal kitchen, watch movies in the community room, or fold clothes in the laundry room.

In addition, as a practical matter, a resident's vulnerability to robbery or other attack is perhaps most acute <u>outside</u> of his or her residential unit, such as while lounging around the premises or going to visit another resident.

---

[15]  *See* Langdon Dep. 52:3-13, Jan. 27, 2011 ███████████████████████████████████████ ████████████████████████████████████████ (deposition excerpt attached as Exhibit E).

[16]  If the resident fled the common area, retrieved his firearm from his unit, and then re-entered the common area to use it against his attacker, the shooting likely would not be deemed "self-defense."

At bottom, the Common Area Provision is illogical and contradictory on its face, it would produce an absurd result in practice, and it does not afford Plaintiffs the full scope of their fundamental right to keep and bear arms as articulated in *Heller*.  Thus, Defendants cannot meet their burden to show that the Common Area Provision is narrowly tailored to achieve a compelling state interest.[17]   Accordingly, the Common Area Provision violates the Second Amendment and should be invalidated.

        b.      *The Common Area Provision does not pass constitutional muster under intermediate scrutiny*

Even if this Court were to conclude that strict scrutiny does not apply, the New Policy would not pass constitutional muster under intermediate scrutiny.  To withstand intermediate scrutiny, Defendants must establish that the New Policy serves an "important," "significant," or "substantial" government interest, and that there is a "reasonable fit" between the New Policy and the asserted governmental interest.  *See Marzzarella*, 614 F.3d at 98.

Defendants have not made Plaintiffs aware of any governmental objective that the

---

[17]   It is also noteworthy that several WHA commissioners could not agree with one another as to the meaning of the term "common area."  *See* Purnell Dep. 82:3–84:14, Jan. 24, 2011 (stating that the courtyards of the Southbridge Apartments are considered a "common area" under the New Policy, but that the steps leading up to an individual unit are not); Spellman Dep. 77:6-78:5, Jan. 31, 2011 (stating that the courtyards of the Southbridge Apartments are not considered a "common area" under the New Policy); Miller Dep. 43:6-21, Jan. 26, 2011 (stating ▮▮▮▮▮▮▮ as to whether the steps leading up to an individual unit in the Southbridge Apartments are considered a "common area" under the New Policy) (deposition excerpts attached as Exhibit F); *compare* definition of "curtilage": "The land or yard adjoining a house, usu. within an enclosure." BLACK'S LAW DICTIONARY 168 (2d pocket ed. 2001). Thus, the term "common area" is open to conflicting interpretations and accordingly is vague. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

  *Cf.*, deposition testimony of WHA commissioners revealing conflicting interpretations of the phrase "reasonable cause" and uncertainty regarding the scope of their authority under the Reasonable Cause Provision: Winston Dep. 64:12-15, Jan. 25, 2011 (testifying ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also* Miller Dep. 49:17-50:7, Jan. 26, 2011 (testifying that she is "not sure" whether a building manager has the authority to determine whether "reasonable cause" exists); Purnell Dep. 111:15-125:18, Jan. 24, 2011 (testifying that the property manager of each building, <u>and</u> James Berrien, has the authority to determine whether "reasonable cause" exists (117:14-118:8), but also testifying that <u>only</u> the property manager has the authority to determine whether "reasonable cause" exists (125:8-18)) (deposition excerpts attached as Exhibit G.)

Common Area Provision may have been designed to fulfill.   Indeed, several WHA commissioners have revealed that they do not know the purpose behind the New Policy.[18]

Even if Defendants were able to articulate an important state interest (such as, e.g., safety), they would not be able to show a "reasonable fit" between the regulation and the asserted governmental goal for the same reasons they fail to satisfy the "narrow tailoring" requirement of the strict scrutiny test.  (*See supra* Sec. IV.B.3.a.)  It does not suffice merely to utter the word "safety" without establishing a nexus between the asserted governmental objective and the Common Area Provision.[19]  Critically, the WHA neglected to review any data, such as crime statistics or other information regarding other public housing authorities, which might have informed their decision as to whether the New Policy would likely achieve some governmental objective such as safety.[20]  Hence, any assertion by Defendants that there is a "reasonable fit" between the New Policy and some yet-to-be-asserted state interest should be rejected.

      c.    *The New Policy is constitutionally infirm because it requires Plaintiffs to trade a fundamental right for a government benefit*

Finally, the New Policy is unconstitutional because it improperly requires that Plaintiffs and similarly situated individuals relinquish the full measure of their fundamental right to keep and bear arms in order to receive a public benefit from Defendants.  "The denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to

---

[18]  *See* Griffiths Dep. 14:3-8, Jan. 31, 2011 (unable to recall any discussions by WHA Board of Commissioners regarding reasons why New Policy was adopted); *see also* Grober Dep. 20:18-19, Jan. 31, 2011 (when asked about the WHA's rationale behind prohibiting guns in the common area, testifying: ▮ ▮) (deposition excerpts attached as Exhibit H.)

[19]  *See Skoien*, 587 F.3d at 814 ("[T]he public benefits of the restrictions must be <u>established by evidence</u>, and <u>not just asserted</u>[;] . . . lawyers' talk is insufficient.") (emphasis added) (quotation omitted).

[20]  *See* Purnell Dep. 79:5-14, Jan. 24, 2011 (when asked whether the WHA Board of Commissioners considered any crime statistics in formulating the New Policy, testifying: ▮ ▮); *see also* Mell Dep. 110:6-12, Jan. 25, 2011 (when asked whether the WHA Board of Commissioners considered any crime statistics in formulating the New Policy, testifying: ▮ ▮); *see also* Langdon Dep. 40:4-19, Jan. 27, 2011 (testifying that paragraph 3 of the New Policy was not based on any statistics regarding its impact on crime, and was not based on any similar policy of any other housing authorities) (deposition excerpts attached as Exhibit I.)

achieve what it may not command directly." *Elrod v. Burns*, 427 U.S. 347, 361 (1976). "Even though government is under no obligation to provide a person, or the public, a particular benefit, it does not follow that conferral of the benefit may be conditioned on the surrender of a constitutional right." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996).

Plaintiffs—who by definition as residents of a WHA-managed facility cannot afford to live elsewhere—should not be forced to trade a fundamental constitutional right for a specific governmental benefit, i.e., the benefit of living in low-rent facilities operated or monitored by WHA. *See, e.g., Holt v. Richmond Redev. & Hous. Auth.*, 266 F. Supp. 397, 401 (E.D. Va. 1966) ("[A] tenant's continued occupancy in a public housing project cannot be conditioned upon the tenant's foregoing his [First Amendment] rights.").

Persons who live in public housing deserve the same legal rights to possess lawful property and to take measures to defend their lives as do persons who live in private homes. Accordingly, this Court should invalidate the New Policy because it violates Plaintiffs' fundamental right to keep and bear arms guaranteed by the Second Amendment.

### C.    A Judicial Determination on the Constitutionality of the Original Policies is Warranted

Defendants' remedial actions in response to this litigation establish that Defendants recognize that the Original Policies were and are constitutionally infirm. Defendants nonetheless refuse to agree to a stipulated injunction preventing the enforcement of the Original Policies[21]; nor will Defendants stipulate that the Original Policies are unconstitutional. Without a formal judicial order pronouncing that the Original Policies are unconstitutional (and therefore

---

[21]   In cases where defendants claim that they have no intention of enforcing a challenged rule or law, a stipulated injunction or consent order is still appropriate. For example, in *National Rifle Ass'n of America, Inc. v. Nagin*, the parties agreed to a Consent Order whereby, *inter alia*, the Mayor of New Orleans memorialized his intent not to exercise his powers under a statute which he interpreted to allow him to order the seizure of any lawfully-possessed firearm from law abiding citizens. *See* 2005 WL 2428840 (E.D. La. Sept. 23, 2005).

unenforceable), there is nothing to stop Defendants from changing their minds and reverting back to the Original Policies after this case concludes.

That Defendants have replaced their Original Policies with the New Policy does not render moot Plaintiffs' claim that the Original Policies are unconstitutional. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *see also People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 231 n.2 (3d Cir. 2008). "[I]f it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.'" *City of Mesquite*, 455 U.S. at 289 n.10 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953)).[22]

"[T]he standard [the Supreme Court] ha[s] announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv. (TOC)*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Export Assn.,* 393 U.S. 199, 203 (1968)). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Id.*

Defendants simply cannot meet their heavy burden of establishing that they "cannot reasonably be expected to" reinstate the Original Policies, and, thus, this Court has Article III jurisdiction[23] to consider Plaintiffs' claim that the Original Policies are unconstitutional. Indeed, Defendants have a long history of engaging in conduct which infringes on their tenants' Second

---

[22]   *See also Radulski v. Del. State Hosp. ex rel. Div. of Alcoholism, Drug Abuse, & Mental Health*, 541 A.2d 562, 566 (Del. 1988) ("Ordinarily, this Court will decline to decide moot issues. However, where the question is of public importance, and its impact on the law is real, this Court has recognized an exception to the above rule.") (citations omitted).
[23]   *See* U.S. CONST. art. III, § 2.

Amendment rights; their concededly unconstitutional Original Policies existed for many years prior to the filing of this action, and they rejected informal efforts prior to this suit to mend their violative restrictions.  Absent judicial action or some type of formal Order, Defendants will be free to revert back to their constitutionally infirm pre-suit policies.

Moreover, Defendants have consistently tarried, and have asked this Court to tarry, in an apparent effort to avoid a final judgment on the important issues that compelled Plaintiffs to file this action.  It is simply unfair and contrary to notions of fair play for Defendants to rebuff pre-suit efforts to change their Original Policies, and deny all allegations that the Original Policies are unconstitutional, only then to amend their Original Policies months later after forcing Plaintiffs to incur substantial effort and costs.  If courts allowed such evasiveness, Defendants would be able to avoid justice and avoid responsibility for their unconstitutional actions.

### D.       The Original Policies and the New Policy Violate the Delaware Constitution

Defendants' Original Policies and the New Policy violate Article I, § 20 of the Delaware Constitution, which provides: "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use."[24]  DEL. CONST. art. I, § 20.

Regardless of the U.S. Supreme Court's decisions in *Heller* and *McDonald*, the expanded rights afforded in Article I, § 20 should be interpreted to protect the right to keep and bear arms at least to the extent of the Second Amendment's guarantee.[25]  Indeed, Justice Randy Holland of the Delaware Supreme Court explained in 2002 that Article I, § 20 "affords greater protections under the Delaware Constitution than the protection of the Second Amendment. . . ."  RANDY J. HOLLAND, THE DELAWARE CONSTITUTION:  A REFERENCE GUIDE, 67 (2002).

---

[24]  Few cases have addressed Article I, § 20, but the language of this Delaware Constitutional provision does not require judicial gloss to convey its obvious meaning.
[25]  Plaintiffs therefore incorporate by reference their arguments in Sections IV.B.2 and IV.B.3. in support of their position that the Original Policies and New Policy violate the Delaware Constitution.

Since this action began, Plaintiffs have had (and continue to have) a separate and independent state-law basis for challenging the firearms policies at issue. Indeed, Defendants admittedly were aware, months before this action began, that their Original Policies did not comport with Delaware law. (*See* February 3, 2010 email in which Purnell expressed concern that the Original WHA Policy ████████████████████████████████████████████████ ████) (Exhibit J). Defendants therefore had no sound basis whatsoever in June 2010 to request a stay pending the Supreme Court's decision in *McDonald* given their acknowledgement that the Original Policies already violate state law.

In sum, this Court should invalidate the Original Policies and New Policy because they violate Article I, § 20 of the Delaware Constitution.

### E.    The Original Policies and the New Policy are Preempted by State Law

The restrictions on the lawful possession and use of firearms imposed by the Original Policies and New Policy are inconsistent with, and are preempted by, the comprehensive regulatory scheme promulgated by the Delaware General Assembly.  *See Cantinca v. Fontana*, 884 A.2d 468, 473 n.23 (Del. 2005) (holding that preemption may be evidenced, *inter alia*, "where the legislature has enacted a comprehensive regulatory scheme in such a manner as to demonstrate a legislative intention that the field is preempted by state law") (quotation omitted).

The Delaware General Assembly has enacted a comprehensive regulatory scheme governing the use and possession of firearms, including, but not limited to, the following regulations: a licensing requirement (24 *Del. C.* §§ 901, 902); prohibition of sales to minors or intoxicated persons (24 *Del. C.* § 903); requiring record keeping and criminal history checks (24 *Del. C.* §§ 904, 904A); requiring a license to carry a concealed weapon (11 *Del. C.* §§ 1441, 1441A, 1442); restrictions on the sale, use, and possession of sawed-off shotguns and machine

guns (11 *Del. C.* § 1444); prohibiting certain persons from owning, using or purchasing firearms (11 *Del. C.* § 1448); and requiring a criminal background check prior to purchase/sale of a firearm (11 *Del. C.* § 1448A).  The Original Policies and the New Policy's Common Area Provision regulate the use and possession of firearms to a significantly greater degree than does this regulatory scheme, and accordingly they should be invalidated.

The New Policy's Reasonable Cause Provision is also preempted by this regulatory scheme.  That provision requires residents of WHA facilities to "have available for inspection" "upon request" any weapons permit or license "when there is reasonable cause to believe that the law or [the New] Policy has been violated."  (*See* Ex. C at ¶ 4.)  While it is true that a law enforcement officer may stop an individual without probable cause to arrest if the officer has a reasonable suspicion that "criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous,"[26] Plaintiffs are not aware of any legal authority (and Defendants have provided none), that would authorize a private citizen, such as a WHA employee, to demand to inspect another private citizen's license or permit based on a suspected lease violation.[27]  The Reasonable Cause Provision is far more restrictive than the State regulations requiring concealed weapons permits.  *See* 11 *Del. C.* §§ 1441, 1441A, 1442.

Finally, it cannot be ignored that the Delaware General Assembly has expressly preempted municipalities and counties from regulating firearm possession.  Section 111 of Title 22 of the Delaware Code provides, in pertinent part:  "The municipal governments shall enact no law, ordinance or regulation prohibiting, restricting or licensing the ownership, transfer, possession or transportation of firearms or components of firearms or ammunition except that the discharge of a firearm may be regulated."  22 *Del. C.* § 111.  In addition, Section 330(c) of Title

---

[26]  *See Terry v. Ohio*, 392 U.S. 1, 30 (1968) (emphasis added).

[27]  Certainly, by analogy, a private citizen has no authority whatsoever to demand that another private citizen produce his driver's license for inspection as a condition to exercising his right to drive.

19

9 provides, in pertinent part:  "The county governments shall enact no law or regulation prohibiting, restricting or licensing the ownership, transfer, possession or transportation of firearms or components of firearms or ammunition except that the discharge of a firearm may be regulated; provided any law, ordinance or regulation incorporates the justification defenses as found in Title 11 of the Delaware Code."  9 *Del. C.* § 330(c).  Although the WHA is neither a municipal nor a county government, it makes no sense to suggest that the General Assembly intended to allow the WHA or other housing authorities in the State to restrict basic rights that cities and counties cannot lawfully restrict.

In sum, there is simply no support for the position that the General Assembly would have expected or allowed the various housing authorities throughout the State to develop their own firearms regulations, given its comprehensive regulatory scheme governing the use and possession of firearms, and its prohibition against municipalities and county governments from regulating in this field.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted, and Plaintiffs should be awarded the relief described in the form of Order provided herewith.

FOX ROTHSCHILD LLP

By:____*/s/ Francis G.X. Pileggi*_____
Francis G.X. Pileggi (Del. Bar No. 2624)
Austen C. Endersby (Del. Bar No. 5161)
Citizens Bank Center
919 North Market Street, Suite 1300
Wilmington, Delaware  19801
(302) 655-3667

*Attorneys for Plaintiffs Jane Doe
and Charles Boone*

Dated:  February 21, 2011