## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| JANE DOE and CHARLES BOONE, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 1:10-cv-00473-LPS |
| | : | |
| WILMINGTON HOUSING AUTHORITY and | : | **PUBLIC VERSION FILED:** |
| FREDERICK S. PURNELL, SR., in his official | : | **FEBRUARY 25, 2011** |
| capacity as executive director of the | : | |
| Wilmington Housing Authority, | : | |
| | : | |
| Defendants. | : | |

### EXHIBITS A TO J TO
### OPENING BRIEF IN SUPPORT OF
### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

FOX ROTHSCHILD LLP
Francis G.X. Pileggi (Del. Bar No. 2624)
Austen C. Endersby (Del. Bar No. 5161)
Citizens Bank Center
919 North Market Street, Suite 1300
Wilmington, Delaware  19801
(302) 655-3667

*Attorneys for Plaintiffs Jane Doe
and Charles Boone*

Dated:  February 21, 2011

WM1A 988948v1 02/21/11

# EXHIBIT A

### THE PARK VIEW
Electra Arms Senior Associates, L.P., Owners

Managed by Wilmington Housing Authority
400 North Walnut Street, Wilmington, DE 19801
(302) 429-6701

**LEASE/RENTAL AGREEMENT**, made the _____ day of _____ year.

1. **PARTIES AND DWELLING UNIT:** The parties to this Agreement are The Park View, referred to as the Landlord, and _____, referred to as the Tenant. Landlord leases to the Tenant unit number _____, located at 1800 North Broom Street, Wilmington, DE 19802 in the community known as The Park View.

2. **LENGTH OF TIME (TERM):** The initial term of this Agreement shall begin on _____ and end on _____. If the initial term ends and the lease/rental agreement has not been renewed or terminated, then it shall continue to successive terms of one month each, subject to the modified rent.

3. **RENT:** The tenant agrees to pay _____ Dollars $_____ for the above lease term with payments as follows: $_____ for the partial month ending on _____ and $_____ per month for the duration of the lease term. This amount is due on the first day of the month at The Park View Management Office located at 1800 North Broom Street, Wilmington, DE 19802.

4. **CHARGES FOR LATE PAYMENTS, LEGAL FEES AND RETURNED CHECKS:** If any rent payment is not received by the owner on or before the fifth (5) day of the month, the resident is responsible for paying a late charge of $10.00, which will be charged to the resident's account. The late fee will not exceed the amount allowed by law. The Landlord may collect a fee equal to the amount charged by the bank whenever a check is not honored for payment (bounces). The charges described in this paragraph are in addition to the regular monthly rent payable by the Tenant.

5. **CONDITION OF DWELLING UNIT:** By signing this Agreement, the Tenant acknowledges that the unit is safe, clean and in good condition. The Tenant agrees that all appliances and equipment in the unit are in good working order, except as described on the Unit Inspection Report, which is Attachment # 2 to this Agreement. The Tenant also agrees that the Landlord has made no promises to decorate, alter, repair or improve the unit, except as listed on the Unit Inspection Report.

6. **CHARGES FOR UTILITIES AND SERVICES:** The following chart describes how the cost of utilities and services related to occupancy of the unit will be paid. The Tenant agrees that this chart accurately describes the utilities and services paid by the Landlord and those paid by the Tenant. The Tenant must pay for the utilities checked in the column titled "Paid by Tenant". Payments should be made directly to the appropriate utility company. Failure to pay the cost of the utilities is grounds for termination of the rental agreement. The items in the column titled "Included in Tenant Rent" that are checked are included in the Tenant's rent.

| Type of Utility | Paid by Tenant | Included in Tenant Rent |
|---|---|---|
| Heat | ☐ | ☒ |
| Lights, Electric | ☐ | ☒ |
| Cooking | ☐ | ☒ |
| Water, Sewer | ☐ | ☒ |
| Trash Collection | ☐ | ☒ |

7. **SECURITY DEPOSITS:** The Tenant has deposited $_____ with the Landlord. The Landlord will hold this security deposit for the period the Tenant occupies the unit. Upon written request of the Tenant, the Landlord will provide the name of the bank where the deposit is held. After the Tenant has moved from the unit, the Landlord will determine whether the Tenant is eligible for a refund of any or all of the security deposit. The amount of the refund will be determined in accordance with the following conditions and procedures:
   a. After the Tenant has moved from the unit, the Landlord will permit the Tenant to participate in the inspection, if the Tenant so requests.

b. The Landlord will refund to the Tenant the amount of the security deposit (plus interest, at the prevailing passbook rate, beginning on the original date of move-in) less any amount needed to pay the cost of:
   1) Unpaid rent;
   2) Damages that are not due to normal wear and tear and cannot be corrected by painting and ordinary cleaning and damages which were not listed on the Unit Inspection Report completed at time of move-in;
   3) Charges for late payment of rent and returned check charges, as described in paragraph 4;
   4) Charges for unreturned keys, as described in paragraph 8;
   5) Rental due for premature termination of the rental agreement by the tenant;
   6) Reimbursement for reasonable expenses incurred in renovating and reletting the premises caused by the premature termination of the rental agreement by the tenant.

c. The Landlord agrees to refund the full amount of the security deposit stated in paragraph 7 if no charges are to be deducted from the deposit. The deposit will be refunded within the period required by State and local law, after the Tenant had permanently moved out of the unit, returned possession of the unit to the Landlord, and given his/her new address to the Landlord in writing. If any amount is deducted from the deposit, the Landlord will give the Tenant a written list of charges that were subtracted from the deposit within 20 days after the termination or expiration of the rental agreement.

d. If more than one person rents the unit, the Tenants agree that they will work out the details of dividing any refund among themselves. The Landlord may pay the refund to any Tenant identified in paragraph 1 of this Agreement.

8. **KEYS AND LOCKS:** A tenant shall have the right to install a new lock at the Tenant's cost, on the condition that (1) the Tenant notifies the Landlord in writing and supplies the Landlord with a key to the lock; (2) the new lock fits into the system already in place; and (3) the lock installation does not cause damage to the door. When the agreement ends, the Tenant agrees to return all keys to the dwelling unit to the Landlord. The Landlord may charge a reasonable fee for each key not returned.

9. **MAINTENANCE:**
   a. The Landlord agrees to:
   1) Regularly clean all common areas of the project;
   2) Maintain the common areas and facilities in a safe condition;
   3) Arrange for collection and removal of trash and garbage;
   4) Maintain all equipment and appliances in safe and working order;
   5) Make necessary repairs with reasonable promptness;

6) Maintain exterior lighting in good working order;
7) Provide extermination services, as necessary; and
8) Maintain grounds and shrubs.

b. The Tenant agrees to:

1) Keep the unit clean;
2) Use all appliances, fixtures and equipment in a safe manner and only for the purposes for which they are intended;
3) Not litter the grounds or common areas of the project;
4) Not destroy, deface, damage or remove any part of the unit, common areas, or project grounds;
5) Give the Landlord prompt notice of any defects in the plumbing, fixtures, appliances, heating and cooling equipment or any other part of the unit or related facilities, notices or any complaints against the premises;
6) Remove garbage and other waste from the unit in a clean and safe manner; and
7) Abide by actions required under State and Local codes.

10. **DAMAGES**: Whenever damage is caused by carelessness, misuse, or neglect on the part of the Tenant, his/her family, guests/ invitees, the Tenant agrees to pay:

a. The cost of all repairs and do so within 30 days after receipt of the Landlord's demand for the repair charges; and
b. Rent for the period the unit is damaged whether or not the unit is habitable.

11. **RESTRICTIONS ON ALTERATIONS**: The Tenant agrees not to do any of the following without first obtaining the Landlord's written permission:

a. Change or remove any part of the appliances, fixtures or equipment in the unit;
b. Paint or install wallpaper or contact paper in the unit;
c. Attach awnings or window guards in the unit;
d. Attach or place any fixtures, signs, or fences on the building(s), the common areas, or the project grounds;
e. Attach any shelves, screen doors, or other permanent improvements in the unit;
f. Install washing machines and dryers (unless the unit is designed for their use), fans, heaters or air conditioners in the unit; or
g. Place any aerials, antennas or other electrical connections on the unit.

12. **GENERAL RESTRICTIONS**: The Tenant must live in the unit and the unit must be the Tenant's only place of residence. The Tenant shall use the premises only as a private dwelling for himself/herself and the individuals listed on the Application Certification and Recertification of Tenant Eligibility. The Tenant may not permit other individuals to reside in the unit unless he/she has obtained the prior written approval of the Landlord. No new additions to the household will be permitted prior to the initial term ending unless extenuating circumstances deem this necessary as approved by management.

The Tenant agrees not to:

a. Sublet or assign the unit, or any part of the unit;
b. Use the unit for unlawful purposes;
c. Engage in or permit unlawful activities in the unit, in the common areas of the project grounds;
d. Have pets or animals of any kind in the unit without the prior written permission of the Landlord, but the landlord will allow the Tenant to keep an animal needed as a reasonable accommodation to the Tenant's disability, and will allow animals to accompany visitors with disabilities who need such animals as an accommodation to their disabilities; or
e. Make or permit notices or acts that will disturb the rights or comforts of neighbors. The Tenant agrees to keep the volume of any radio, phonograph, television or musical instrument at a level, which will not disturb the neighbors.
Any violation of the General Restrictions by the Tenant after having received notification to correct shall be grounds for termination of the lease/rental agreement.

13. **RULES**: The Tenant agrees to obey the House Rules, which is Attachment No. 3 to this Agreement. The Tenant agrees to obey additional rules established after the effective date of this Agreement if:

a. The rules are reasonably related to the safety, care and cleanliness of the building and the safety, comfort and convenience of the Tenant; and
b. The Tenant receives written notice of the proposed rule(s) at least 30 days before the rule is enforced.
c. Any violation of the Rules by the Tenant after having received notification to correct shall be grounds for termination of the lease/rental agreement.

14. **REGULARLY SCHEDULED RECERTIFICATION**: Every year approximately three to four months prior to the expiration of this lease, the Landlord will request the Tenant to report the income and composition of the Tenant's household and to supply any other information required for the purposes of determining the Tenant's eligibility for the rental benefits of the Section 42 Low Income Housing Tax Credit Program. The Tenant agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request. The Landlord will verify the information supplied by the Tenant and use the verified information to re-determine eligibility for the Low Income Housing Tax Credit Program. If any Tenant does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may begin action to terminate the Lease Agreement.

15. **TRANSFERS**: The Tenant agrees that this rental agreement is only for the unit identified in this contract. Any request for a transfer will be considered in accordance with company policy. The Tenant agrees to move within 30 days after the Landlord notifies him/her that a unit of the required size is available within the project.

16. **ACCESS BY LANDLORD**: The Landlord agrees to enter the unit only during reasonable hours, and to provide forty-eight hours advance written notice of his/her intent to enter the unit, except for emergencies and in accordance with local code requirements and exceptions:

a. The Tenant agrees to permit the Landlord, his/her agents or other persons, when authorized by the Landlord, to enter the unit for the purpose of making reasonable repairs and periodic inspections.
b. After the Tenant has given notice of intent to move, the Tenant agrees to permit the Landlord to show the unit to prospective tenants during reasonable hours.
c. If the Tenant moves before this Agreement ends, the Landlord may enter the unit to decorate, remodel, alter or otherwise prepare the unit for re-occupancy.

17. **DISCRIMINATION PROHIBITED**: The Landlord agrees not to discriminate based upon race, color, religion, creed, national origin, sex, age, handicap, familial status or membership in any other protected class as may be defined by Federal or State law.

18. **CHANGES IN RENTAL AGREEMENT**: The Landlord may change the terms and conditions of this Agreement. Any changes will become effective only at the end of the initial term or a successive term. The Landlord must notify the Tenant of any change and must offer the Tenant a new Agreement or an amendment to the existing Agreement. The Tenant must receive the notice at least 60 days before the proposed effective date of the change. The Tenant may accept the changed terms and conditions by signing the new Agreement or the amendment to the existing Agreement and returning it to the Landlord. The Tenant may reject the changed terms and conditions by giving the Landlord written notice that he/she intends to terminate the tenancy. The Tenant must give such notice at least 45 days before the proposed change will go into effect. If the Tenant does not accept the amended agreement the Landlord may require the Tenant to move from the project.

19. **TERMINATION OF TENANCY**:

a. If the Tenant elects to terminate this agreement at the expiration of the lease term addressed in paragraph 2, the Tenant must give the Landlord 60 day written notice before moving from the unit.
b. If the Landlord elects to not renew this Agreement at the expiration of the lease term, the Landlord agrees to give the Tenant written notice of the termination. Notices of the termination must be

given in accordance with any time frames set forth in State and Local law.

  c.  Any termination of the Agreement by the Landlord must be carried out in accordance with State and Local law, and the terms of this Agreement. The Landlord may terminate this Agreement prior to the expiration of the lease for:

1) The Tenant's material noncompliance with the terms of this lease including the general restrictions and rules;

2) The Tenant's material failure to carry out obligations under any State Landlord and Tenant Act;

3) Drug related criminal activity engaged in, near or on the premises, by any tenant, household member, guest, or by any other person under the tenant's control;

4) Landlord has determined that a household member is illegally using a drug;

5) Landlord has determined that a pattern of illegal drug use interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents;

6) Criminal activity by any tenant, household member, guest or by another person under the tenant's control that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents or by persons residing in the immediate vicinity of the premises.

7) Tenant is fleeing to avoid prosecution, custody, or confinement after conviction or attempt to commit a crime that is considered to be a felony under the laws of the place from where the individual flees;

8) Tenant is violating a condition of probation or parole under Federal or State law;

9) Landlord has determined that a household member's abuse or pattern of abuse of alcohol threatens the health, safety, or right to peaceful enjoyment of the premises by other residents;

10) Landlord has determined that the tenant, any household member, guest or any other person under the tenant's control has engaged in the criminal activity, regardless of whether an arrest or conviction for such activity has been made.

11) Other good cause, which includes but is not limited to the Tenant's refusal to accept the Landlord's proposed change to this Agreement. Terminations for "other good cause' may only be effective as of the end of any initial or successive term.

Material noncompliance includes but is not limited to: nonpayment of rent beyond any grace period available under State law, failure to reimburse the Landlord within 30 days for repairs made under paragraph 10 of this Agreement; repeated late payments of rent; permitting unauthorized person(s) to live in the unit; serious or repeated damage to the unit or common areas; creation of a physical hazard or other hazards that will increase the project's insurance premium; serious or repeated violations of the rental agreement that disrupt the livability of the project, adversely affect the health or safety of any person or have an adverse financial effect on the project, interfere with the management of the project or interfere with the rights and quiet enjoyment of other tenants; giving the Landlord false information regarding income or other factors considered in determining the Tenant's eligibility and rent; failure of the Tenant to timely supply all required information on the income, composition, or eligibility factors of the Tenant's household as required by paragraph 14 of the lease.

20. **HAZARDS**: The Tenant shall not undertake or permit his/her family or guests to undertake, any hazardous acts or do anything that will increase the project's fire insurance premiums. If the unit is damaged by fire, wind, or rain to the extent that the unit cannot be lived in and the damage is not caused or made worse by the Tenant, the Tenant will be responsible for rent only up to the date of the destruction. Additional rent will not accrue until the unit has been repaired to a livable condition. Tenant will pay pro-rata rent for any partial use of the property still permitted after a hazard.

21. **PENALTIES FOR SUBMITTING FALSE INFORMATION**: If the Tenant deliberately submits false information regarding income, family composition or other data in

which the Tenant's eligibility or rent is determined, the Landlord may begin action to terminate this rental agreement. In addition, the Tenant could become subject to penalties available under law for providing false information.

22. **CONTENTS OF THIS AGREEMENT**: This Agreement and its attachments make up the entire agreement between the Tenant and the Landlord regarding the unit. If any Court declares a particular provision of this Agreement to be invalid or illegal, all other terms of this Agreement will remain in effect and both the Landlord and the Tenant will continue to be bound by them.

23. **FULL-TIME STUDENT CLAUSE**: The Tenant certified that the household meets one of the following criteria at time of lease signing:

  a.  All household members are NOT full-time students; or

  b.  The household contains all students and at least one student is part-time or one household member meets one of the student exceptions:

    i. A student receiving assistance under Title IV of the Social Security Act or Temporary Assistance for Needy Families;

    ii. A student enrolled in a job training program and receiving assistance under the Job Training Partnership Act or under other similar Federal, State or local laws;

    iii. Housing unit is occupied entirely by full-time students and such students are single parents and his or her minor children and no other tenants are dependents of a third party;

    iv. Students married and filing a joint return. (NOTE: Married students must have filed a joint tax return prior to moving into the unit or at the time of application.); or

  c.  The household contains all full-time students and at least one child who is not a full-time student (children living in Tax Credit properties are considered to be full-time students when they enter first grade, unless kindergarten is mandatory under state law).

24. **ATTACHMENTS TO THIS AGREEMENT**: The Tenant certified that he/she has received and read a copy of this Agreement and the following Attachments to this Agreement and understands that these Attachments are part of this Agreement.

- Attachment No. 1 – Rental Application and Certification of Tenant Eligibility for the Section 42 LIHTC Program
- Attachment No. 2 – Unit Inspection Report
- Attachment No. 3 – House Rules
- Attachment No. 4 – Anti-Drug Lease Addendum
- Attachment No. 5 – Occupancy Rules and Regulations
- Attachment No. 6 – Pet Ownership Rules
- Attachment No. 7 – Accessible Unit Addendum
- Attachment No. 8 – Summary of the State Landlord/Tenant Code (if required by code)

25. **GOVERNING LAW**: The Landlord Tenant Code of the State in which the rental unit is located, as it may be amended from time to time, shall govern this rental agreement. Any amendments or revisions to the Landlord Tenant Code shall be effective as to this rental agreement at the earlier of renewal or as indicated in the legislation.

26. **SIGNATURES**:

TENANT
BY:

1. _____
                  Date signed

2. _____
                  Date signed

LANDLORD
BY:

1. _____
                  Date signed

 The Park View does not discriminate on the basis of race, color, religion, sex, national origin, age, disability, or familial status.

## HOUSE RULES
### LEASE ATTACHMENT NUMBER 3

1. Exterior of grounds and any public area within the development shall be kept free of any personal property (including furniture).

2. Exterior plantings of any kind shall be subject to the approval of management.

3. Building management does not insure personal property. All residents are urged to obtain renter's insurance coverage through a private insurance company.

4. Vehicles not properly registered or in good working order are not permitted on the premises. Car repairs are not to be done on the premises. Washing of cars on the premises is not permitted. Only one (1) vehicle per licensed member of the family is allowed on the premises.

5. No flammable materials are permitted in the unit or in the storage areas.

6. Tenants will abide by all rules pertaining to common use activities rooms such as: hours and operations for laundry rooms, community rooms, workout rooms, etc.

7. All trash, garbage and other waste shall be disposed of in a clean/safe manner and deposited in the appropriate receptacle(s) as defined by management. Individual trash and garbage containers are not permitted in public halls (where applicable) or outside the buildings.

8. Tenants shall abide by the directions of management for the proper operation of heat, ventilation and air conditioning.

9. No signs, notices or advertising is permitted on any part of the building or unit without prior approval of management.

10. Tenants shall not shake from any window, door, or balcony any carpet, bed clothing or other articles or sweep any dirt or other matter from the rental unit into any entrance way or hall.

11. Only the customary bed and furniture is permitted. No water beds or jell beds or any other such bed or furniture is permitted without proof of liability insurance (updated annually).

12. Where tenant has been granted a utility allowance, the tenant is responsible to pay all applicable utility bills for the dwelling unit. Failure to pay utility bills which results in a cutoff or proposed cutoff of services shall be considered a threat to the dwelling unit and building and a cause for lease termination.

13. No playing of any kind (which shall include ball playing) is permitted in the parking areas or roadways. All play shall be in the areas designated by management.

14. Children (including visitor's children) must be properly supervised at all times. A curfew on the grounds of 10:00 p.m. is enforced for all children under the age of 18 or in accordance with applicable state/local laws.

15. Tenant must not disconnect smoke detector or carbon monoxide detector, remove batteries where applicable, or cover detector at any time. Tenants will notify management immediately if detectors malfunction/fail to operate and/or if fire extinguisher is used.

16. No accumulation of papers, rags, boxes, etc., will be permitted in any part of the unit.

17. Either residents or their guests shall not loiter or gather on the grounds. Visitors are restricted to the apartment, which they are visiting.

18. Landlord will provide Pest Control Services. Tenant agrees to permit the exterminator to enter the unit for inspection and treatment. The tenant agrees to abide by management's instruction(s) for preparing the unit for treatment. Repeated failure to cooperate according to the Landlord's instruction shall be considered material non-compliance with the lease and grounds for termination of the rental agreement.

19. Tenant will not allow anyone not included in Certification/Recertification to use his/her unit when tenant is not on premises nor allow anyone to use his/her address for the regular receipt of mail.

20. Tenant is responsible for the actions of friends/relatives/visitors while they are on premises. Any violation of restrictions (Lease and any addendum to Lease) by such visitor, friends, relatives, etc., with or without tenant's permission will be considered as material non-compliance and tenant accepts responsibility whether or not tenant is on premises at time of such violations.

21. All visitors must have their own separate legal residence. Guests and visitors are expected to follow all house rules. A "visit" of more than 14 days (consecutive or not) within any 45-day period constitutes unauthorized occupancy and is a violation of the lease.

    If management has any reason to suspect that a tenant is housing an unauthorized guest or guests, the tenant must prove to management that person has a permanent residence elsewhere. If a tenant doesn't provide acceptable proof within 14 days from the date of management's request, management may begin eviction proceedings for material noncompliance in accordance with the lease agreement. Acceptable proof may consist of (but is not limited to) the following:

    A. Valid lease with a valid rent receipt for the current month;
    B. Copy of a utility bill for the current month showing the person's name and address (electric, gas, phone, cable);
    C. Current paycheck stub showing name and address
    D. Current bank statement showing name and address
    E. Car registration showing name and address;
    F. Copy of a mortgage coupon showing name and address.

22. Any criminal offense under law committed by a tenant or tenant's guest(s), which impairs the physical and/or social environment and which occurs on or about the leased premises or on or about any location within the housing development shall be cause for management to terminate the lease. In addition, when any tenant is

Incarcerated for any criminal act deemed to be of a potentially threatening nature to the community such tenant is in violation of Paragraph 13 of the lease (unit rented shall be the tenants only place of residence) and shall be cause for management to terminate lease.

23. Tenant shall be responsible for removal of any discards (furniture, mattresses, etc.) from the premises. Such discards shall not be placed in public areas (i.e., laundry room, community room, dumpster areas, etc.).

24. Tenant is not permitted to display or use any firearms, BB guns, pellet guns, slingshots, or other weapons on the premises.

25. The lease may be terminated by management for serious or repeated violation of material terms of the lease such as failure to fulfill the tenant obligations set forth in his/her lease or for other good cause.

Such violations of material terms shall include but not be limited to:

   a) Repeated late payment of rent or other charges due by the fifth of the month. Repeated late payments of rent are defined as paying the full month's rent after the 5th of the month four or more times in any twelve-month period.

   b) The unlawful use, sale or possession of drugs or drug paraphernalia in a unit and/or seizure of drugs in a unit by a law enforcement officer.

   c) Conviction of any person(s) as defined in paragraph 19 and 20 above, of a crime related to illegal use, possession or trafficking of drugs while on the premises. (Premises included individual units, public areas, grounds and facilities held out for use by tenants generally throughout the development).

   d) A fire resulting from carelessness, negligence, or unattended cooking (any fire directly caused by action(s) of tenant(s)).

26. Trailers, boats, campers, tractors and all terrain vehicles are not permitted on premises or common areas without prior consent of management.

27. Babysitting or any other business conducted out of the unit or on the premises is not permitted.

28. All tenant's guests or visitors who remain within the premises for a period in excess of twenty-four (24) hours must register with the management office and be granted consent. Prior to any additions to the household composition, the resident must obtain management's written approval. Any addition to the household composition that is an adult, age 62 or older, as defined by State or local law must fill out an application and be approved by management in accordance with the screening criteria prior to moving in.

29. Tenants are obligated to comply with all local recycling laws. If a fine is assessed to the property, it will be allotted equally to all residents unless the person or persons responsible are positively identified.

30. In the event a resident chooses to vacate the unit, they must comply with the following:

   a) Notice must be in writing.

   b) A 60-day notice is required. Any notice given after the first day of the month does not begin until the first of the following month. Example: notice given March 10th – 60-day notice begins April 1st.

   c) Resident is responsible for the rent and any utilities through the expiration of the 60-day notice or until such time a replacement resident moves into the unit.

31. The resident agrees to cooperate with Management in all Landlord-Tenant related matters and resident agrees not to interfere with the management of the development. Cooperation includes, but is not limited to, signing all forms in the time frame required which relate to eligibility and residency, appearing at the scheduled time for interviews, recertification and other housing related appointments and answering all questions that relate to eligibility determination. Improper behavior such as abusive or threatening language or actions is not permitted. Failure to cooperate with Management shall be considered material non-compliance with the lease and is grounds for termination.

32. There is a $10 charge for lockouts after normal business hours until 11:00 p.m.; between the hours of 11:00 p.m. and 7:00 a.m. the lockout fee is $20.

33. Tenants will be properly attired when in common areas.

34. Door-to-door soliciting is not permitted within the apartment community. Residents are requested to notify management immediately when solicitors appear at the door.


_____                    _____
Applicant Signature                                                   Date


_____                    _____
Spouse/co-head Signature                                              Date


_____                    _____
Management Signature                                                  Date

EXHIBIT B

RECEIVED

JAN 1 1 2011

# LEASE

# AND

# GRIEVANCE PROCEDURE

# FOR

# PUBLIC HOUSING RESIDENTS



## REVISED September 1, 2008

**WILMINGTON HOUSING AUTHORITY**
**400 NORTH WALNUT STREET**
**WILMINGTON, DE 19801**
**(302) 429-6700**

D000001

WILMINGTON HOUSING AUTHORITY RESIDENTIAL LEASE AGREEMENT
PART I

Terms and Conditions

THIS LEASE AGREEMENT (called "Lease", which includes Parts I and II) is between Wilmington Housing Authority, hereafter called "WHA" or "Authority", and the Resident named in Part II of this Lease, hereinafter called the "Resident".  Part II of this Lease identifies the premises leased and the parties to the Lease.

I.      DESCRIPTION OF PARTIES AND PREMISES

      A.  WHA, using verified data about income, family composition, and needs, hereby leases to Resident, the property (hereinafter called "premises" or "dwelling unit") described in Part II of this Lease Agreement, subject to the terms and conditions contained in this Lease.

      B.  Premises must be used only as a private residence, solely for Resident and the household members named on Part II of the Lease, including reasonable accommodation of their guests.  Guest shall be defined as a person in the leased unit with the consent of a household member. WHA may, by prior written approval, consent to Resident's use of the unit for legal profit-making activities subject to the WHA's policy on such activities.

      C.  Any additions to the household members named on the Lease, including live-in aides and foster children, except for natural births or adoption, require the advance written approval of the Authority. Such approval will be granted **only** if the new household members pass the Authority's screening criteria **and** addition of another person does not create an over-crowded living condition or a unit of the appropriate size is available.  Permission to add live-in aides and foster children shall not be unreasonably refused. [24 CFR 966.4 (d)(3)(i)] Resident agrees to wait for the Authority's approval before allowing additional persons to move into the premises. Failure on the part of Resident to comply with this provision is a material violation of the material terms of the Lease, for which the Authority may terminate the Lease in accordance with Section XIV.

      D.  Deletions (for any reason) by the head of household of any household members named on the Lease must be reported by head of household to WHA in writing, within 10 days of the occurrence.

II.     LEASE TERM AND AMOUNT OF RENT

      The rent amount is stated in Part II of this Lease for any initial partial month and successive full months.

D000002

A. Unless otherwise modified under Section VII or terminated under Section XIV, this Lease shall have a twelve-month term. Except as provided in paragraph A (1) of this section, the lease term must be automatically renewed for the same period.

   1. The WHA may not renew the lease if the family has violated the requirement for resident performance of community service or participation in an economic self-sufficiency program in accordance with 24 CFR, Part 960, Subpart F.

B. Rent stated in Part II of this Lease should remain in effect unless adjusted by the WHA in accordance with Section VII herein.

C. The amount of the Total Tenant Payment or Resident Rent is equal to the highest of: 10% of monthly income; 30% of adjusted monthly income; or the minimum rent in accordance with WHA's Admissions and Continued Occupancy Policy. [24 CFR 966.4 (3) (b)]

D. Rent is DUE and PAYABLE in advance on the first day of each month and will be considered delinquent after the fifth working day of the month. Rent may include utilities as described in Section VI below, and includes all maintenance services due to normal wear and tear. [966.4 (e)(1) & (3)]

E. When the WHA makes any change in the amount of Total Tenant Payment or Resident Rent, WHA shall give notice in accordance with Section VII of this Lease. The notice shall state the new amount, and the date from which the new amount is applicable. Rent re-determinations are subject to the Administrative Grievance Procedure. The notice shall also state that Resident may ask for an explanation of how the amount is computed by WHA. If Resident asks for an explanation, WHA shall respond in a reasonable time. [24 CFR 966.4(c)(4)]

III.   OTHER CHARGES

In addition to rent, Resident is responsible for the payment of certain other charges specified in this Lease. The type(s) and amounts of other charges are specified in Part II of this Lease Agreement. Other charges can include:

A. Maintenance/damage costs:  The cost for services or repairs due to intentional or negligent damage to the dwelling unit, common areas or grounds beyond normal wear and tear caused by Resident, household members or by guests. If police report is obtained and vandalism is verified, management **may** consider waiver of said charges.  When the Authority determines that needed maintenance is not caused by normal wear and tear the Resident shall be notified in accordance with Section XIV B.  Any charges established shall be for the cost of such service, either in accordance with the Schedule of Maintenance Charges posted by the Authority or (for work not listed on the Schedule of Maintenance Charges) based on the actual

D000003

cost to the Authority for the labor and materials needed to complete the work, if overtime work is required, overtime rates shall be charged. [CFR 24 966.4(b)(2)]

B. Excess Utility Charges:  At developments where utilities are provided by WHA, a charge shall be assessed for excess utility consumption due to the operation of major resident-supplied appliances.  This charge does not apply to Residents who pay their utilities directly to a utility supplier.

C. Charges for maintenance and repair and excess utilities consumption as listed in the Schedule of Maintenance Charges, shall become due and collectable two weeks after WHA gives notice of said charges. WHA retains the right to enter into a repayment contract for these charges when circumstances or Resident's past history warrant.

D. When a failure by a Resident causes or threatens to cause irreparable harm to any person or property, WHA may, without notice; either remedy the failure and bill the Resident in accordance with paragraph (A) of this section, and immediately terminate the rental agreement upon notice to the Resident and bring summary proceedings for possession, or may do both.

E. The charge for non-sufficient check returns and/or other returned check reasons will result in a $25.00 charge for each occurrence.

IV.   PAYMENT LOCATION

Rent and other charges are to be paid at the Wilmington Housing Authority Central Office by check or money order only. Residents who pay by a check that is returned for insufficient funds will be required to make all future payments by cashier's check or money order. Cash payments will not be accepted.

V.   SECURITY DEPOSIT

A. Resident Responsibilities:  Resident agrees to pay an amount equal to the greater of $50 or one month's Total Tenant Payment, not to exceed the flat rent for the leased unit.  In the case of a move from one unit to another within the Authority, the security deposit for the first unit will be transferred to the second unit. The dollar amount of the security deposit is noted on Part II of this Residential Lease.

B. WHA's Responsibilities:  WHA will use the security deposit at the termination of this Lease:

1. To pay the cost of any rent or any other charges owed by Resident at the termination of this Lease.

2. To reimburse the cost of repairing any intentional or negligent damages to the dwelling unit caused by Resident, household members or guests.

D000004

The security deposit may not be used to pay rent or other charges while Resident occupies the dwelling unit. No refund of the security deposit will be made until after Resident has vacated, and the Manager or designee on behalf of the WHA has inspected the dwelling unit. WHA will notify Resident in writing and provide an itemized list of damages and estimates for the repairs to the property. The Resident will be advised that the security deposit will be applied to the cost of repairs. WHA agrees to return the security deposit, less any deductions for costs indicated above within 20 days when he/she vacates. The notice will be mailed to resident's last known address or to a forwarded address if one was provided.

VI.     UTILITIES AND APPLIANCES

As part of the rent the Authority will supply water and sewer service.

A.  WHA Supplied Utilities: If indicated by an (X) on Part II, WHA will supply the indicated utility: water, sewer service, electricity, natural gas, heating fuel and trash collection. The Authority will not be liable for the failure to supply utility service for any cause whatsoever beyond its control.

If indicated by an (X) on Part II of the Lease Agreement, the Authority will provide a cooking range and refrigerator. Other major electrical appliances, air conditioners, freezers, extra refrigerators, washers, dryers, etc., may be installed and operated only with the written approval of the Authority. Monthly service charges will be payable by Resident for the electricity used in the operation of such appliances, as shown on the Schedule posted in the Manager's Office. The installation of an air-conditioner must not cause damage to the property, be properly braced, and not contribute to any safety hazards.

B.  Resident-Paid Utilities:  If Resident resides in a development where the Authority does not supply electricity, natural gas, or heating fuel, an allowance for utilities shall be established, appropriate for the size and type of dwelling unit for utilities Resident pays directly to the utility supplier. The Total Tenant Payment less the allowance for utilities equals Resident Rent. If the allowance for utilities exceeds the Total Tenant Payment, the Authority will pay a Utility Reimbursement to the Resident each month.

WHA may change the allowance at any time during the term of the lease, and shall give Resident 60-days written notice of the revised allowance along with any resultant changes in Resident Rent or utility reimbursement. [24 CFR 965.502] Families paying the flat rent will not receive an allowance for utilities.

D000005

If Resident's actual utility bill exceeds the amount of the allowance for utilities, Resident shall be responsible for paying the actual bill to the supplier. If Resident's actual utility bill is LESS than the allowance for utilities, Resident shall receive the benefit of such saving.

C. Resident Responsibilities:   Resident agrees not to waste the utilities, including water usage, provided by the Authority and to comply with any applicable law, regulation, or guideline of any governmental entity regulating utilities or fuels.  Resident may be charged for excess usage of any utility stated herein.

Resident also agrees to abide by any local ordinance or House Rules restricting or prohibiting the use of space heaters in multi-dwelling units.

D. Resident agrees to maintain gas and electrical services in their name at all times. Resident will sign a third party notification agreement so the WHA will be notified if the Resident fails to pay the utility bill.  If the utility services are disconnected, the resident has 24 hours to restore service or the Lease will be terminated. If the City Department of License and Inspection condemns any unit found to be without utilities the resident must vacate the unit at that time.   WHA will secure the unit and proceed with lease termination.  The resident will be allowed to return to the unit once WHA verifies that the utilities have been restored.

VII.    TERMS AND CONDITIONS

The following terms and conditions of occupancy are made a part of the Lease:

A. Use and Occupancy of Dwelling:  Resident shall have the right to exclusive use and occupancy of the dwelling unit for Resident and other household members listed on the Lease.  In the event that a visitor(s) is expected to stay in a resident's unit beyond five (5) days, resident must report this information to the manager prior to the visit. All visitors that remain in unit beyond 30 days must either vacate the residence or be listed as a household member on the Residential Lease Agreement provided that they pass WHA's screening criteria. Failure to comply will result in a breach of the Lease. Medical hardship of the resident or other extenuating circumstances will be considered in making determinations under this paragraph.

With prior written consent of WHA, members of the household may engage in legal profit making activities in the dwelling unit, where the WHA determines that such activities are incidental to primary use of the leased unit for residence by members of the household.

With written consent of WHA a foster child or a live-in aide may reside in the unit. See Admission and Continued Occupancy Policy for circumstances in which WHA's consent will be given or denied.

D000006

B. Ability to Comply with Lease Terms:  If, during the term of this Lease, the Resident, by reason of physical or mental impairment is no longer able to comply with the material provisions of this Lease, and cannot make arrangements for someone to aid him/her in complying with the lease terms, and WHA cannot make any reasonable accommodation that would enable the Resident to comply with the Lease, then; WHA will terminate the Lease and assist Resident, or designated person(s), to find more suitable housing.  If there are no family members or designated person who can or will take responsibility for moving the Resident, then WHA will work with the appropriate agencies to secure suitable housing during the notice period of lease termination.

Live-in aide is defined as a person who resides with an elderly, near-elderly and/or disabled person or persons and who:

1. Is determined by the Authority to be essential to the care and well-being of the person(s):

2. Is not obligated for the support of the person(s); and

3. Would not be living in the unit except to provide the necessary supportive services.

At the time of admission and at recertification, all Residents must identify the family member(s) to be contacted if they become unable to comply with the lease terms.

C. Re-Determination of Rent, Dwelling Size, and Eligibility.  The rent amount as fixed in Part II of the Lease Agreement is due each month until changed as described below.

1. For families paying an income-based rent, the WHA must conduct a reexamination of family income and composition at least annually and must make appropriate adjustments in the rent after consultation with the family and upon verification of the information. When it is not possible to estimate projected family income or when a family reports no income, the Special Recertification clause as found in the Admissions & Continued Occupancy Policy will apply. Failure to abide by this provision shall be considered a lease violation.

2. For families who choose flat rents, the WHA must conduct a reexamination of family COMPOSITION at least annually, and must conduct a reexamination of family INCOME at least once every three years.

D000007

3. For all families except those who qualify as exempt individuals as defined in 24 CFR 960.601, the WHA must determine compliance once each twelve months with the Community Service and Self-Sufficiency requirements of 24 CFR Part 960, Subpart F, which includes but is not limited to the performance of eight hours of community service each month, or participation in a self-sufficiency program for at least eight hours every month.

4. Resident agrees to supply the Authority, when requested, with accurate information about: household composition, age of household members, sources of income of all household members, assets, and related information necessary to determine eligibility, annual income, adjusted income, and rent.

5. WHA shall give Resident reasonable notice of what actions Resident must take, and of the date by which any such action must be taken for compliance under this section. This information will be used by the Authority to decide whether the amount of the rent should be changed, and whether the dwelling size is still appropriate for Resident's needs. Should a resident disagree with the rental increase or appropriate dwelling size he/she may request a hearing in accordance with WHA Grievance Procedure.

6. Failure of Resident to complete the recertification shall result in termination of resident's dwelling lease. This determination will be made in accordance with the Admissions and Continued Occupancy Policy, which is publicly posted in the Manager's Office.

7. Resident agrees to voluntarily submit to procedures to determine his/her or members of the household's criminal history record information.

8. All information must be verified. Resident agrees to comply with Authority's requests for verification by signing releases for third-party sources, presenting documents for review, or providing other suitable forms of verification. Failure to supply such information when requested is a material violation of the terms of the Lease and WHA may terminate the Lease.

9. Failure to provide complete, accurate and truthful information, especially as it relates to household annual income and family composition, is a deliberate act of fraud against a governmental program and could result in lease termination with WHA. Moreover, fraud is a federal offense that is punishable by law.

D000008

D.  Interim Re-determination of Family Income, Composition, and Allowances:

Rent will be adjusted if the following occurs:

1.  A person with income joins the household.

2.  At the birth of a child, the additional income will be included at the same time the appropriate allowances are given, if applicable.

3.  Resident reports a change in his/her circumstances that would justify an increase or decrease in rent (increases or decreases in income and/or allowable expenses).

4.  Federal law or regulation changes rent formulas or procedures.

5.  Utility allowances are revised.

E.  All changes in income, household composition and/or allowable expenses must be reported to the Housing Manager within 10 days of the occurrence. Failure to report within the 10 days may be considered fraud and may result in a retroactive rent charge or further actions as deemed appropriate by the Authority.

F.  Rent Adjustments:   Resident will be notified in writing of any rent adjustment due to the situations described above.  All notices will state the effective date of the rent adjustment.

1.  An interim re-determination of rent will be processed within 30 days after notification to recalculate the rent. Decreases in rent will be effective the first day of the month following the reported change. Increases in rent are effective 60 days following the reported change. No interim will be processed unless it can be verified that the change in income will extend beyond a 30-day period.

2.  In the case of a rent increase due to misrepresentation, failure to report a change in household composition, or failure to report an increase in income the Authority shall apply the increase in rent retroactive to first of the month following the month in which the misrepresentation occurred, although the resident will be notified of the adjustment 60 days in advance of the charge. The Authority also reserves the right to pursue lease termination, civil and/or criminal action as deemed appropriate and acceptance of any rent payment does not constitute a waiver of this right.

D000009

G. Transfers

1. Resident agrees that if WHA determines that the size or design of the dwelling unit is no longer appropriate to Resident's needs, WHA shall send Resident written notice.  Resident further agrees to accept a new lease for a different dwelling unit of the appropriate size or design.

2. WHA may move a Resident into another unit if it is determined necessary to rehabilitate or dispose of Resident's unit.

3. If a Resident makes a written request for special unit features in support of a documented disability and if such action would not result in an undue financial and administrative burden on the Authority, WHA shall have the sole and exclusive option to modify Resident's existing unit or transfer Resident to another unit with the features requested. [24 CFR 8.24]

4. A Resident's household without disabilities who is housed in a unit with special features must transfer to a unit without such features should a Resident with disabilities need the unit. [24 CFR 8.27]

5. Resident shall be required to move into the dwelling unit made available by WHA.  Resident shall be given seven (7) business days time in which to move following the signing of the new lease.  A $50 fee will be charged to the resident if the move is not completed within the time required. If Resident refuses to move, the Authority may terminate the Lease. [24 CFR 966.4(c)(3)]

6. Over/under housed residents are subject to the Grievance Procedure, and no such transfers may be made until either the time to request a Grievance has expired or the procedure has been completed.  [24 CFR 966.4(c)(4)]

7. WHA will consider any Resident requests for transfer in accordance with the transfer priorities established in the Admissions and Continued Occupancy Policy.

VIII.    WHA OBLIGATIONS

WHA shall be obligated:

A. To maintain the dwelling unit and the development in decent, safe and sanitary condition according to its obligations under the Delaware Landlord Tenant Code;

B. To comply with the requirements of applicable building codes, housing codes, and HUD regulations materially affecting health and safety;

D000010

C. To educate applicants about the dangers of lead-based paint and notify applicants of the presence of known lead-based paint and lead-based paint hazards;

D. To notify residents of the results of any evaluation and/or reduction activities, protect residents when addressing lead-based paint hazards, respond to children with environmental intervention blood lead levels, conduct proper ongoing maintenance activities with lead-safe work practices, and, when necessary, perform lead hazard reevaluations

E. To make necessary repairs to the dwelling unit;

F. To keep building, facilities, and common areas, not otherwise assigned to Resident for maintenance and upkeep, in a clean and safe condition;

G. To maintain in good and safe working order and condition electrical, plumbing, sanitary, heating, ventilating, and other facilities and appliances, including elevators supplied or required to be supplied by WHA;

H. To provide and maintain appropriate receptacles and facilities for the deposit of ashes, garbage, rubbish, and other waste removed from the premises by Resident as required by this Lease. Residents housed in family developments and Scattered Sites will be issued garbage cans which must be stored at the rear of each unit

I. To supply running water and reasonable amounts of hot water and reasonable amount of heat at appropriate times of the year according to local custom and usage; EXCEPT where the building that includes the dwelling unit is not required to be equipped for that purpose, or where heat or hot water is generated by an installation within the exclusive control of Resident and supplied by a direct utility connection;

J. To notify Resident of the specific grounds for any proposed adverse action by WHA. (Such adverse action includes, but is not limited to, a proposed lease termination, transfer of Resident to another unit, or imposition of charges for maintenance and repair, or for excess consumption of utilities.) When WHA is required to afford Resident the opportunity for a hearing under the WHA grievance procedure for a grievance concerning a proposed adverse action:

   1. The Notice of the proposed adverse action shall inform Resident of the right to request such hearing. In the case of lease termination, the notice shall state that in accordance with the Grievance Procedure, the Resident has ten (10) days to request a hearing.

   2. In the case of a proposed adverse action other than a proposed lease termination, WHA shall not take the proposed action until time to request such a hearing has expired or (if hearing was requested in a timely manner) the grievance process has been completed. [24 CFR 966.4(e)(8)]

D000011

K. To provide reasonable accommodations for residents with disabilities.

L. To avoid termination of leases for criminal activity directly related to domestic violence, dating violence, or stalking engaged in by a member of a resident's household or any guest or other person under the resident's control if the resident or immediate member of the family is the victim or threatened victim of that domestic violence, dating violence, or stalking.

IX.    RESIDENT'S OBLIGATIONS

Resident shall be obligated:

A. Not to assign the Lease, nor sublease the dwelling unit.

   1. Not to provide accommodations to boarders or lodgers;

   2. Not to give accommodations to long-term guests (in excess of 5 days) without the consent of WHA.

B. To use the dwelling unit solely as a private dwelling for Resident and Resident's household as identified in PART II of the Lease, and not to use or permit its use for any other purposes. This provision does not exclude the care of foster children or live-in care of a member of Resident's household, provided the accommodation of such persons conforms to the Authority's Occupancy Standards, and so long as WHA has granted prior written approval for the foster children, or live-in aide to reside in the unit. [24 CFR 966.4(f)(3)]

C. To abide by necessary and reasonable regulations developed by the WHA for the benefit and well-being of the housing community and Residents. These regulations are posted in a conspicuous manner in the Manager's Office and incorporated by reference in this Lease.

D. To comply with the requirements of applicable state and local building or housing codes, materially affecting health and/or safety of Resident and household as well as other residents of WHA.

E. To keep the dwelling unit and other such areas as may be assigned to Resident for exclusive use in a clean and safe condition. This includes keeping both front and rear entrances and walkways for the exclusive use of Resident free from snow, ice, and trash and keeping the yard free of debris and litter.

F. To dispose of all household trash and other waste from the dwelling unit in a sanitary and safe manner only in containers approved or provided by the Authority. To refrain from, and cause members of Resident's household or guests to refrain from, littering or leaving trash and debris in common areas.

G. To use only in reasonable manner all utilities including water, electricity,

D000012

heating, ventilating, air-conditioning, other facilities and equipment which includes elevators.

H. There shall be no pools on or about WHA property nor should any resident hook up a hose to a faucet to provide children with a means of cooling off in the summer.

I. To refrain from, and to cause household and guests to refrain from destroying, defacing, damaging, or removing any part of dwelling unit or development.

J. To pay reasonable charges (other than for wear and tear) for the repair of damages to the dwelling unit, buildings, facilities, or common areas caused by Resident, household members or guests.

K. To act, and cause household members or guests to act, in a manner that will:

   1. Not disturb other resident's peaceful enjoyment of their accommodations; and

   2. Be conducive to maintaining all Authority developments in a decent, safe, and sanitary condition.

L. To assure that no Resident, any member of the resident's household, or guests, engage in:

   1. Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of WHA's public housing premises by other residents or employees of WHA, or;

   2. Any drug-related criminal activity on or off the premises; and abuse or pattern of abuse of alcohol that the WHA determines affects the health, safety, or right to peaceful enjoyment of the premises by other residents.

Any criminal activity in violation of the preceding paragraph L shall be cause for lease termination and for eviction from the unit. (For the purposes of this Lease, the term drug-related criminal activity includes the illegal manufacture, sale, distribution, use or possession with intent to manufacture, sell, distribute, or use, of a controlled substance as defined in Section 102 of the Controlled Substances Act, [24 CFR 966.4(f)(12)] and Title 16 of the Delaware Code).

Any violation of paragraphs 1 and 2 above is not subject to the grievance procedure as provided herein.

D000013

M. To make no alterations, repairs, or redecorate the interior or exterior of the dwelling unit.    To install no additional equipment or major appliances without written consent of the Authority.  To make no changes to locks or install new locks on interior or exterior doors.  To use no nails, tacks, screws, brackets, or fasteners on any part of the dwelling unit (a reasonable number of picture hangers is acceptable). Not to use contact paper, border or self-sticking mirrors. Use of shelf liner paper in the kitchen, bathroom or closets is permissible. Not to alter the color of the paint in the unit; pending availability, residents may request paint for the interior of their dwelling unit after 5 years of residency. If, at any time during residency, the colors of the walls are altered or contact paper, wall paper or border has been installed, the resident will be required to return the affected area to its original condition.

N. To give prompt prior notice to the Authority, if the dwelling unit will be unoccupied for any period exceeding one calendar week.

O. To act in a cooperative manner with neighbors and Authority staff.  To refrain from and cause members of Resident's household or guests to refrain from acting or speaking in an abusive or threatening manner including but not limited to verbal threats, harassment of violent or sexual nature, threat of or actual physical harm or display of disorderly conduct toward neighbors and Authority staff.

P. Not to display, use, or possess or allow members of Resident's household or guests to display, use or possess any firearms, (operable or inoperable) or other dangerous instruments or deadly weapons as defined by the laws of the State of Delaware anywhere on the property of the Authority.

Q. To take reasonable precautions to prevent fires and to refrain from storing or keeping flammable materials inside and outside dwelling units. Not to dislodge, relocate or otherwise remove smoke detectors or carbon monoxide detectors placed in the units. To maintain at all times smoke detectors and carbon monoxide detectors in operable condition.

R. To avoid obstructing entrances, exits, sidewalks, hallways, passages, elevators, or stairs; and to avoid using these for purposes other than going in and out of the dwelling unit. To refrain from storing items in front of heater rooms and circuit breaker panels and to refrain from blocking the call for aid switch.

S. To refrain from erecting or hanging satellite, radio or television antennas on or from any part of the dwelling unit; satellite dishes are prohibited on WHA property.

T. To refrain from placing signs of any type in or about the dwelling except those allowed under applicable zoning ordinances and then only after having received written permission of the Authority.

D000014

U. To refrain from, and cause members of Resident's household to refrain from keeping, maintaining, harboring, or boarding any dog, cat, livestock, or pet of any nature unless it is approved by management. See Pet Policy incorporated in the Admissions and Continued Occupancy Policy for guidelines governing pet ownership in and on WHA properties.

V. To remove from Authority property any vehicles without valid registration and inspection stickers.  To refrain from parking any vehicles in any right-of-way or fire lane designated and marked by the Authority. Any inoperable or unlicensed vehicles will be removed from the Authority property at Resident's expense.  Vehicle washing and repairs are not permitted on or at WHA sites.

W. To remove any personal property left on Authority premises when Resident leaves, abandons or surrenders the dwelling unit. Property left for more than seven (7) days shall be considered abandoned and will be disposed of by the Authority. Costs for storage and disposal shall be assessed against the former resident.

X. To use reasonable care to keep his/her dwelling unit in such condition as to ensure proper health and sanitation standards for Resident, household members and neighbors. RESIDENT SHALL NOTIFY THE AUTHORITY PROMPTLY OF THE NEED FOR REPAIRS TO HIS OR HER DWELLING UNIT, and of unsafe or unsanitary conditions in the dwelling unit or in common areas and grounds of the development. Resident is responsible for reporting all property damage as a result of fire, flood, etc within 24 hours of the incident. Resident's failure to report the need for repairs and/or property damage in a timely manner shall be considered to contribute to any damage that occurs and can be cause for lease termination.

Y. Not to commit any fraud in connection with any Federal Housing Assistance Program, and not to receive assistance for occupancy of any other unit assisted under any Federal Housing Assistance Program during the term of the Lease. A current Public Housing resident who has been issued a Section 8 Housing Choice Voucher must immediately notify the PH staff and any debt must be cleared prior to the actual move. Section 8 staff will work with the Public Housing staff to ensure that the time frames for the move do not overlap to avoid paying subsidy at 2 units.

Z. To promptly pay any utility bills for utilities supplied to Resident by a direct connection to the utility company, and to avoid disconnection of utility service for such utilities.

AA. No waterbeds are allowed except for documented medical reasons. Residents must obtain written approval prior to installing a waterbed and provide proof of insurance on an annual basis.

BB. Resident acknowledges that all personal property placed in the leased premises, storage room, or in any other portion of the building shall be stored

D000015

at the sole risk of the Resident.  WHA shall not be held liable for the loss, destruction, theft or damages to such property, except if the above is the result of any acts or omissions, whether intentional or negligent on the part of WHA or the WHA's authorized representatives or agents.  Resident is advised to obtain insurance to cover personal property.

CC.   To maintain the cleanliness of the resident's assigned yards/common areas on a daily basis.  Failure to do so will result in a yard citation.  The first citation will be a warning with no charge.  Each subsequent citation will result in a charge of $25.00.  Three (3) or more yard citations within one (1) year will be grounds for lease termination.

DD.   To put trash to the curb on assigned days and remove trash cans from the curb on the same day as trash collection and store in the back of their units.  Failure to do so will result in a yard citation as described above.

EE.   To repay the WHA for any $50.00 fine incurred as a result of the City of Wilmington's Instant Ticketing program.  Should you improperly dispose of trash or allow high grass, junk and debris to litter our property WHA as the landlord receives a citation with an instant fine of $50.00.  Three (3) or more Instant Ticketing violations received within one (1) year will be grounds for lease termination.

FF.   To certify via HUD form 50066 if claiming eligibility for protection under the Violence Against Women Act.  This form requires a resident to identify the perpetrator and to certify that the actual or threatened incidents of abuse are legitimate.

GG.   For each adult in the Resident household to perform at least 8 hours per month of qualifying community service(as specified by WHA) unless the requirement is waived due to age, disability, or the fact that the adult is excused as a result of employment, attendance at an educational institution, or participation in a qualified training program.

X.     DEFECTS HAZARDOUS TO LIFE, HEALTH OR SAFETY

In the event that the dwelling unit is damaged to the extent that conditions are created which are hazardous to the life, health, or safety of the occupants:

D000016

WHA Responsibilities:

1. The Authority shall be responsible for repair of the unit within a reasonable period of time after receiving notice from Resident. If Resident, household members, or guests caused the damage, the reasonable cost of the repairs shall be charged to Resident. The Resident will be charged the actual cost incurred by WHA for repairs, which is either the cost of the insurance deductible or the cost of repairs.

2. WHA shall offer Resident a replacement dwelling unit of comparable size, if available, if necessary repairs cannot be made within a reasonable time. WHA is not required to offer Resident a replacement unit if resident, household members or guests caused the hazardous condition. [966.4(h)(3)]

3. Resident shall accept any replacement unit offered by WHA.

4. In the event that repairs cannot be made by the Authority, as described above, and alternative accommodations are unavailable, then rent shall abate in proportion to the seriousness of the damage and loss in value as a dwelling. No abatement of rent shall occur if Resident rejects alternative accommodations or if Resident, household members, or guests caused the damage.

5. If the Authority determines that the dwelling unit is uninhabitable because of imminent danger to the life, health, and safety of Resident, and Resident refuses alternative accommodations, this Lease shall be terminated, and any rent paid will be refunded to Resident.

Resident Responsibilities:

1. Resident shall immediately notify the Manager of the damage and intent to abate rent, when the damage is or becomes sufficiently severe that Resident believes he/she is justified in abating rent.

2. Resident agrees to continue to pay full rent, less the abated portion agreed upon by the Authority, during the time in which the defect remains uncorrected.

XI.   INSPECTIONS

Residents will be notified at least 48-hours in advance of the scheduled inspection date for the following inspection types. It is recommended that the resident or a representative be present for the inspection but is not necessary.

1. Uniform Physical Condition Standards Inspections
2. REAC Inspections
3. Housekeeping Inspections
4. Any other scheduled audit inspections

D000017

A. <u>Move-in Inspection</u>:  The Authority and Resident or representative shall inspect the dwelling unit prior to occupancy by Resident. The Authority will give the Resident a copy of the Move-In inspection noting the condition of the dwelling unit, both inside and outside, and including any equipment provided with the unit. The Authority and Resident shall sign the inspection form and the original will be retained in Resident's file. The Authority, at no charge to Resident, will correct any deficiencies noted on the inspection report.

B. <u>Move-out Inspection</u>:  The Authority will inspect the unit at the time Resident vacates and give Resident a written statement of the charges, if any, for which Resident is responsible. Resident and/or representative may join in such inspection, unless Resident vacates without notice to WHA.

C. <u>Uniform Physical Condition Standards Inspection</u>:  The Authority will conduct annual unit inspections utilizing the HUD required Uniform Physical Condition Standards (UPCS).

D. <u>Housekeeping Inspections</u>: The Authority will inspect each unit to determine compliance with WHA's Housekeeping Standards:

   1. Annually in conjunction with the UPCS Inspections;

   2. When conditions in the unit are noted as being adverse to the standards outlined in the Lease;

   3. When noted conditions become a health and safety hazard to staff and other residents;

   4. Once each month during the first quarter of residency for move-ins and quarterly for the remainder of the first year of occupancy;

   5. Quarterly for the first year when transferred.

   6. Weekly, monthly or quarterly at management's discretion.

   Residents who fail housekeeping inspections will be given a 7-day notice to correct. Three (3) or more notices to correct within a year will be grounds for lease termination.

XII.   ENTRY OF PREMISES DURING RESIDENCY

   A. Resident Responsibilities:

   1. Resident agrees that the duly authorized agent, employee, or contractor of the Authority will be permitted to enter Resident's dwelling during reasonable hours (<u>8:00 A.M. to 5:00 P.M.</u>) for the purpose of performing routine maintenance, making improvements or repairs, inspecting the unit, or showing the unit for re-leasing.

D000018

2. When Resident calls to request maintenance on the unit, the Authority shall attempt to provide such maintenance at a time convenient to Resident. If Resident is absent from the dwelling unit when the Authority comes to perform maintenance, Resident's request for maintenance shall constitute permission to enter.

B. Authority's Responsibilities:

1. WHA shall give Resident at least 48-hours written notice that the WHA intends to enter the unit. WHA may enter only at reasonable times.

2. The Authority may enter Resident's dwelling unit at any time without advance notification when there is reasonable cause to believe that an emergency exists.

If Resident and all adult members of the household are absent from the dwelling unit at the time of entry, the Authority shall leave in the dwelling unit a written statement specifying the date, time and purpose of entry prior to leaving the dwelling unit.

XIII.   NOTICE PROCEDURES

A. Resident Responsibility: Any notice to the Authority must be in writing, delivered to the Management Office or to the Authority's central office, or sent by prepaid first-class mail, properly addressed.

B. Authority Responsibility: Notice to Resident must be in writing, delivered to Resident or to any adult member of the household residing in the dwelling unit, [CFR 24 966.4(k)(1)] or sent by first-class mail addressed to Resident.

C. Certificate of Mailing, and/or Return receipt for Registered or Certified mail shall be sufficient evidence that notice was given, whether signed or unsigned.

D. Any changes proposed in Lease Addendums Part I or Part II of Lease must provide at least 30 days notice to Residents and resident organizations setting forth proposed changes and providing an opportunity to submit comments. Comments submitted shall be considered by the WHA before formal adoption of any new Lease Addendum.

XIV.   TERMINATION OF THE LEASE

In terminating the Lease, the following procedures shall be followed by the Authority and Resident:

A. This Lease may be terminated for serious or repeated violations of material terms of the Lease, or failure to fulfill Resident obligations set forth in Section IX and other terms and conditions herein, or for other good cause.

<u>Responsibility of Head of Household</u> – Without in any way limiting any other provision of this Lease, head of household understands that this Lease may be terminated for any serious violation of this Lease by him/her, any member of his/her household, by any guest or other persons under the resident's control (control, in that the resident has permitted access to the premises).

Such serious or repeated violations of terms **shall include but not be limited to:**

1. The failure to pay rent or other payments when due;

2. Repeated late payment, which shall be defined as failure to pay the amount of rent or other charges (i.e.: maintenance charges) due by the fifth working day of the month.  Four (4) late payments within a 12-month period shall constitute repeated late payment;

3. Failure to pay utility bills when Resident is responsible for paying such bills directly to the supplier of utilities; or causing the utilities to be shut off for non-payment;

4. Intentional misrepresentation of household income, assets, or composition;

5. Failure to supply, in a timely fashion, any certification, release, information, or documentation on household income or composition needed to process annual recertification, special recertification or interim re-determination;

6. Serious or repeated damage to the dwelling unit, creation of physical hazards in the unit, common areas, grounds, or parking areas of any site and/or failure to report incidents of property damage;

7. Repeated lease violations such as, but not limited to, allowing unauthorized persons to live in the unit, allowing guests to be unescorted in common areas of the high-rise and mid-rise buildings or defacing the property.  Up to three (3) notices shall constitute repeated lease violations;

8. Drug related criminal activity engaged in on or off the premises by any resident, member of the resident's household or guest, and any such activity engaged in on the premises by any other person under the resident's control. Additionally, the WHA may evict a family when it is determined that a household member is illegally using a drug or when the WHA determines that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents and WHA staff;

D000020

9. A resident fleeing to avoid prosecution, custody or confinement after conviction, for a crime, or the attempt to commit a crime that is a felony under the laws of Delaware or the State to which the individual flees; or violating a condition of probation or parole imposed under Federal or State law.

10. Termination of the residency by judicial action for criminal activity if WHA determines that the covered person has engaged in the criminal activity, regardless of whether the covered person has been arrested or convicted for such activity and without satisfying the standard of proof used for a criminal conviction;

11. Criminal activity by Resident, household member, guest, or other person under Resident's control, including criminal activity that threatens the health, safety or right to peaceful enjoyment of WHA's public housing premises by other residents, or any drug-related criminal activity on or off the premises, and alcohol abuse that the WHA determines interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents;

12. Deadly weapons, dangerous instruments or illegal drugs or drug paraphernalia seized on or off WHA property by a law enforcement officer, or employee, agent or representative of WHA;

13. Any fire on Authority premises caused by carelessness, failure to supervise children or unattended cooking. Up to three (3) incidents of unattended cooking will result in lease termination;

14. Failure of a family member to comply with the Community Service Requirement will result in ineligibility for continued occupancy and termination of residency at the end of the twelve month base term (see Admission and Continued Occupancy Policy);

15. Discovery of material false statements or fraud by the resident in connection with application for assistance or with recertification;

16. Repeated yard citations for failing to keep yard and area around dwelling unit clean and failing to have WHA approved receptacles for trash and garbage storage. Up to three (3) such notices shall constitute repeated lease violations;

17. Repeated Instant Ticketing violations from the City of Wilmington. Up to three (3) such violations shall constitute repeated;

18. Failure to sign a revised Lease and/or Lease Addendum;

19. Immediate termination if the WHA determines that any member of the household has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of

D000021

federally assisted housing.

20. Failure to comply with completion of the HUD form 50066 will negate protections afforded to victims of domestic violence, dating violence or stalking.

B. The Authority shall give written notice of the proposed termination of the lease:

1. 14 days in the case of failure to pay rent;

2. 7 days notice, and an opportunity to correct the violation, will be given for violation of rules or covenants which are material to this rental agreement;

   a. If the resident violation can be remedied by WHA, as by cleaning, repairing, replacing a damaged item, or the like, WHA may remedy the violation and bill the resident for the actual and reasonable cost of such remedy. This bill shall be due and payable immediately upon receipt.

   b. If the resident's violation constitutes a material breach of an obligation imposed upon residents by a municipal, county or state code, ordinance, or statute, WHA may terminate the rental agreement and bring a summary proceeding for possession.

3. A reasonable time considering the seriousness of the situation (but not to exceed 30 days) when the health or safety of other residents or WHA employees is threatened;

4. 30 days in any other case.

C. The Notice of Termination:

1. The notice of termination to Resident shall state specific reasons for the termination, shall inform Resident of his/her right to respond to the action, and of Resident's right to examine WHA documents directly relevant to the termination or eviction [24 CFR 966.4(l)(3)(ii)]. Responses may be made either orally or in writing. Oral responses shall be made in person or by phone. Written responses shall be mailed or hand-delivered to the manager's office for the applicable development.

2. WHA is required to offer Resident the opportunity for a grievance hearing in cases involving adverse action (see exclusions Section B of WHA's Grievance Procedure), the notice shall also inform Resident of the right to request such a hearing in accordance with the WHA's grievance procedures [24 CFR 966.4(l)(3)(ii)].

3. Any notice to vacate which State or local law requires may be combined

D000022

with, or run concurrently with, the notice of lease termination under this section. The Notice to Vacate must be in writing, and specify that if Resident fails to vacate the premises within the applicable statutory period, appropriate action will be brought against resident, and resident may be required to pay court costs and attorney's fees.

4. When WHA is required to offer Resident the opportunity for a grievance hearing under WHA's grievance procedure for a grievance concerning the lease termination, the residency shall not terminate (even if any Notice to Vacate under State or local law has expired) until the period to request a hearing has expired, or (if a hearing is requested) the grievance process has been completed.

5. When WHA is not required to offer Resident the opportunity for a hearing under the grievance procedure the notice of lease termination shall:

    a. State that Resident is not entitled to a grievance hearing on the termination; and

    b. Specify the judicial eviction procedure to be used by WHA for eviction and state that HUD has determined that this eviction procedure provided the opportunity for a hearing in a court that contains the basic elements of due process as defined in HUD regulations; and

    c. State whether the eviction is for a criminal activity that threatens health or safety of residents or staff or for drug-related criminal activity. [24 CFR 966.4(l)(3)(v)].

6. WHA may evict Resident from the unit only by bringing a court action [24 CFR 966.4(l)(4)].

D. Resident may terminate this Lease at any time by giving 30 days written notice.

E. In deciding to evict for criminal activity, WHA shall have discretion to consider all of the circumstances of the case, including the seriousness of the offense, the extent of participation by or awareness of household members, and the effects that the eviction would have both on household members not involved in the proscribed activity and on the household's neighbors. In appropriate cases, WHA may permit continued occupancy to remaining household members and may impose a condition that household members who engaged in the proscribed activity will neither reside in or visit the unit. WHA may require a household member who has engaged in the illegal use of drugs to present credible evidence of successful completion of a treatment program as a condition to being allowed to reside in the unit [24 CFR 966.4(l)(5)(vii)].

D000023

F. When WHA evicts a Resident from a dwelling unit for criminal activity the WHA shall notify the local post office serving that dwelling unit that such individual or household is no longer residing in the unit so the post office will stop mail delivery for such persons and they will have no reason to return to the unit [24 CFR 966.4(l)(5)(iii)].

XV.     WAIVER

No delay or failure by the WHA in exercising any right under this Lease Agreement, and no partial or single exercise of any such right shall constitute a waiver (post or prospective) of that or any other right, unless otherwise expressly provided herein.  The acceptance of rent from a resident after termination proceedings have commenced does not constitute a waiver of any of WHA's rights to pursue the lease termination.

XVI.    HOUSEKEEPING STANDARDS

In an effort to improve the livability and conditions of the apartments owned and managed by the Authority, uniform standards for resident housekeeping have been developed for all resident families.

A. Authority Responsibility:  The standards that follow will be applied fairly and uniformly to all Residents.  The Authority will inspect each unit at least annually, to determine compliance with the standards.  Upon completion of an inspection the Authority will issue a seven (7) day notice advising the Resident in writing if he/she fails to comply with the standards.  The Authority will advise Resident of the specific correction(s) required to establish compliance.  Within a reasonable period of time (not to exceed two weeks), the Authority will schedule a second inspection. If the resident's housekeeping continues to fall below the established standard, the resident will be scheduled for a third and final housekeeping inspection. No improvement shown by the third inspection will result in lease termination.

B. Resident responsibility:  Resident is required to abide by the standards set forth below.  Failure to abide by the Housekeeping Standards resulting in the creation of a threat to health or safety is a violation of the lease terms and can result in eviction. All residents must cooperate with WHA's mandatory extermination program (i.e.: keeping the unit clean in accordance with the housekeeping standards).

D000024

C. Housekeeping Standards:  Inside the Unit

General:

1. Walls: should be clean, free of dirt, grease, holes, cobwebs, and fingerprints.
2. Floors: should be clean, clear, dry and free of hazards.  Phone cords and cable wires should not be running across any walkway as it poses a tripping hazard.
3. Ceilings: should be clean and free of cobwebs.
4. Windows: should be clean and not nailed shut.  Shades or blinds should be intact.
5. Woodwork: should be clean, free of dust, gouges, or scratches.
6. Doors: should be clean, free of grease and fingerprints.  Doorstops should be present.  Locks should work.
7. Heating units:  should be dusted and access uncluttered.
8. Trash: shall be disposed of properly and not left in the unit.
9. Entire unit should be free of rodent or insect infestation.

Kitchen:

1. Stove: should be clean and free of food and grease.
2. Refrigerator: should be clean.  Freezer door should close properly and freezer have no more than one inch of ice.
3. Cabinets: should be clean and neat.  Cabinet surfaces and counter top should be free of grease and spilled food.  Cabinets should not be overloaded.  Storage under the sink should be limited to small or lightweight items to permit access for repairs.  Do not store heavy pots and pans under the sink.
4. Exhaust Fan: should be free of grease and dust.
5. Sink: should be clean, free of grease and garbage. Dirty dishes should be washed and put away in a timely manner.
6. Food storage areas:  should be neat and clean without spilled food.
7. Trash/garbage: should be stored in a covered container until removed to the disposal area.

Bathroom:

1. Toilet and tank:  should be clean and odor free.
2. Tub and shower: should be clean and free of mold and mildew.  Where applicable, shower curtains should be in place, and of adequate length.
3. Exhaust fans: should be free of dust.
4. Floor should be clean and dry.

Storage Areas:

1. Linen closet: should be neat and clean.
2. Other closets: should be neat and clean. No highly flammable materials should be stored in the unit.
3. Other storage areas: should be clean, neat and free of hazards.

D. Housekeeping Standards:  Outside the Unit

The following standards apply to family and scattered site developments only; some standards apply only when the area noted is for the exclusive use of Resident:

1. Yards:  should be free of debris, trash, and abandoned cars.  Exterior walls should be free of graffiti.
2. Porches (front and rear):  should be clean and free of hazards. Any items stored on the porch shall not impede access to the unit.
3. Steps (front and rear):  should be clean, and free of hazards.
4. Sidewalks:  should be clean and free of hazards.
5. Storm doors:  should be clean, with glass or screens intact.
6. Parking lot:  should be free of abandoned cars. No car repairs should be made in the lots.
7. Hallways:  should be clean and free of hazards.
8. Stairwells:  should be clean and uncluttered.
9. Laundry areas:  should be clean and neat.  Remove lint from dryers after use. Any dryer installed with permission from management in the family developments must have a moisture box.
10. Utility rooms and/or basements:  should be free of debris, motor vehicle parts, and flammable materials.  A basement is not to be used as a sleeping facility. All items stored in the basement should be stored neatly and should pose no hazards.
11. Trash containers:  must be present, have a lid and be stored in the rear of the unit unless it is moved to the curb for scheduled trash pick-up.

XVII.   GRIEVANCE PROCEDURE

All disputes concerning the obligations of the Resident and WHA shall be resolved in accordance with the Grievance Procedure.

A. Definitions applicable to the grievance procedure:

1. **Grievance**:  Any dispute which a Resident may have with respect to WHA action or failure to act in accordance with respect to the individual Resident's Lease or WHA's regulations which adversely affect the individual Resident's rights, duties, welfare or status.

D000026

2. **Complainant**:  Any Resident (as defined below) whose grievance is presented to WHA (at the management office) in accordance with the requirements presented in this procedure.

3. **Elements of Due Process**:  An eviction action or a termination of tenancy in a State or local court in which the following procedural safeguards are required:

    a.  Adequate notice to the Resident of the grounds for terminating the tenancy and for eviction;

    b.  Right of the Resident to be represented by counsel;

    c.  Opportunity for the Resident to refute the evidence presented by WHA, including the right to confront and cross examine witnesses and to present any affirmative legal or equitable defense which the Resident may have;

    d.  A decision on the merits.

4. **Hearing Officer**:  An impartial person appointed by the Authority, other than a person who made or approved the Authority action under review, or a subordinate of that person.

5. **Resident**:  The adult person (or persons) (other than a live-in aide):

    a.  Who resides in the unit, and who executed the Lease with WHA as lessee of the dwelling unit, or, if no such person now resides in the unit;

    b.  Who resides in the unit, and who is the remaining head of the household of the resident family residing in the dwelling unit.

6. **Resident Organization**:  An organization of residents, which also includes a resident management corporation.

B.  Applicability of this grievance procedure:

1.  In accordance with the applicable Federal regulations [24 CFR 966.50] this grievance procedure shall be applicable to all individual grievances (as defined in Section A above) with the exception of any termination of tenancy or proposed eviction which involves or arises from:

    a.  Any criminal activity that threatens the health, safety or right to peaceful enjoyment of the premises by other residents or employees of WHA, or

    b.  Any violent or drug-related criminal activity on or off such premises;

D000027

or

   c. Any criminal activity that resulted in felony conviction of a household member.

2. WHA grievance procedure shall not be applicable to disputes between Residents not involving WHA or to class grievances. The grievance procedure is not intended as a forum for initiating or negotiating policy changes between a group or groups of residents and the WHA's Board of Commissioners. This grievance procedure is incorporated in all Resident Dwelling Leases and will be furnished to each Resident and all resident organizations.

Any changes proposed in this grievance procedure must provide at least 30-days notice to Residents and resident organizations, setting forth the proposed changes and providing an opportunity to present written comments. Comments submitted shall be considered by the WHA before any revisions are made to the grievance procedure. [24 CFR 966.52(c)]

C. Informal Settlement of a Grievance [24 CFR 966.54]

Any grievance must be personally presented, either orally or in writing, to WHA's central office or the management office of the development in which the complainant resides within ten (10) days after the grievance occurred.

As soon as the grievance is received management will review it. Should one of the exclusions apply, the complainant will be notified in writing that the matter raised is not subject to WHA's grievance procedure and provide an explanation why.

If neither of the exclusions cited above apply, the complainant will be contacted to arrange a mutually convenient time within ten (10) working days to meet so the grievance may be discussed informally and settled without a hearing.

At the informal hearing the complainant will present the grievance and the person in charge of the management office will attempt to settle the grievance to the satisfaction of both parties.

Within five (5) working days following the informal discussion, WHA shall prepare and either give or mail to Resident a summary of the discussion that must specify the names of the participants, the dates of meeting, the nature of the proposed disposition of the complaint and the specific reasons therefore, and shall specify the procedures by which a formal hearing under this procedure may be obtained if the complainant is not satisfied. A copy of this summary shall also be placed in Resident's file. The summary of the informal discussion will be sent Certificate of Mailing.

D000028

D. Formal Grievance Hearing [24 CFR 966.55]

If the complainant is dissatisfied with the settlement arrived at in the informal hearing, the complainant must submit a written request for a hearing to the management office of the development where Resident resides no later than five (5) working days after the summary of the informal hearing is received. A receipt signed by the complainant, Certificate of Mailing, and/or a return receipt for delivery of Registered or Certified Mail, whether or not signed, will be sufficient proof of time of delivery for the summary of the informal discussion.

The written request shall specify:

a. The reasons for the grievance; and

b. The action or relief sought from WHA.

If the complainant requests a hearing within the required time, WHA shall schedule a hearing on the grievance at the earliest time possible for the complainant, WHA and the hearing officer, but in no case later than ten (10) working days after WHA received the complainant's request.

If the complainant fails to request a hearing within five (5) working days after receiving the summary of the informal hearing, WHA's decision rendered at the informal hearing becomes final and WHA is not obligated to offer the complainant a formal hearing unless the complainant can show good cause why he/she failed to proceed in accordance with this procedure (i.e., health, family emergencies, etc.).

Failure to request a grievance hearing does not affect the complainant's right to contest WHA's decision in a court hearing.

E. Selecting the Hearing Officer [24 CFR 966.55(b)(2)(ii)]

A grievance hearing shall be conducted by a Hearing Officer who shall be an impartial person appointed by the WHA after consultation with resident organizations, as described below:

1. WHA shall nominate a slate of impartial persons to sit as hearing officers. Such persons may include WHA Board members, WHA staff members, residents, professional arbitrators, or others. The initial slate of nominees should be at least nine persons.

2. WHA will check with each nominee to determine whether there is an interest in serving as a potential hearing officer, whether the nominee feels fully capable of impartiality, whether the nominee can serve without compensation, and what limitations on the nominee's time would affect such service.

D000029

3. Nominees will be informed that they will be expected to disqualify themselves from hearing grievances that involve personal friends, other residents of developments in which they work or reside, or grievances in which they have some personal interest.

4. Nominees who are not interested in serving as hearing officers or whose time is too limited to make service practical will be withdrawn.

5. A slate of potential hearing officers nominated by the WHA shall be submitted to WHA's Resident Advisory Board. Written comments from the RAB shall be considered by WHA before the nominees are appointed as hearing officers.

6. When the comments from the RAB have been received and considered, the nominees will be informed that they are WHA's official grievance hearing committee. WHA will subsequently contact committee members in random order to request their participation as hearing officers.

F. Escrow Deposit Required for a Hearing Involving Rent

Before a hearing is scheduled in any grievance involving the amount of rent which WHA claims is due under this Lease, the complainant shall pay to WHA an amount equal to the rent due and payable as of the first of the month proceeding the month in which the act or failure to act took place. The complainant shall, thereafter, deposit the same amount of the monthly rent in an escrow account until the complaint is resolved by decision of the hearing officer.

This requirement will not be waived by WHA unless the complainant is paying minimum rent and the grievance is based on a request for a hardship exemption or the tenant's welfare benefits have been reduced for welfare fraud or failure to comply with economic self sufficiency requirements. In these cases only, rent need not be escrowed.

D000030

G. Scheduling Hearings [24 CFR 966.55(f)]

When a complainant submits a timely request for a grievance hearing, WHA shall promptly appoint a hearing officer and the hearing officer will promptly schedule a hearing at a time and place reasonably convenient to both the complainant and WHA. A written notification, specifying the time, place and the procedures governing the hearing shall be delivered to the complainant and the appropriate WHA official within ten (10) working days of the date of the appointment of the hearing officer.

H. Procedures Governing the Hearing [24 CFR 966.56]

The hearing shall be held before the designated hearing officer as described above in Section E. The complainant shall be afforded a fair hearing, which shall include:

1. The opportunity to examine any WHA documents before the hearing, including records and regulations that are directly relevant to the hearing.

   The Resident shall be allowed to copy any such document at the Resident's expense. The charge shall be established according to actual cost to WHA to make the requested copies.

   If WHA does not make the document available for examination upon request by the complainant, WHA may not rely on such document at the grievance hearing.

2. The resident has a right to be represented by counsel or other person chosen as the Resident's representative and to have such person make statements on the Resident's behalf.

3. The right to a private hearing unless the complainant requests a public hearing.

4. The right to present evidence and arguments in support of the Resident's complaint, to controvert evidence relied on by WHA or project management, and to confront and cross-examine all witnesses upon whose testimony or information WHA or project management relies; and

5. A decision based solely and exclusively upon the facts presented at the hearing.

The hearing officer may render a decision without proceeding with the hearing if they determine that the issue has been previously decided in another proceeding.

D000031

At the hearing, the complainant must first make a showing of an entitlement to the relief sought and, thereafter, WHA must sustain the burden of justifying WHA action or failure to act against which the complaint is directed.

The hearing officer shall conduct the hearing informally. Oral or written evidence pertinent to the facts and issues raised by the complaint may be received without regard to admissibility under the rules of evidence applicable to judicial proceedings.

The hearing officer shall require WHA, the complainant, counsel and other participants or spectators to conduct themselves in an orderly fashion. Failure to comply with the directions of the hearing officer to obtain order may result in exclusion from the proceedings or in a decision adverse to the interests of the disorderly party and granting or denial of the relief sought, as appropriate.

The complainant or WHA may arrange in advance, and at expense of the party making the arrangement, for a transcript of the hearing. Any interested party may purchase a copy of such transcript.

WHA must provide a reasonable accommodation for persons with disabilities to participate in the hearing. Reasonable accommodation may include qualified sign language interpreters, readers, accessible locations, or attendants. If the Resident is visually impaired, any notice to the Resident that is required under this procedure must be in an accessible format.

I.  If the hearing officer fails to disqualify himself/herself as required in Section E of this procedure, WHA will remove the hearing officer from the hearing committee, invalidate the results of the hearing and schedule a new hearing with a new hearing officer. Failure to Appear at the Hearing

If the complainant or WHA fails to appear at the scheduled hearing, the hearing officer may make a determination to postpone the hearing for not to exceed five (5) business days, or may make a determination that the party has waived the right to a hearing.

Both the complainant and WHA shall be notified of the determination by the hearing officer provided that a determination that the complainant has waived his right to a hearing shall not constitute a waiver of any right the complainant may have to contest WHA's disposition of the grievance in court.

D000032

J.  Decision of the Hearing Officer [24 CFR 966.57]

The hearing officer shall prepare a written decision, together with the reasons for the decision within ten (10) working days after the hearing. A copy of the decision shall be sent to the complainant and WHA.

The WHA shall retain a copy of the decision in the Resident's folder. A copy of the decision, with all names and identifying references deleted, shall also be maintained on file by WHA and made available for inspection by a prospective complainant, his representative, or the hearing officer.

The decision of the hearing officer shall be binding on WHA which shall take all actions, or refrain from any actions, necessary to carry out the decision unless WHA's Board of Commissioners determines within ten (10) working days, and promptly notifies the complainant of its determination that:

1.  The grievance does not concern WHA action or failure to act in accordance with or involving the complainant's lease or WHA regulations, which adversely affects the complainant's rights, duties, welfare or status.

2.  The decision of the hearing officer is contrary to applicable Federal, State or local law, HUD regulations, or requirements of the annual contributions contract between HUD and WHA.

3.  A decision by the hearing officer or Board of Commissioners in favor of WHA or which denies the relief requested by the complainant in whole or in part shall not constitute a waiver of, nor affect in any way, the rights of the complainant to a trial or judicial review in any court proceedings which may thereafter be brought in the matter.

RESIDENT AGREES THAT ALL THE PROVISIONS OF THIS LEASE (Parts I and II) HAVE BEEN READ AND ARE UNDERSTOOD AND FURTHER AGREE TO BE BOUND BY ITS PROVISIONS AND CONDITIONS AS WRITTEN. (SIGNATURE REQUIRED ON PART II OF THE LEASE.)

THE WHA ADMISSIONS AND CONTINUED OCCUPANCY POLICY IS HEREBY INCORPORATED BY REFERENCE AND IS POSTED IN THE MANAGEMENT OFFICE AND WILL BE MADE AVAILABLE UPON REQUEST.

D000033

### THE DANGER OF LEAD POISONING TO HOMEOWNERS & RENTERS

This housing or apartment was built before 1978. There is a possibility that it may contain lead paint. Lead paint is poisonous if eaten. Many children do eat paint flakes and frequently become very sick. You as a parent are in the best position to safeguard your child's health by preventing him or her from eating paint or paint chips. This information will answer some of your questions about how to know if your child has been eating lead paint and what to do.

Lead poisoning is a serious problem in this country. Each year thousands of children less than 7 years of age are poisoned when they eat bits of paint containing lead. Children who eat lead can become mentally retarded, blind, paralyzed, or even die. You can safeguard your child's health by preventing him/her from eating paint chips that may contain lead. The Department of Housing and Urban Development has prepared this information to make you aware of the problem of lead paint poisoning in the home.

As a parent, you need to know how to prevent the sickness lead paint can cause. You need to know what to do if your child has lead poisoning.

Your child can get lead poisoning by eating paint, dirt, dust, newspaper, or other non-food items containing lead. The most common cause of lead poisoning is lead-based paint. Children can get dangerous amounts of lead from eating even very small amounts of such paint. Unfortunately, usually there are no obvious signs of lead poisoning. Often lead poisoning can seem like a number of other childhood diseases, but if your child has stomach aches and vomiting, headaches, a loss of appetite, is cranky, or frequently is too tired to play, he may have lead poisoning. Any or all of these symptoms can be signs of lead poisoning. Often, there are no symptoms at all if anyone tells you that your child has eaten paint chips or plaster, or if you see any of these signs in your child, he should be tested for lead in his blood as soon as possible. Do not wait too long! Your doctor, local clinic, hospital, or public health department can test your child for lead poisoning. Blood samples can be taken and tested to tell if your child has eaten enough lead to be harmful. In many communities the local health department operates blood-screening programs, but screening is usually conducted in other areas of cities where lead- based paint and poisoning is most common. Testing for lead takes only a matter of minutes.

Blood screening programs are usually free and will test children for lead even if they show no symptoms of poisoning and have not been seen eating paint. The Department of Health, Education, and Welfare and local health departments support a number of blood screening programs. If you are unaware of a screening program in your area, call your public health nurse or social worker at the local health department. If there are no screening programs in your city and you cannot afford testing, the Medicaid program may pay for screening of children both below six years of age and above the age of six, if a doctor says that testing is necessary.

If tests show that your child has a high level of lead in his blood he will need medical supervision and possibly treatment. If treatment is necessary, your doctor, a local clinic, or hospital will be able to remove the lead in his blood. If tests show that your child has a lot of lead in his blood, the local health department may send someone to measure the lead paint in your home. Standards for treatment of lead hazards in housing vary from city to city. Follow

D000034

the directions and guidance of your local health department.

Lead paint is not the only cause of lead poisoning. Young children put many things besides food in their mouths, but if those objects contain lead, poisoning is possible. Your child can get lead poisoning from eating or chewing on non-food items which contain lead, including dirt, newspaper, and even some pottery, and furniture. Even common household dust sometimes contains high levels of lead. Lead paint, which has weathered and fallen to the ground, can collect in dust and soil. Exhaust from automobiles which use leaded gasoline also contains lead, which can collect in dust and soil. Children should be discouraged from playing in dust and dirt near busy streets where the lead content in soil is likely to be heaviest.

You should stop your child from eating or chewing paint and other objects that may contain lead. Warn your child of the dangers of eating anything other than food if he/she is old enough to understand. Make sure that the rest of your family and anyone who baby-sits for you are aware of the lead paint problem and will prevent your child from eating paint. Often children will eat things if they are bored or hungry. Children are safer if they have activities or toys to keep them busy. If your child is not eating properly, you may want to take him to a doctor.

The best way to prevent lead paint poisoning is to keep your home in good shape. The primary source of the lead paint hazard is peeling and flaking paint. Water leaks from faulty plumbing or defective roofs often cause paint to peel or flake from walls and ceilings. Quick repair of such leaks can prevent this.

To prevent peeling paint, most housing units should be repainted every three to five years. Any loose or flaking paint should be removed by scraping or brushing. Cracked walls should be re-plastered before new paint is applied, if your walls are cracking or peeling now, you may have a lead paint hazard. If you have small children there are some things you should do immediately to protect them: (1) Get a broom or stiff brush and remove all loose pieces of paint from walls, woodwork, and ceilings; (2) sweep up all the pieces of paint and plaster; (3) put the sweepings in a paper bag or wrap them in newspaper and put these packages in a trash can; (4) be careful not to leave paint chips on the floor. Always keep the floor clear of loose bits of paint and plaster by sweeping the floors clean of paint off walls. Be cautious about keeping loose paint from the lower part of walls where your child can reach. As an emergency measure to protect your child, you can cover up the lower part of walls with adhesive backed paper tape or paper and you may also move heavy furniture against walls with peeling paint.

D000035

# EXHIBIT C

# WHA Firearms and Weapons Policy

**Lease Modification** (Replaces Lease Part I § IX.P.):

Ownership, possession, transportation, display, and use of firearms and weapons is governed by the Wilmington Housing Authority Firearms and Weapons Policy which is incorporated into and made a part of this lease.

**Wilmington Housing Authority Firearms and Weapons Policy**:

WHA recognizes the importance of protecting its residents' health, welfare, and safety, while simultaneously protecting the rights of its residents to keep and bear arms as established by the federal and state constitutions.   WHA therefore adopts the following Firearms and Weapons Policy.   Residents, members of a resident's household, and guests:

1.   Shall comply with all local, state, and federal legal requirements applicable to the ownership, possession, transportation, and use of firearms or other weapons. The term "firearm" includes any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded, and any weapon or destructive device as defined by law.

2.   Shall not discharge or use any firearm or other weapons on WHA property except when done in self-defense.

3.   Shall not display or carry a firearm or other weapon in any common area, except where the firearm or other weapon is being transported to or from the resident's unit, or is being used in self-defense.

4.   Shall have available for inspection a copy of any permit, license, or other documentation required by state, local, or federal law for the ownership, possession, or transportation of any firearm or other weapon, including a license to carry a concealed weapon as required by 11 *Del. C.* § 1441, upon request, when there is reasonable cause to believe that the law or this Policy has been violated.

5.   Shall exercise reasonable care in the storage of loaded or unloaded firearms and ammunition, or other weapons.

6.   Shall not allow a minor under 16 years of age to have possession of a firearm, B.B. gun, air gun, or spear gun unless under the direct supervision of an adult.

7.   Shall not give or otherwise transfer to a minor under 18 years of age a firearm or ammunition for a firearm, unless the person is that child's parent or guardian, or unless the person first receives the permission of the minor's parent or guardian.

Violation of this Policy by any resident or member of the resident's household shall be grounds for immediate Lease termination and eviction.  In addition, a resident or member of the resident's household who knowingly permits a guest to violate this Policy shall be subject to immediate Lease termination and eviction.

EXHIBIT D

1  C. D. Michel - S.B.N. 144258
   Don B. Kates - S.B.N. 39193
2  Jason A. Davis - S.B.N. 222250
   Clinton B. Monfort - S.B.N. 255609
3  TRUTANICH • MICHEL, LLP
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
   Telephone: 562-216-4444
5  Facsimile: 562-216-4445
   Email: cmichel@tmllp.com
6

7  Attorneys for Plaintiffs

8        **IN THE UNITED STATES DISTRICT COURT**

9       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10            **SAN FRANCISCO DIVISION**

11 | GUY MONTAG DOE, NATIONAL ) CASE NO. CV-08-03112 TEH
   | RIFLE ASSOCIATION OF       )
12 | AMERICA, INC., CITIZENS    ) **STIPULATION RE SETTLEMENT**
   | COMMITTEE FOR THE RIGHT TO ) **AND DISMISSAL OF DEFENDANTS**
13 | KEEP AND BEAR ARMS,        ) **SAN FRANCISCO HOUSING**
   |                            ) **AUTHORITY AND HENRY**
14 |         Plaintiffs         ) **ALVAREZ III WITHOUT**
   |                            ) **PREJUDICE**
15 |           vs.              )
   |                            )
16 | SAN FRANCISCO HOUSING      )
   | AUTHORITY, HENRY ALVAREZ   )
17 | III, IN HIS OFFICIAL CAPACITY, )
   | JOHN STEWART COMPANY, AND  )
18 | DOES 1-10,                 )
   |                            )
19 |         Defendants.        )

20
21
22
23
24 **WHEREAS:**

25        In 2005 Defendant San Francisco Housing Authority ("SFHA")

26 formally amended its Model Lease Agreement to prohibit the possession of

27 firearms and ammunition in the home by residents of public housing in the City

28 and County of San Francisco.  SFHA's policies are set forth in the current San

                                1

1    Francisco Housing Authority Model Lease Agreement ("MLA") at paragraphs 14

2    and 15.  (A true and correct copy of SFHA's current Model Lease Agreement is

3    attached hereto as Exhibit "A.")

4    **NOW THEREFORE, THE PARTIES STIPULATE AS FOLLOWS:**

5           1.      Plaintiffs shall and hereby do dismiss Defendants San Francisco

6    Housing Authority and Henry Alvarez III from the above captioned lawsuit

7    without prejudice.

8           2.      The parties agree to a mutual waiver of all fees and costs incurred in

9    this litigation.

10          3.      The parties further agree that this Court shall retain jurisdiction over

11   the parties to enforce the settlement until the parties have performed the terms of

12   this agreement in full.

13

14          **Obligations of Defendant San Francisco Housing Authority**

15          1.      Effective immediately, Defendant SFHA shall not at any time enforce

16   the provisions of paragraph 14 of the MLA relating to the lawful possession of

17   ammunition.

18          2.      Defendant SFHA shall not at any time mandate, require, encourage, or

19   otherwise allow enforcement of the provisions of paragraph 14 of the MLA,

20   relating to the lawful possession of ammunition, by any of SFHA's employees or

21   agents, or by any property manager or administrator of any public housing

22   development owned or controlled by SFHA.

23          3.      Defendant SFHA shall not at any time enforce the provisions of

24   paragraph 15 of the MLA relating to the lawful possession of firearms and other

25   arms or weapons.

26          4.      Defendant SFHA shall not at any time mandate, require, encourage, or

27   otherwise allow enforcement of the provisions of paragraph 15 of the MLA,

28   relating to the lawful possession of firearms and other arms or weapons, by any of

1   SFHA's employees, agents, or by any property manager or administrator of any

2   public housing development owned or controlled by SFHA.

3       5.    Defendant SFHA hereby agrees to, and shall formally, amend

4   paragraphs 14 and 15 of its Model Lease Agreement by no later than November 1,

5   2009, to provide as follows:

6           "14.   (I)   FIRE SAFETY

7           (A)   Unlawfully storing, unlawfully keeping, or unlawfully

8           possessing, any ammunition, explosives, fireworks, flammable or

9           other hazardous materials in or around the Residence or Development

10          by a Household Member, guest, or other person under the control of a

11          Household Member, is strictly prohibited.

12          (B)    No gas powered vehicles or equipment shall be allowed in or

13          around the Residence.  No explosives or fireworks of any kind shall be

14          possessed or exploded on or about the Residence or Development.

15          Tenant shall use reasonable precautions to avoid causing a fire,

16          including but not limited to refraining from smoking in bed, failing to

17          control lit materials, or overloading electrical circuits or extension

18          cords. The SFHA shall terminate this Lease if it determines that any

19          Tenant, Household Member, guest or other person under their control

20          deliberately or negligently caused a fire that resulted in damage to any

21          portion of the Residence or Development. In addition, the SFHA shall

22          assess the costs of repair to the Tenant and shall use all legal remedies

23          to recover such costs.

24          15.    PROHIBITION ON UNLAWFUL FIREARMS

25                 AND WEAPONS

26          (A)    Unlawful ownership, unlawful possession, unlawful

27          transportation or unlawful use of any firearm or any weapon, in or

28          around the Residence, the Development, or SFHA property, by a

---

3

1    Household Member, guest, or other person under the control of a

2    Household Member, is strictly prohibited.

3    (B)    Violation of the provisions of this section 15 by any Household

4    Member, guest, or other person under the control of a Household

5    Member, shall be grounds for immediate Lease termination and

6    eviction. The term "firearm" is defined broadly and shall include but

7    not be limited to all pistols, revolvers, other handguns, rifles,

8    shotguns, automatic and semiautomatic guns, and any other instrument

9    that expels a metallic, partly metallic, or other hard projectile,

10    including but not limited to BB guns, air guns and spring action

11    guns."

12    **IT IS SO STIPULATED AND AGREED.**

13    Dated: January 12, 2009          TRUTANICH ● MICHEL, LLP

14

15                                              C. D. Michel

16                                              Attorney for Plaintiffs

17

18    Dated: January 6, 2009          SAN FRANCISCO HOUSING AUTHORITY

19

20                                              Henry Alvarez, Executive Director

21                                              San Francisco Housing Authority

22    **PURSUANT TO THE STIPULATION, IT IS SO ORDERED.**

23

24    Date: January 12, 2009

25

26    Honorable Thelto

27    Judge of the

28

                                4

                    Judge Thelton E. Henderson

REDACTED

# EXHIBIT E

REDACTED

# EXHIBIT F

# REDACTED

# EXHIBIT G

REDACTED

# EXHIBIT H

# REDACTED

# EXHIBIT I

REDACTED

# EXHIBIT J

# REDACTED