**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

JANE DOE and CHARLES BOONE　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)　　C.A. No. 1:10-cv-00473-LPS
　　　　　　　　　　　　　　　　　)
WILMINGTON HOUSING AUTHORITY　　)　　**JURY TRIAL DEMANDED**
and FREDERICK S. PURNELL, SR., in　　)
his official capacity as Executive Director　)
of the Wilmington Housing Authority,　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants　　　　　)

**DEFENDANTS' ANSWERING BRIEF IN RESPONSE
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (REDACTED VERSION)**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby, Esquire (Bar I.D. 1016)
Lauren E. Moak, Esquire (Bar I.D. 5366)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666; (302) 576-3255
Facsimile: (302) 576-3345; (302) 576-3750
Email: bwilloughby@ycst.com; lmoak@ycst.com

*Attorneys for Defendants Wilmington Housing Authority
and Frederick S. Purnell, Sr.*

Dated: March 25, 2011

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................ ii

NATURE AND STAGE OF PROCEEDINGS .......................................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 2

STATEMENT OF FACTS ............................................................................................ 3

ARGUMENT ................................................................................................................... 4

    I.    ANY CHALLENGE TO THE ORIGINAL POLICIES IS MOOT, AND
        THIS COURT IS WITHOUT JURISDICTION TO CONSIDER IT ............................ 4

    II.   THE ORIGINAL POLICIES AND THE NEW POLICY ARE LAWFUL
        UNDER THE SECOND AMENDMENT ........................................................................ 7

        A.   The Original Policies Did Not Violate The Second Amendment ........................... 7

        B.   The New Policy Is Lawful Under Established Precedent ......................................... 8

        C.   The New Policy Does Not Predicate Receipt Of Governmental
            Benefits Upon Waiver Of Fundamental Rights ..................................................... 15

    III.  DEFENDANTS' CONDUCT IS LAWFUL UNDER ARTICLE I, § 20 OF
        THE DELAWARE STATE CONSTITUTION............................................................. 17

    IV.  THE DOCTRINE OF PREEMPTION IS INAPPLICABLE BECAUSE A
        LEASE IS NOT LEGISLATIVE CONDUCT ............................................................. 18

CONCLUSION .............................................................................................................. 20

YCST01:10887417.2
050548.1081

# TABLE OF AUTHORITIES

**Cases**

299 Assoc., LLC v. Rutkoske,
   No. 9320,
   2000 Del. Ch. LEXIS 185 (Del. Ch. Nov. 9, 2000) .................................................................. 6

A.W. Fin. Servs., S.A. v. Empire Res., Inc.,
   981 A.2d 1114 (Del. 2009) ............................................................................................................ 18

Burson v. Freeman,
   504 U.S. 191 (1992) ........................................................................................................................ 13

Chi. United Indus. v. City of Chicago,
   445 F.3d 940 (7th Cir. 2006) ...................................................................................................... 5

City of Mesquite v. Aladdin's Castle, Inc.,
   455 U.S. 283 (1982) .................................................................................................................. 5, 6

Clark v. Cmty. for Creative Non-Violence,
   468 U.S. 288 (1984) ...................................................................................................................... 16

D.C. v. Heller,
   554 U.S. 570 (2008) ........................................................................................................... 7, 9, 10

DeBolt v. Espy,
   47 F.3d 777 (6th Cir. 1995) ........................................................................................................ 4

Dickerson v. State,
   975 A.2d 791 (Del. 2009) ........................................................................................................... 17

Farm Raised Salmon Cases,
   175 P.3d 1170 (Cal. 2008) ......................................................................................................... 19

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,
   528 U.S. 167 (2000) ........................................................................................................................ 5

Garcetti v. Ceballos,
   547 U.S. 410 (2006) ................................................................................................................ 9, 16

Golan v. Holder,
   609 F.3d 1076 (10th Cir. 2010) ................................................................................................ 12

Holt v. Richmond Redev. & Hous. Auth.,
   266 F. Supp. 397 (E.D. Va. 1966) .................................................................................... 15, 16

IMS Health Inc. v. Ayotte,
   550 F.3d 42 (1st Cir. 2008) ....................................................................................................... 13

In re: Application of McIntyre,
      552 A.2d 500 (Del. Super. Ct. 1988) ................................................................. 17

Magnuson v. Hickory Hills,
      933 F.2d 562 (7th Cir. 1991) ......................................................................... 4

McDonald v. City of Chicago,
      130 S. Ct. 3020 (2010) ................................................................................ 4, 7

Monsanto Co. v. Geertson Seed Farms,
      130 S. Ct. 2743 (2010) ................................................................................. 6

Nite Moves Entm't, Inc. v. City of Boise,
      153 F. Supp. 2d 1198 (D. Idaho 2001) ......................................................... 18

Pagan v. Fruchey,
      492 F.3d 766 (6th Cir. 2007) ......................................................................... 12

Pickering v. Bd. of Educ.,
      391 U.S. 563 (1968) ...................................................................................... 16

Richland Bookmart, Inc. v. Knox County, Tenn.,
      555 F.3d 512 (6th Cir. 2009) ......................................................................... 13

Short v. State,
      No. 228, 1990,
      1991 Del. LEXIS 11 (Del. Supr. Ct. Jan. 14, 1991) ...................................... 17

Smith v. State,
      882 A.2d 762 (Del. 2005) .............................................................................. 17

Troiano v. Supervisor of Elections,
      382 F.3d 1276 (11th Cir. 2004) ..................................................................... 5

Turner Broad. Sys. v. Fed. Commc'ns Comm'n,
      520 U.S. 180 (1997) ...................................................................................... 12

U.S. v. Aluminum Co. of Am.,
      148 F.2d 416 (2d Cir. 1945) .......................................................................... 5

U.S. v. Concentrated Phosphate Export Ass'n, Inc.,
      393 U.S. 199 (1968) ...................................................................................... 5

U.S. v. Marzzarella,
      614 F.3d 85 (3d Cir. 2010) ............................................................. 8, 9, 10, 11, 12, 15

iii

U.S. v. Masciandaro,
    No. 09-4839,
    2011 U.S. App. LEXIS 5964 (4th Cir. Mar. 24, 2011) .......................................... 10, 12, 13, 14

U.S. v. Rene E.,
    583 F.3d 8 (1st Cir. 2009) ......................................................................... 10

U.S. v. Salerno,
    481 U.S. 739 (1987) ................................................................................ 11

U.S. v. Skoien,
    587 F.3d 803 (7th Cir. 2009) .................................................................. 12

U.S. v. Skoien,
    614 F.3d 638 (7th Cir. 2010) (*en banc*) ................................................ 12

U.S. v. W. T. Grant Co.,
    345 U.S. 629 (1953) .................................................................................. 5

Wis. Right to Life, Inc. v. Schober,
    366 F.3d 485 (7th Cir. 2004) ..................................................................... 6

**Statutes**

9 Del. C. § 330(c) ...................................................................................... 18

22 Del. C. § 111 ........................................................................................ 18

**Other Authorities**

Charles Alan Wright & Arthur Miller,
    Federal Practice and Procedure (3d ed. 2008) ..................................... 4, 6

Del. Const. art. I, § 20 .......................................................................... 17, 18

YCST01:10887417.2                                                              050548.1081

## NATURE AND STAGE OF PROCEEDINGS

This action, originally filed on May 27, 2011 in the Court of Chancery, was removed to

this Court on June 1, 2010.  (D.I. 1.)  Defendants Wilmington Housing Authority ("WHA") and

Frederick S. Purnell, Sr. ("Mr. Purnell," and together with WHA, "Defendants") filed their

Answer and Affirmative Defenses on June 16, 2010.  (D.I. 13.)  The Court subsequently stayed

the proceedings in this matter pending the Supreme Court's decision in McDonald v. City of

Chicago, 130 S. Ct. 3020 (2010) and WHA's amendment of its firearms policy in response to the

McDonald decision.  (D.I. 21.)

Plaintiffs twice amended their Complaint, and Defendants filed amended Answers and

Affirmative Defenses in response.  (D.I. 23, 40; 24, 47.)  The parties engaged in discovery

throughout December 2010 and January 2011.  On February 21, 2011, after the completion of

discovery, the parties filed cross-motions for summary judgment.  (D.I. 86, 88.)

This is Defendants' Answering Brief in response to Plaintiffs' Motion for Summary

Judgment and Opening Brief in support thereof.  (D.I. 87.)

## SUMMARY OF ARGUMENT

1.      Plaintiffs' allegations regarding the Original Policies, in effect prior to the Supreme Court's decision in <u>McDonald v. City of Chicago</u>, are moot because the policies are no longer in effect, and Defendants have no intention of reinstating the Original Policies regardless of the outcome of this litigation.

2.      Both the Original Policies, while they were in effect, and the New Policy now in effect, are lawful under the Second Amendment and binding precedent.  Because the New Policy is constitutional, Plaintiffs cannot maintain that they are being required to waive fundamental rights in exchange for governmental benefits.

3.      The Original Policies and the New Policy are also lawful under Article I, § 20 of the Delaware State Constitution, for the same reasons that they are lawful under the Second Amendment.

4.      The doctrine of preemption is inapplicable in the present case because it applies to legislative action, not the establishment of lease provisions.  However, even if the doctrine of preemption were implicated by the facts of this case, Delaware law does not preempt Defendants' actions because there is no legislation governing the conduct to which Plaintiffs object.

YCST01:10887417.2                                                    050548.1081

## STATEMENT OF FACTS

Defendants incorporate by reference the Statement of Facts contained in Defendants' Opening Brief in Support of Their Motion for Summary Judgment. (D.I. 89.)

Plaintiffs limit their challenge to (1) the Original Policies, which include the lease provisions and house rules that governed the possession and use of firearms prior to WHA's adoption of the WHA Firearms and Weapons Policy (the "New Policy"), and (2) Paragraphs 3 and 4 of the New Policy. (D.I. 87, n.5.) Paragraph 3 addresses the possession of firearms in common areas (the "Common Area Provision") and Paragraph 4 addresses WHA's right to inspect any applicable firearms permit or license "where there is reasonable cause to believe that the law or this Policy has been violated" (the "Reasonable Cause Provision"). Because both Plaintiffs expressly stated in their depositions that they did not oppose the Reasonable Cause Provision, Plaintiffs have no basis to now challenge it. (A48; A72.[1]) In addition, for the reasons set forth in Section I of this brief, and in Defendants' Opening Brief in Support of Their Motion for Summary Judgment (D.I. 89), Plaintiffs also lack standing to challenge the Original Policies and the Common Area Provision.

---

[1] All appendix citations in this Brief refer to the Appendix to Defendants' Opening Brief in Support of Their Motion for Summary Judgment, D.I. 90.

YCST01:10887417.2                                                                                    050548.1081

**ARGUMENT**

I. **ANY CHALLENGE TO THE ORIGINAL POLICIES IS MOOT, AND THIS COURT IS WITHOUT JURISDICTION TO CONSIDER IT**

Plaintiffs spend a significant portion of their Opening Brief addressing the Original Policies.[2] The Original Policies, however, are not properly at issue in this litigation because they were suspended immediately upon the U.S. Supreme Court's issuance of its decision in McDonald v. City of Chicago, 130 S. Ct. 3020 (2010). The Original Policies remained suspended until WHA completed the HUD-mandated process for amending the WHA public housing lease. The Original Policies were thereafter replaced by the New Policy. Furthermore, it is undisputed that no WHA tenant was ever evicted or otherwise disciplined under the Original Policies or during the period of their suspension. Consequently, the Original Policies are moot. See, e.g. DeBolt v. Espy, 47 F.3d 777, 782 (6th Cir. 1995) (holding plaintiff's claim against Farmer's Home Administration moot after FmHA revised its lease to comply with applicable regulations).

Cases that do not involve an active controversy are moot, and must be dismissed for lack of jurisdiction pursuant to Article III of the U.S. Constitution. A controversy is moot if: (1) there has been a complete discontinuation of the disputed conduct; (2) there are no continuing effects after the discontinuation; and (3) there are no other factors justifying relief. Magnuson v. Hickory Hills, 933 F.2d 562, 565 (7th Cir. 1991); 13C Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 3533.7 (3d ed. 2008). In the case at bar, there can be no dispute that Defendants have discontinued the Original Policies, and that there are no continuing effects, because Plaintiffs' conduct is now governed exclusively by the New Policy.

---

[2] Defendants preserve each of the arguments asserted in their Opening Brief in Support of Their Motion for Summary Judgment. (D.I. 89.) This Brief, however, only addresses those arguments raised in the Opening Brief in Support of Plaintiffs Motion for Summary Judgment. (D.I. 87.)

4

Thus, in an attempt to establish that this Court has jurisdiction to review the Original Policies, Plaintiffs point to the theoretical possibility that Defendants will reinstate the Original Policies, as a consideration justifying relief. Of course, there is no evidence that Defendants intend to reinstate the Original Policies and Plaintiffs have cited none.

Instead, Plaintiffs point to several cases that stand for the general proposition that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982). However, a "case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'" U.S. v. W. T. Grant Co., 345 U.S. 629, 633 (1953) (quoting U.S. v. Aluminum Co. of Am., 148 F.2d 416, 448 (2d Cir. 1945)). A public official's assertion that the disputed conduct has ceased is sufficient to meet this burden.[3] See, e.g. Troiano v. Supervisor of Elections, 382 F.3d 1276, 1283 n.4 (11th Cir. 2004) (citing cases). In fact, several Circuit Courts of Appeals have held that "when the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will not recur." Troiano, 382 F.3d at 1283; see also Chi. United Indus. v. City of Chicago, 445 F.3d 940, 947 (7th Cir. 2006).

In order for Plaintiffs to overcome this rebuttable presumption, they must present some evidence that "the wrong will be repeated," and thus that relief remains appropriate. W. T. Grant Co., 345 U.S. at 633 ("the moving party must satisfy the court that relief is needed"). For example, in City of Mesquite v. Aladdin's Castle, Inc., the City expressly announced that it

---

[3] Most of the cases cited by Plaintiffs are distinguishable because they involve private entities whose assurances of non-enforcement are not entitled to the same credence as public officials. See W.T. Grant Co., 345 U.S. 629, 630 (1953); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 175 (2000); U.S. v. Concentrated Phosphate Export Ass'n, Inc., 393 U.S. 199, 200 (1968).

intended to reenact the objectionable provision if the district court's decision was vacated, thereby establishing the continued need for relief.  455 U.S. at 289 n.11.  No such evidence is present in the case at bar because Defendants have not given any indication of an intent to reinstate the Original Policies.  Rather, Defendants have engaged in the time-consuming process of amending their public housing lease in accordance with applicable HUD regulations, thereby creating significant disincentive to revert to previous practices.

In summary, Defendants have demonstrated their good faith by first suspending and then replacing the Original Policies with the New Policy.  (D.I. 20, 23.)  Moreover, WHA's assertion that it will not enforce the Original Policies is "extremely creditable given that [Defendants] have never enforced the [Original Policies] in the past."  Wis. Right to Life, Inc. v. Schober, 366 F.3d 485, 492 (7th Cir. 2004); (D.I. 20, ¶18.).  Nor can Plaintiffs point to any evidence indicating that Defendants intend to reinstate the Original Policies.  In the absence of such evidence, Plaintiffs' request that this Court rule on the Original Policies amounts to nothing more than "curiosity or a naked desire for vindication."  Federal Practice and Procedure § 3533.  Based on the foregoing, the Original Policies are clearly moot.  This Court is therefore without jurisdiction to address the constitutionality of the Original Policies.[4]

---

[4] Despite the fact that the Original Policies are moot, Plaintiffs once again ask this Court to revisit the issue of a preliminary injunction.  However, as Defendants have repeatedly pointed out, an injunction is an extraordinary remedy to which Plaintiffs must prove an entitlement.  299 Assoc., LLC v. Rutkoske, No. 9320, 2000 Del. Ch. LEXIS 185, at *4-5 (Del. Ch. Nov. 9, 2000).  It is not a remedy to be "granted as a matter of course."  Monsanto Co. v. Geertson Seed Farms, 130 S. Ct. 2743, 2761 (2010).  Because Plaintiffs have not addressed, let alone established, the elements required for a preliminary injunction in their briefing, such an award would be inappropriate.

6

## II.   THE ORIGINAL POLICIES AND THE NEW POLICY ARE LAWFUL UNDER THE SECOND AMENDMENT

### A.   The Original Policies Did Not Violate The Second Amendment

Plaintiffs' challenge to the Original Policies is moot.  Notwithstanding that fact, none of Defendants' conduct with respect to the Original Policies was violative of the Second Amendment.[5]

#### 1.   The Original Policies Were Lawful Under Pre-McDonald Precedent

As Plaintiffs concede, it was not until the Supreme Court's decision in McDonald v. City of Chicago, issued on June 28, 2010, that the Supreme Court first incorporated the Second Amendment into the Fourteenth Amendment, thereby making it applicable to the states.  130 S. Ct. at 3050; (D.I. 87 at 6).  In fact, in its analysis, the Supreme Court reviewed its Second Amendment case law from the enactment of the Fourteenth Amendment through the present, and concluded that it had repeatedly "reaffirmed that the Second Amendment applies only to the Federal Government."  Id. at 3030 (quoting D.C. v. Heller, 554 U.S. 570, 620 n.23 (2008)). Consequently, prior to June 28, 2010, there was no basis on which to conclude that the Original Policies violated the Second Amendment.

Moreover, as Plaintiffs concede, as soon as Defendants became aware of the Court's decision in McDonald, they suspended operation of the Original Policies.  (D.I. 87 at 8; D.I. 20 ¶¶ 25.)  As a result, at no time after the Second Amendment became applicable to the states were the Original Policies in effect.

---

[5] In footnote 9 of their Opening Brief, Plaintiffs analogize the Original Policies and the New Policy to post-Civil-War firearms bans prohibiting firearms possession by African Americans. To analogize Defendants' good-faith efforts to protect their tenants' safety to expressly and intentionally racist conduct is offensive, unfounded, and amounts to nothing more than mud-slinging.  Plaintiffs have not presented any empirical evidence of the alleged disparate impact of Defendants' conduct, nor have they presented any evidence of discriminatory intent—because no such evidence exists.

050548.1081

### 2.   Jane Does Was The Only Plaintiff During The Effective Period Of The Original Policies

Even if the Second Amendment had been applicable to the states prior to the McDonald

decision, Plaintiff Charles Boone was not a party to this action at that time.  This suit was

originally filed by Plaintiff Jane Doe, a resident of The Park View.  (D.I. 1.)  The Park View is a

privately-owned residential facility that is managed by WHA, and subject to a different lease

than other WHA-owned properties.  (D.I. 87 at 3, n.8; see also D.I. 20 ¶¶ 2-8 (describing the

ownership structure of The Park View).)  As a result, Ms. Doe's allegations regarding the

Original Policies were not applicable to any other public housing facility.

Plaintiff Charles Boone, a resident of the Southbridge Apartments, a public housing

project owned and operated by Defendant WHA, did not become a party to this action until

August 6, 2010, more than one month after Defendants had suspended the Original Policies.

(D.I. 23.)  Consequently, any alleged violation of the Second Amendment raised by Plaintiff Doe

is limited to The Park View, and does not extend to any other public housing facilities.

### B.   The New Policy Is Lawful Under Established Precedent

#### 1.   Intermediate—Not Strict—Scrutiny Is The Appropriate Standard Of Review In The Case At Bar

Defendants agree with Plaintiffs that the analysis articulated by the Third Circuit in U.S.

v. Marzzarella, 614 F.3d 85 (3d Cir. 2010) should guide this Court in resolution of the current

dispute.  Defendants strenuously disagree, however, with Plaintiffs' application of that analysis.

As Plaintiffs note, the Third Circuit developed a two-pronged approach, requiring that trial

courts (1) ask whether the challenged conduct imposes a burden on conduct falling within the

scope of the Second Amendment's guarantee; and (2) if the conduct imposes a burden, evaluate

it under "some form of means-end scrutiny." Id. at 89. In the process, the Third Circuit rejected a

strict scrutiny standard, noting that such a standard should be reserved for cases like District of

Columbia v. Heller, 544 U.S. 570 (2008) involving a complete ban on possession of firearms in the home. Mazzarella. at 96-97.

Notably, unlike the law in Heller, the New Policy as a whole, and the Common Area Provision specifically,[6] (1) does not involve a complete ban on the possession of firearms in the home, and (2) provides an exception for self-defense.  Therefore, the intermediate scrutiny standard defined by the Third Circuit in Marzzarella should be applied.  Further, unlike Heller, this case involves the government it its role as landlord.  As discussed in Defendants' Opening Brief and infra, the Third Circuit has made clear that First Amendment case law provides guidance on how the Courts should apply Second Amendment rights.  (D.I. 89.)  Cases such as Garcetti v. Ceballos, show that the Court must consider the role in which a government entity is acting in applying constitutional principles.  547 U.S. 410, 418 (2006) (holding that a public employee's speech is unprotected by the First Amendment unless he speaks "as a citizen on a matter of public concern.").  Thus, WHA's role as a landlord unquestionably gives it a greater right and duty to regulate firearms than a municipality that attempts to regulate firearms possession by the citizenry in general.  Consequently, Plaintiffs are without support in their assertion that this Court should apply strict scrutiny in reviewing the Common Area Provision.

### 2. The Common Area Provision Does Not Impose A Burden On Conduct Falling Within The Scope Of The Second Amendment's Guarantee

As a threshold matter, the restriction contained in the Common Area Provision falls completely outside the scope of the Second Amendment, taking this matter outside the analysis identified by the Third Circuit in Marzzarella.  The right to bear arms identified by the Supreme Court in Heller was limited to the home—it did not extend to public spaces.  Heller, 554 U.S. at

---

[6] While Plaintiffs assert that they continue to challenge both the Common Area Provision and the Reasonable Cause Provision, they only address the Common Area Provision with respect to their Second Amendment argument.

050548.1081

635.  In fact, the Court expressly acknowledged the limited nature of its holding, writing that "whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. (emphasis added). Indeed, the Fourth Circuit has expressly cautioned that courts should await further guidance from the Supreme Court before expanding Heller's holding outside of the home. U.S. v. Masciandaro, No. 09-4839, 2011 U.S. App. LEXIS 5964, at *46-47 (4th Cir. Mar. 24, 2011). Therefore, Heller only establishes a right to bear arms in one's home, not in common areas of a public housing facility shared with other residents.

The limited nature of the right identified by the Heller Court is in keeping with the well-established right of governments to restrict the use or possession of firearms on government property.  And, as the Heller Court noted, "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." Id. at 626-27.  Moreover, the Third Circuit expressly held that such traditional limitations on the Second Amendment's provisions regulate conduct outside the scope of the Second Amendment." Marzzarella, 614 F.3d at 91 (emphasis added); see also U.S. v. Rene E., 583 F.3d 8, 16 (1st Cir. 2009) (concluding that restrictions on juvenile possession of handguns fall outside the scope of the Second Amendment).

The spaces governed by the Common Area Provision—those shared by WHA tenants, their guests, and WHA personnel—do not constitute the "hearth and home" protected by Heller. For example, WHA does not need permission from any tenant to enter into or inspect common areas.  In addition, a wide range of people have access to the common areas, including tenants, visitors, and WHA employees.  Consequently, these areas are distinguishable from a tenant's unit, where the possession of firearms is unrestricted by the New Policy.  As a result, the

10

restriction imposed by the Common Area Provision falls outside the scope of the Second

Amendment entirely, and is not subject to any constitutional scrutiny.

### 3. The Common Area Provision Satisfies The Intermediate Scrutiny Standard Defined By The Third Circuit

Even if the Common Area Provision does govern conduct falling within the scope of the

Second Amendment, it withstands intermediate scrutiny.[7] In defining the means-end scrutiny to

be applied in Second Amendment cases, the <u>Marzzarella</u> Court found that the governmental

interest asserted in support of the challenged conduct must be either significant, substantial, or

important. <u>Id.</u> at 98. The Court also held that the fit between the restriction imposed and the

governmental interest must be reasonable, but not perfect. <u>Id.</u> Thus, "the regulation need not be

the least restrictive means of serving the interest," but must not burden "reasonably necessary"

conduct. <u>Id.</u>

Contrary to Plaintiffs' assertions, the New Policy expressly identifies the government

interest served by its provisions: protection of "residents' health, welfare, and safety." In

developing the New Policy, Defendants also considered (1) the unique circumstances of many

WHA properties, which include various community spaces such as daycare facilities, libraries,

and community rooms that play host to many of WHA's most vulnerable residents: the elderly

and children; and (2) the concerns of WHA residents as expressed at the October 14, 2010 Public

Hearing. (A102-05; D.I. 20, A20-21, A89.) Such considerations are, by their very nature,

compelling. <u>See</u>, <u>e.g.</u> <u>U.S. v. Salerno</u>, 481 U.S. 739, 745 (1987) (noting "the Federal

Government's compelling interests in public safety"); <u>Masciandaro</u>, 2011 U.S. App. LEXIS

---

[7] Plaintiffs' cursory argument that the definition of "common areas" is subject to multiple understandings and therefore impermissibly vague falls flat. Plaintiffs cite the testimony of various WHA Commissioners. However, the Board of Commissioners is not responsible for interpreting or enforcing the New Policy. Consequently, their difficulty in expressing the precise contours of the New Policy is irrelevant to the question of its constitutionality.

11

5964, at *41 ("the government has a substantial interest in providing for the safety of individuals who visit and make us of the national parks"). The question, therefore, is only whether the New Policy is narrowly tailored to satisfy these interests, such that it does not burden "reasonably necessary" conduct. Marzzarella, 614 F.3d at 98.

Citing U.S. v. Skoien, 587 F.3d 803 (7th Cir. 2009) (*vacated by* No. 08-3770, 2010 U.S. App. LEXIS 6584 (7th Cir. Feb. 22, 2010)), Plaintiffs assert that the Common Area Provision cannot be shown to be narrowly tailored to Defendants' compelling governmental interests absent statistical evidence tying the policy to the asserted governmental objective. (D.I. 87 at 14.) However, Plaintiffs' interpretation of Skoien is contradicted by the Seventh Circuit's subsequent *en banc* opinion in the same case. In that decision, the Court analogized the federal firearms statute at issue—banning possession of firearms by those convicted of domestic violence misdemeanors—to similar categorical limits on free speech. U.S. v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) (*en banc*). The Court concluded that those decisions, upholding categorical limits, were not "conditioned . . . on proof, satisfactory to a court, that the exclusion was vital to the public safety."[8] Id.; see also Golan v. Holder, 609 F.3d 1076, 1088-89 (10th Cir. 2010) ("The Supreme Court has cautioned that imposing too strict of an evidentiary requirement on Congress is 'an improper burden for courts to impose on the Legislative Branch.'") (quoting Turner Broad. Sys. v. Fed. Commc'ns Comm'n, 520 U.S. 180, 213 (1997); Pagan v. Fruchey, 492 F.3d 766, 773 (6th Cir. 2007) ("the Supreme Court has made quite clear that the evidentiary requirement the state must meet under intermediate scrutiny does not prescribe the manner by

---

[8] The current case is also distinguishable from Skoien because the panel decision indicated that it had reason to believe that additional evidence existed, but that the government had not exerted the effort to present such evidence. 587 F.3d at 815. The resources at Defendants' disposal are also significantly more limited: WHA does not have the investigatory and fact-finding resources that Congress had when enacting the federal legislation at issue in Skoien.

which evidence must be gathered or the precise form that it must take"). Consequently, there is no reason to conclude that such statistical evidence is required in the present case in order for the Common Area Provision to survive intermediate scrutiny.

The Skoien *en banc* decision is in line with the case law of other Circuit Courts of Appeals. For example, the Sixth Circuit noted, in the context of the First Amendment, that " the kind of evidence required to establish that a regulation furthers a substantial government interest depends on [the] character of the interest. A content-neutral regulation of conduct, such as the prohibition on public nudity or on the destruction of draft cards, requires no evidentiary showing at all that the threatened harm was real." Richland Bookmart, Inc. v. Knox County, Tenn., 555 F.3d 512, 522 (6th Cir. 2009). Similarly, the First Circuit has held that empirical data is not required to survive intermediate scrutiny, and that "[a] state need not go beyond the demands of common sense to show that a statute promises directly to advance an identified governmental interest." IMS Health Inc. v. Ayotte, 550 F.3d 42, 55 (1st Cir. 2008) (citing Burson v. Freeman, 504 U.S. 191, 211 (1992)).

The case at bar is one in which common sense will suffice: the presence of firearms increases the risk of firearms-related injuries, and their absence decreases that risk. Masciandaro, 2011 U.S. App. LEXIS 5964, at *42 ("loaded firearms are surely more dangerous than unloaded firearms"); (Pls. Opening Br. Ex. H, Grober Dep. 20:18-19 ("we just thought it was kind of like . . . common sense").) Moreover, in a tenant's unit, the tenant and his guests are the only individuals exposed to the risk of such injury. In common areas, however, the risk of injury is imposed upon unwitting residents, guests, and visitors, who do not willingly assume the risk of harm.

13

On the basis of the foregoing, Defendants have carefully considered relevant case law, the opinions of WHA tenants as expressed in the October 14, 2010 Public Hearing, and the policies adopted by other public housing authorities to draft a narrowly tailored firearms policy. To ensure Plaintiffs' Second Amendment rights, the New Policy permits the possession of firearms in a tenant's residence, and in common areas to the extent they are being transported to and from a tenant's unit, but limits the tenant's use of a firearm to circumstances of self-defense.

In common areas, however, WHA must more carefully balance rights and safety. Common areas are those where tenants' Second Amendment rights are most likely to come into conflict, because Plaintiffs' rights to possess a weapon directly impact others' rights not to possess a weapon, and to be safe from accidental or intentional firearm violence. See, e.g. Masciandaro, 2011 U.S. App. LEXIS 5964, at *33 (recognizing a "longstanding out-of-the-home/in-the-home distinction" in firearms regulation). Moreover, it is in these areas that the very presence of a gun is most likely to alarm residents and their guests. (A42-44; A65-66.) Thus, under the New Policy, weapons may only be possessed in common areas to the extent they are being transported to and from a tenant's unit, and may only be used in common areas to the extent they are used in self-defense.

Thus, the Common Area Provision is carefully tailored to permit Plaintiffs to exercise their Second Amendment rights, while simultaneously preserving the rights and safety of others. By contrast, the solution proposed by Plaintiffs—that Defendants should not be permitted to impose any lease restrictions more extensive than Paragraph 1 of the New Policy—sacrifices the rights of the many for those of the few. No WHA resident should be subject to a needlessly increased risk of harm from firearms in common areas, where the constitution does not so require. Masciandaro, 2011 U.S. App. LEXIS 5964, at *33 ("as we move outside the home,

14

firearm rights have always been more limited, because public safety interests often outweigh individual interests in self defense"). For the foregoing reasons, the WHA Board of Commissioners' decision to limit weapons in common areas is narrowly tailored to meet compelling objectives.

### 4.   The Common Area Provision Satisfies Strict Scrutiny

For the same reasons that the Common Area Provision and the New Policy as a whole survive intermediate scrutiny, they would also survive strict scrutiny. As noted, <u>supra</u>, the U.S. Supreme Court has recognized that a government has a compelling interest in limiting crime. Thus, in order to survive strict scrutiny, the Common Area Provision and the New Policy must be narrowly tailored to effectuate that compelling state interest. <u>Marzzarella</u>, 614 F.3d at 97 n.14. As discussed, the New Policy as a whole, and the Common Area Provision specifically, are narrowly tailored, allowing residents to possess firearms in their units and to use them in self defense in common areas when going to or from their homes. The additional limits imposed on possession and use in common areas are narrowly tailored to protect the health and safety of other individuals using the common areas.

### C.   The New Policy Does Not Predicate Receipt Of Governmental Benefits Upon Waiver Of Fundamental Rights

Because the New Policy is constitutional, Plaintiffs' argument that they are being required to waive their fundamental rights must fail. Compliance with reasonable restrictions upon the exercise of a right is not a waiver. Plaintiffs cite only one analogous case in support of their position: <u>Holt v. Richmond Redevelopment & Housing Authority</u>, 266 F. Supp. 397 (E.D. Va. 1966). In that case, the district court held that the plaintiff could not be required to forego his First Amendment rights in exchange for continued residency in public housing facilities. <u>Id.</u> at 401. <u>Holt</u>, however, is clearly distinguishable because the tenant's threatened eviction in that

15

case was the result of the landlord's retaliation for the exercise of First Amendment rights. Id. at 400. The defendant housing authority did not have an articulated policy regarding the speech at issue, and it never argued that it had a compelling interest in limiting the speech, or that the speech fell outside of the First Amendment.

In contrast, the New Policy and the Common Area Provision are narrowly tailored policies that are neutrally applied to all WHA tenants, without any retaliatory animus. Moreover, they impose constitutional restrictions consistent with the Supreme Court's established Second Amendment case law. As a result, the limits at issue in the case at bar are analogous to those addressed in Pickering v. Board of Education and its progeny, where the Supreme Court has repeatedly recognized an employer's right to limit the workplace speech of its employees. 391 U.S. 563, 568 (1968). In addressing the argument raised by Plaintiffs, the Pickering Court wrote:

> The theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568 (internal quotations omitted). See also Garcetti, 547 U.S. at 418 (holding that a public employee's speech is unprotected by the First Amendment where he does not speak "as a citizen on a matter of public concern").

Here, WHA has established reasonable limits upon the exercise of Second Amendment rights. The New Policy is akin to a reasonable "time, place, and manner" restriction under the First Amendment. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 (1984)

16

("Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions."). Such restrictions are lawful, and do not constitute a waiver. Thus, because the New Policy is narrowly tailored to effectuate a compelling governmental interest, its restrictions are constitutional.

III.   **DEFENDANTS' CONDUCT IS LAWFUL UNDER ARTICLE I, § 20 OF THE DELAWARE STATE CONSTITUTION**

Article I, § 20 of the Delaware Constitution provides that "[a] person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use." No Delaware court has addressed the scope of this provision outside the context of a license to carry a concealed deadly weapon.[9] In the absence of any guiding precedent from Delaware state courts, this Court should follow federal constitutional precedent. To that extent, Defendants incorporate by reference their argument, supra, in Section II.

Plaintiffs attempt to muddle this issue by arguing that the Delaware Constitution provides greater protection than the Second Amendment. However, the reference to "hunting and recreational use" in Article I, § 20 is completely inapplicable to the current situation. The issue in this case is the extent of Plaintiffs' rights to keep and bear arms in common areas of public housing facilities, not their right to the recreational use of firearms. Consequently, Plaintiffs' argument on this point is irrelevant.

---

[9] Dickerson v. State, 975 A.2d 791, 796 (Del. 2009) (holding that Article I, § 20 does not guarantee the right to carry a concealed deadly weapon); Smith v. State, 882 A.2d 762 (Del. 2005) (table cite) (holding that carrying a concealed deadly weapon is a privilege provided by statute, not a right protected by Article 1, § 20); Short v. State, No. 228, 1990, 1991 Del. LEXIS 11, at *4-5 (Del. Supr. Ct. Jan. 14, 1991) (holding that 11 Del. C. § 1448 (possession of a deadly weapon by a person prohibited) does not violate Article 1, § 20); In re: Application of McIntyre, 552 A.2d 500, 501 n.1 (Del. Super. Ct. 1988) (noting without holding that Article 1, § 20 "does not necessarily require that such arms may be kept concealed").

17

Based on the arguments contained in Section II, supra, the Court should deny Plaintiffs'

Motion for Summary Judgment, and dismiss Count II of their Complaint alleging a violation of

Article I, § 20 of the Delaware Constitution.

## IV.    THE DOCTRINE OF PREEMPTION IS INAPPLICABLE BECAUSE A LEASE IS NOT LEGISLATIVE CONDUCT

The theory of preemption is completely inapplicable in this case. "Preemption refers to

circumstances where the law of a superior sovereign takes precedence over the laws of a lesser

sovereign." A.W. Fin. Servs., S.A. v. Empire Res., Inc., 981 A.2d 1114, 1121 (Del. 2009)

(emphasis added).  By contrast, the issue in this case is WHA's legal authority to impose lease

provisions upon Plaintiffs—WHA has not engaged in any legislative activity.

This distinction is emphasized by the express preemption statutes cited by Plaintiffs:

both prohibit local governments from enacting laws, regulations, or ordinances governing

firearms.  22 Del. C. § 111, 9 Del. C. § 330(c).  WHA, by contrast, has not enacted, nor is it

capable of enacting, laws, regulations, or ordinances.  Instead, WHA has established a mere lease

provision.  Such conduct is not subject to the doctrine of preemption.  Nor is there any

inconsistency resulting from WHA's being allowed to enact lease provisions when a municipal

or county government may not regulate firearms—the nature of the conduct engaged in by WHA

and that engaged in by the legislative bodies of the municipal and county governments is

completely distinguishable.  There is no basis to conclude that the exercise of WHA's lease-

making authority is in any way inconsistent with Delaware's firearms preemption statutes.  See,

e.g. Nite Moves Entm't, Inc. v. City of Boise, 153 F. Supp. 2d 1198, 1207 (D. Idaho 2001) ("the

doctrine of implied preemption does not go so far as to preclude local governments from

targeting, through different means, the social ills that the legislature seeks to remedy").

050548.1081

Even if preemption were applicable in the case at bar, the provisions cited by Plaintiffs in support of implied preemption do not indicate the General Assembly's intent to occupy this area of legislation.  The provisions cited by Plaintiffs fall into two categories: professional regulations governing firearms dealers (Title 24), and criminal provisions (Title 11).  Neither has any relation to WHA's authority to impose lease provisions, which derives from Title 31 of the Delaware Code.  Nor is either category substantively related to WHA's authority to lease low-income housing units.  Consequently, there is no basis on which to conclude that the General Assembly intended to preempt WHA's lease-making authority by passing laws located in far-flung portions of the Delaware Code unrelated to public housing.  By contrast, the two express preemption statutes cited by Plaintiffs are located in the Titles governing Counties and Municipalities—the precise subjects of their preemption.  C.f. Farm Raised Salmon Cases, 175 P.3d 1170, 1179 (Cal. 2008) ("Congress knows how to write a preemption clause when it wants to") (internal citation omitted).

Based on the foregoing, there is no evidence to indicate that the Delaware General Assembly intended—either expressly or impliedly—to preempt Defendants' lease-making authority.

## CONCLUSION

For the reasons set forth in the brief above, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment, and enter summary judgment in favor of Defendants.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Barry M. Willoughby*

Barry M. Willoughby, Esquire (Bar I.D. 1016)
Lauren E. Moak, Esquire (Bar I.D. 5366)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6666; (302) 576-3255
Facsimile: (302) 576-3345; (302) 576-3750
Email: bwilloughby@ycst.com; lmoak@ycst.com

*Attorneys for Defendants Wilmington Housing Authority
and Frederick S. Purnell, Sr.*

Dated: March 25, 2011

20