## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JANE DOE and CHARLES BOONE, | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : C.A. No. 1:10-cv-00473-LPS |
| | : |
| WILMINGTON HOUSING AUTHORITY and | : **PUBLIC VERSION FILED:** |
| FREDERICK S. PURNELL, SR., in his official | : **APRIL 1, 2011** |
| capacity as executive director of the | : |
| Wilmington Housing Authority, | : |
| | : |
| Defendants. | : |

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF OF BRADY CENTER AS AMICUS CURIAE

FOX ROTHSCHILD LLP
Francis G.X. Pileggi (Del. Bar No. 2624)
Carl D. Neff (Del. Bar No. 4895)
919 North Market Street, Suite 1300
Wilmington, Delaware  19801
(302) 655-3667

*Attorneys for Plaintiffs Jane Doe
and Charles Boone*

Dated:  March 25, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ............................................................. 1

SUMMARY OF THE ARGUMENT ..................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 2

ARGUMENT ........................................................................................................................... 3

I.     PLAINTIFFS HAVE STANDING TO BRING THIS SUIT ................................. 3

     A.    Plaintiffs Have Suffered an "Injury in Fact" Which is "Concrete and Particularized" and "Actual or Imminent" ............................................ 4

          1.    Ms. Doe has suffered an "injury in fact" .......................................... 4

          2.    Mr. Boone has suffered an "injury in fact" ...................................... 8

II.    THE COMMON AREA PROVISION OF THE NEW POLICY VIOLATES THE SECOND AMENDMENT ....................................................... 12

     A.    The Common Area Provision ................................................................... 12

     B.    The Common Area Provision Imposes a Burden on Conduct Falling Within the Scope of the Second Amendment's Guarantee ....................... 13

          1.    The Second Amendment's text recognizes a right not just to "keep," but also to "bear arms," and does not restrict the right to one's house ........................................................................... 13

               (a)    *Heller* recognized the general right to carry arms ............. 15

               (b)    *McDonald* recognized that the right to bear arms is infringed by laws restricting the right to persons with licenses not available to law-abiding citizens generally ................................................................ 15

          2.    Brady apparently misunderstands Plaintiffs' position and the Common Area Provision ................................................................ 17

          3.    Neither Defendants nor Brady has established that "common areas" of WHA property constitute "sensitive places" ................. 19

C.   Strict Scrutiny, or, in the Alternative, Intermediate Scrutiny, is the Appropriate Level of Scrutiny ..................................................22

1.   Strict Scrutiny .............................................................22

2.   Intermediate Scrutiny....................................................23

i.   There is no "reasonable fit" between the Common Area Provision and the government's asserted interest in promoting safety, as required by intermediate scrutiny.....24

D.   The "Reasonable Regulation Test" Does Not Apply in the Third Circuit and Should Be Rejected ..........................................................29

E.   The "Government as Proprietor" Doctrine Advocated By WHA and Brady Should Not Be Applied In This Case ...............................................30

III.   A JUDICIAL DETERMINATION ON THE CONSTITUTIONALITY OF THE ORIGINAL POLICIES IS WARRANTED..........................................................32

IV.   THE ORIGINAL POLICIES AND THE COMMON AREA PROVISION VIOLATE THE DELAWARE CONSTITUTION.................................................33

V.   DEFENDANTS' POLICIES ARE PREEMPTED BY STATE LAW .................34

A.   Implied Preemption:  The Delaware General Assembly has Passed a Comprehensive Regulatory Scheme in the Field of Firearm Possession ..35

B.   Express Preemption:  The General Assembly has Reserved its Own Exclusive Authority to Regulate in the Field of Firearm Possession, by Specifically Prohibiting Municipal Governments from Regulating in this Field ..........................................................35

VI.   WHA HAS EXCEEDED THE SCOPE OF ITS AUTHORITY ..........................37

VII.   COUNT FIVE, SEEKING DECLARATORY RELIEF, SHOULD NOT BE DISMISSED ..........................................................39

CONCLUSION..........................................................40

WM1A 996694v1 04/01/11

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Adderly v. Florida,
    385 U.S. 39 (1966)..................................................................................................31

Cantinca v. Fontana,
    884 A.2d 468 (Del. 2005) ......................................................................................34

Chavez v. Hous. Auth. of El Paso,
    973 F.2d 1245 (5th Cir. 1992) ...............................................................................24

City of Mesquite v. Aladdin's Castle, Inc.,
    455 U.S. 283 (1982)..............................................................................................3, 5

Daniel v. City of Tampa,
    38 F.3d 546 (11th Cir. 1994) .................................................................................24

Dickerson v. State,
    975 A.2d 791 (Del. 2009) ......................................................................................33

Digiacinto v. George Mason Univ.,
    705 S.E.2d 365 (Va. 2011)................................................................................20, 21

District of Columbia v. Heller,
    554 U.S. 570 (2008)...................................................................................... passim

Doe v. Portland Housing Auth.,
    656 A.2d 1200 (Me. 1995)...................................................................................36, 37

Falcon Steel Co. v. HCB Contractors,
    1991 WL 166120 (Del. Super. July 31, 1991).....................................................39

Greer v. Spock,
    424 U.S. 828 (1976)..............................................................................................31

Horne v. Flores,
    129 S. Ct. 2579 (2009).............................................................................................3

In re: Application of McIntyre,
    552 A.2d 500 (Del. Super. 1988)..........................................................................33

Int'l Soc'y for Krishna Consciousness v. Lee,
    505 U.S. 672 (1992)..............................................................................................30

Jackson v. Wilmington Hous. Auth.,
    1986 WL 630317 (Del. Super. Feb. 6, 1986)......................................................38

# TABLE OF AUTHORITIES (Cont'd)

Page(s)

CASES

Knolls Action Project v. Knolls Atomic Power Lab,
    771 F.2d 46 (2d Cir. 1985).................................................................................31

Kreshtool v. Delmarva Power & Light Co.,
    310 A.2d 649 (Del. Super. 1973) .................................................................36, 38

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)...............................................................................4, 8, 12

Massie v. United States HUD,
    620 F.3d 340 (3d Cir. 2010)............................................................................36

McDonald v. Chicago,
    130 S. Ct. 3020 (2010) ........................................................................... passim

People Against Police Violence v. City of Pittsburgh,
    520 F.3d 226 (3d Cir. 2008)..........................................................................3, 5

Peoples Rights Organization, Inc. v. City of Columbus,
    152 F.3d 522 (6th Cir. 1998) .......................................................................6, 8, 9

Richmond Tenants Org. v. Richmond Redev. & Hous. Auth.,
    751 F. Supp. 1204 (E.D. Va. 1990) ..................................................................24

Short v. State,
    586 A.2d 1203 (table), 1991 WL 12101 (Del. Jan. 14, 1991) .................................33

Sierra Club v. Morton,
    405 U.S. 727 (1972).......................................................................................4

Simon v. Eastern Ky. Welfare Rights Org.,
    426 U.S. 26 (1976).........................................................................................4

Smith v. BCE, Inc.,
    225 Fed. App'x 212 (5th Cir. 2007) ..................................................................39

Smith v. State,
    882 A.2d 772 (table), 2005 WL 2149410 (Del. Aug. 17, 2005)...............................33

Swift & Co. v. Wickham,
    382 U.S. 111 (1965).....................................................................................33

iv

## TABLE OF AUTHORITIES (Cont'd)

**Page(s)**

CASES

*Thompson v. Ashe*,
  250 F.3d 399 (6th Cir. 2001) ............................................................24

*United States v. Bjerke*,
  796 F.2d 643 (3d Cir. 1986)............................................................31

*United States v. Dorosan*,
  2009 WL 3294733 (5th Cir. 2009) ........................................20, 21, 31

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010)............................................................ *passim*

*United States v. Skoien*,
  587 F.3d 803 (7th Cir. 2009) ........................................................22, 26

*Warth v. Seldin*,
  422 U.S. 490 (1975)........................................................................3, 4

*Watson v. Stone*,
  4 So.2d 700 (Fla. 1941)..................................................................17

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)......................................................................4, 5, 8

*Wilmington Hous. Auth. v. Williamson*,
  228 A.2d 782 (Del. 1967) ................................................................38

*Wilmington Vitamin & Cosmetic Corp. v. Tigue*,
  183 A.2d 731 (Del. Super. 1962) ....................................................38

CONSTITUTIONAL PROVISIONS

DEL. CONST. art. I, § 20 ...................................................................... *passim*

U.S. CONST. amend II .......................................................................... *passim*

U.S. CONST. amend III ..........................................................................15

U.S. CONST. amend IV ..........................................................................15

U.S. CONST. amend. XIV ...................................................................... *passim*

v

STATUTES AND RULES

10 *Del. C.* § 6501 ...............................................................................................39, 40

11 *Del. C.* § 1441 .....................................................................................................33

11 *Del. C.* § 1441A ..................................................................................................33

11 *Del. C.* § 1442 .....................................................................................................33

18 U.S.C. § 922 .......................................................................................................29

22 *Del. C.* § 111 ...........................................................................................36, 37, 38

22 *Del. C.* § 835(a)(6) ..............................................................................................36

25 M.R.S.A. § 2011 .................................................................................................37

31 *Del. C.* § 4308(a)(5) ...........................................................................................37

39 C.F.R. § 232.1(l) .................................................................................................20

5th Cir. R. 47.5.4.....................................................................................................21

OTHER AUTHORITIES

STEPHEN P. HALBROOK, SECURING CIVIL RIGHTS: FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS (2010 ed.) ......................................................16

JOHN R. LOTT, JR., MORE GUNS, LESS CRIME (3d ed. 2010).........................................28

Stefan B. Tahmassebi, *Gun Control and Racism*, 2 GEO. MASON U. CIV. RTS. L. J. 67 (1991).................................................................................................................28

*Tx. Op. Att'y Gen.*, No. DM-71 (Dec. 31, 1991) .................................................36, 37

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. REV. 1443 (2009)..............................................................................31

Jamie Wershbale, *The Second Amendment under a Government Landlord: Is There a Right to Keep and Bear Legal [Fire]arms in Public Housing*, 84 ST. JOHNS L. REV. (forthcoming) .....................................................................................................21

## NATURE AND STAGE OF THE PROCEEDINGS[1]

On February 21, 2011, Plaintiffs[2] filed a Motion for Summary Judgment (D.I. 86) and their Opening Brief in support thereof (D.I. 87), and Defendants also filed their Motion for Summary Judgment (D.I. 88) and their Opening Brief in support thereof ("Defendants' Opening Brief") (D.I. 89).  On the same date, *Amicus Curiae* The Brady Center to Prevent Gun Violence ("Brady") filed a motion for leave to file an *amicus* brief (D.I. 91) and an accompanying *Amicus* Brief (D.I. 91, Ex. A).  Plaintiffs did not oppose Brady's motion for leave to file.[3]  Given that Plaintiffs needed to respond to two briefs instead of only one, on March 3, 2011, this Court entered a stipulated scheduling order which extended the page limit for Plaintiffs' Answering Brief to 40 pages.  (*See* D.I. 97 at ¶ 1.)  This is Plaintiffs' Answering Brief in opposition to Defendants' Opening Brief and Brady's *Amicus* Brief.

## SUMMARY OF THE ARGUMENT

1.      Plaintiffs have standing to bring this suit because an actual case or controversy exists.  Plaintiffs have suffered an injury at the hands of the Defendants that is concrete and particularized, and actual or imminent.

2.      The Common Area Provision of the New Policy violates the Second Amendment because it fails constitutional muster under the strict scrutiny and intermediate scrutiny standards.  The "Reasonable Regulation Test" which has been adopted by some state courts but not federal courts does not apply here and should not be adopted by this Court.  Further, the "government-as-proprietor" doctrine should not be applied in this case.

---

[1] The "Nature and Stage of the Proceedings" from the inception of the above-captioned case through February 21, 2011 is described fully in the Opening Brief in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Opening Brief") (D.I. 87).

[2] All capitalized terms herein shall have the same meanings as in Plaintiffs' Opening Brief.

[3] Brady also stated that it would not be filing any other briefs in this case.

3.     A judicial determination on the constitutionality of the Original Policies is warranted because Plaintiffs' argument that they violate the Second Amendment is not moot and because this Court did not explicitly foreclose Plaintiffs from making that argument.

4.     The Original Policy and the New Policies violate the Delaware Constitution. Although only a handful of cases have interpreted Article I, § 20 of the Delaware Constitution, they do not address the issue before this Court.   Thus, Second Amendment jurisprudence is instructive.

5.     The doctrine of preemption applies to WHA's policies, and the General Assembly has clearly intended to preempt WHA from enacting firearm restrictions through the implementation of its comprehensive state regulatory scheme which governs the use and possession of firearms, and through express statutory preemption.

6.     Title 31, Chapter 43 of the Delaware Code specifically grants a private cause of action against WHA, and given that Chapter 43 provides no mechanism by which WHA may enact rules governing the use and possession of firearms, WHA has exceeded the scope of its authority in adopting such rules.

7.     Plaintiffs are entitled to declaratory relief pursuant to 10 *Del. C.* § 6501. Plaintiffs have not asserted declaratory relief as an independent cause of action, but have properly sought such relief as an additional and alternative form of relief.

## STATEMENT OF FACTS

The salient facts are set forth fully in Plaintiffs' Opening Brief.

WM1A 996694v1 04/01/11

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO BRING THIS SUIT

Defendants' assertion that Ms. Doe and Mr. Boone lack standing to bring this matter is without merit, and should be rejected by this Court. Defendants limit their standing argument to whether Ms. Doe and Mr. Boone have presented an injury that is "concrete, and particularized," and "actual or imminent."[4] *See Horne v. Flores*, 129 S. Ct. 2579, 2585 (2009); *Warth v. Seldin*, 422 U.S. 490, 508 (1975). Their standing argument is also limited to the New Policy; they do not challenge the standing of Ms. Doe and Mr. Boone to contest the Original Policies.[5]  In support of Defendants' strained argument, they rely upon irrelevant facts, and misconstrue Plaintiffs' deposition testimony, to paint a self-serving and factually incorrect portrait of the Plaintiffs as individuals who, but for the efforts of investigative reporter Lee Williams,[6] had no desire to challenge the Policies and use firearms for self-defense on WHA property. For the reasons set forth below, this Court should reject Defendants' skewed portrayal of Ms. Doe and Mr. Boone, and should find that they have standing to bring this case.

---

[4]   Given that Defendants do not dispute that Plaintiffs have satisfied the second and third prongs of standing, discussed *infra*, an analysis of whether these prongs have been met will not be addressed in this Answering Brief.

[5]  Despite the fact that WHA has replaced the Original Policies with the New Policy, Plaintiffs still seek an order from this Court ruling that the Original Policies were unconstitutional. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *see also People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 231 n.2 (3d Cir. 2008).

[6] Lee Williams (a former reporter for *The News Journal*) is an investigative reporter who worked for the Caesar Rodney Institute ("CRI") at the time of the commencement of this action. Mr. Williams met with the Plaintiffs in connection with his investigation for, and writing of, an article entitled *Delaware Public Housing: Defenseless by Decree*, that was published for the CRI. Plaintiffs' counsel never met or knew Lee Williams until after his article was published. When the National Association for the Advancement of Colored People ("NAACP") vindicated the rights of Rosa Parks, we do not recall arguments based on the collaboration between Ms. Parks and the NAACP's lawyers. We do not object to the Brady Center injecting itself into the middle of this lawsuit to argue its political and policy positions, as compared to a lawyer advancing fundamental constitutional rights as requested by an actual person.

The "irreducible constitutional minimum of standing"[7] contains three elements.  First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  *See Warth*, 422 U.S. at 508; *Sierra Club v. Morton*, 405 U.S. 727, 740-41 n.16 (1972); *see also Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).  Second, there must be a causal connection between the injury and the conduct complained of: the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court."  *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."  *Id.* at 38, 43.

### A.      Plaintiffs Have Suffered an "Injury in Fact" Which is "Concrete and Particularized" and "Actual or Imminent"

Plaintiffs satisfy the first prong, which requires Plaintiffs to "have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized," and (b) "actual or imminent."  *Lujan*, 504 U.S. at 560-61.

### 1.      Ms. Doe has suffered an "injury in fact"

The injuries sustained by Ms. Doe as a result of the implementation of Defendants' Policies affirmatively affect her in a "personal and individual way," resulting in a deprivation of her Second Amendment rights.  *See id.*  The Original Policies placed a blanket restriction on the possession and use of firearms, and the New Policy imposes unconstitutional restrictions on Ms. Doe's ability to defend herself in "common areas," which serves to deprive Ms. Doe of her Second Amendment rights.  She is affected in a "personal and individual way" because she is a

---

[7] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

4

resident of The Park View where WHA's restrictions apply, and has been at all times relevant to this litigation. The Park View has adopted the New Policy to restrict gun usage of its residents, and therefore Ms. Doe is required to comply with the provisions of the New Policy or face eviction. Accordingly, there can be no dispute that her injury is "distinct and palpable," as opposed to "merely abstract." *See Whitmore,* 495 U.S. at 155 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

Further, Ms. Doe's injury itself is "actual or imminent": as of December 13, 2010, the New Policy was adopted as to The Park View, thus depriving Ms. Doe of her Second Amendment rights on that date. Should Ms. Doe exercise her Second Amendment rights and carry a firearm in the "common areas," she would be subject to eviction.[8] Further, without a Court ruling to the contrary, WHA is free to revert to the Original Policies, which placed a complete ban on gun possession. *See Aladdin's Castle*, 455 U.S. at 289 ("[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."); *People Against Police Violence*, 520 F.3d at 231 n.2 (same).

Defendants' assertion that Ms. Doe lacks standing to bring this action ignores the salient facts of this case and does not properly take into account applicable case law. It is undeniable that Ms. Doe has a desire to possess a firearm and use it for self defense while in the common areas of WHA property. She clearly disagrees with the prohibition on the possession of firearms

---

[8] *See* The Park View Lease at ¶ 19(c)(1) ("The Landlord may terminate this Agreement prior to the expiration of the lease for: (1) The Tenant's material noncompliance with the terms of this lease including the general restrictions and rules . . . ."); *see also* WHA lease, Section XIV(A) ("This Lease may be terminated for serious or repeated violations of material terms of the Lease, or failure to fulfill Resident obligations set forth in Section IX and other terms and conditions herein, or for other good cause.") (emphasis in original). A true and correct copy of The Park View Lease is attached to Plaintiffs' Opening Brief as Exhibit A, and a true and correct copy of the WHA lease is attached to Plaintiffs' Opening Brief as Exhibit B.

in the "common areas" imposed by the Common Area Provision. *See* Jane Doe Dep. 14:12-17, Jan. 19, 2011 (testifying, in response to the question of whether she would have any reason to want to take a weapon to a community room, that: ███████████████████████████████ ███████████████████████████████████████████████████████████).[9]

Defendants' reliance upon the fact that Ms. Doe does not currently possess a gun in support of their argument that she lacks standing should be given little weight by this Court. It was not until December 13, 2010, just weeks before her deposition, that the Original Policies were replaced by the New Policy. Ms. Doe in fact owns a gun. *See* Affidavit of Jane Doe (the "Doe Affidavit"), attached hereto as Exhibit B, ¶ 2. She has been keeping it at a relative's house in New Jersey for several years due to fear of eviction under the Original Policies. *See id.* Were it not for the unconstitutional provisions of the Original Policies, Ms. Doe would not have felt the need to have a relative keep her firearm due to the risk of eviction.[10] *See Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 528-29 (6th Cir. 1998) ("[W]e are satisfied that Plaintiffs have standing to bring this action and that this case is ripe for a decision on the merits. . . . Plaintiffs . . . face a clear Hobson's choice. They can either possess their firearms in Columbus and risk prosecution under the City's law, or, alternatively, they can store their weapons outside the City, depriving themselves of the use and possession of the weapons."). Moreover, Ms. Doe never received notice from WHA that the Original Policies were replaced by the New Policy, or that WHA allegedly had no intention of enforcing the Original Policies, until the date of her deposition. *See* Doe Affidavit, ¶ 3.

---

[9] Excerpts of the highly confidential deposition transcript of Jane Doe are attached hereto as Exhibit A.
[10] Ms. Doe has already been the subject of retaliation by WHA, as she has recently been billed for miscellaneous fees by The Park View for which she was never charged prior to the commencement of this action. *See* Doe Affidavit, ¶ 5. The Park View's intimidating retaliation gives Ms. Doe legitimate reasons to fear further repercussions by the WHA due to her effort to assert her basic rights—despite her deposition being subject to an "attorneys eyes only" confidentiality order.

Further, Defendants' implication that Ms. Doe is not qualified to obtain a license to carry a concealed deadly weapon ("License") is purely speculative, is not relevant to this discussion, and is incorrect.  Indeed, Ms. Doe does not need to have a License for her rights to be violated by the Policies.  *See generally, District of Columbia v. Heller*, 554 U.S. 570 (2008) (invalidating ban on handguns in home for self-defense).  Notwithstanding the above, there is no evidence that Ms. Doe would be denied a License.

Of significance, she has never been convicted of any crime, nor has she suffered any mental disorders, two significant factors considered in granting a license.[11]  *See* Doe Affidavit, ¶ 7.  In fact, she can answer each of the questions posed in Delaware's Application for a License to Carry a Concealed Deadly Weapon (the "Application") in a manner that can satisfy the requirements for obtaining a license to carry a concealed weapon.  *See* Doe Affidavit, ¶ 6. Further, while Ms. Doe may have recently suffered a mild stroke, not only did she testify to having a ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████   Indeed, her physical condition may be another reason why she needs a firearm for self-defense.   Therefore, this Court should reject Defendants' speculative implication that Ms. Doe would be unable to obtain a License, and thus find that Ms. Doe has suffered an injury in fact which is "concrete and particularized," and "actual or imminent."  *Lujan,* 504 U.S. at 560-61.

---

[11] Ms. Doe testified that her only encounter with police was the following: while marching with the legendary Dr. Martin Luther King in Selma, Alabama, many years ago, she was briefly detained because, as she explained, everyone marching that day was arrested but later released without charge.  *See* Doe Dep., 24:7-9; *see also* Doe Affidavit, ¶ 8.
[12] *See* Doe Dep., 23:3.

WM1A 996694v1 04/01/11

### 2.   *Mr. Boone has suffered an "injury in fact"*

Defendants' assertion that Mr. Boone lacks standing to bring this action likewise does not comport with binding case law, nor does it acknowledge the facts.   Like Ms. Doe, the injury sustained by Mr. Boone—a deprivation of his Second Amendment rights—affects him in a "personal and individual way," and is not merely "conjectural" or "hypothetical."   *Lujan,* 504 U.S. at 560 n.1.   Mr. Boone's injury itself is "actual or imminent": as of October 25, 2010, the New Policy was adopted as to the Southbridge Apartments, thus depriving Mr. Boone, a resident of Southbridge, of his Second Amendment rights on that date.   Should Mr. Boone exercise his Second Amendment rights and carry a firearm for protection while, for example, doing his laundry in the laundry rooms, he would be subject to eviction.   *See* WHA lease, Section XIV(A). Thus, his injuries are actual or imminent, and not merely 'conjectural' or 'hypothetical.'" *Whitmore,* 495 U.S. at 155 (quoting *Lyons,* 461 U.S. at 102).

Defendants' reliance on the fact that Mr. Boone does not keep his gun in his apartment should be given little weight.   Importantly, Mr. Boone owns a firearm.   *See* Charles Boone Dep., 9:5-11;[13] *see also City of Columbus,* 152 F.3d at 528-29 (plaintiffs facing Hobson's choice of either possessing their firearms and risking prosecution, or depriving themselves of the use and possession of the weapons, do not lack standing to challenge constitutionality of firearm restriction).   For years, through the Original Policies, WHA placed a blanket prohibition on Mr. Boone's right to possess his gun in his residence.   Mr. Boone was aware of that policy.   *See* Boone Dep., 12:6-12.   Like Ms. Doe, Mr. Boone is an elderly individual on a fixed income, and cannot afford to be evicted from WHA premises.   Moreover, while the New Policy was adopted by the Southbridge Apartments on October 25, 2010, Mr. Boone did not receive notice from WHA of this change, nor did WHA ever communicate the new position that they allegedly had

---

[13] The deposition transcript of Charles Boone is attached hereto as Exhibit C.

no intention of enforcing the Original Policies, until the date of his deposition.  *See* Charles Boone Dep., 12:12-22 (testifying that only several days before his deposition did he become aware that the weapons policy had changed).

Further, the fact that Mr. Boone's wife may be afraid of guns has no relevance to the issue of whether Mr. Boone has standing.  It would not be illegal for Mr. Boone to possess a gun in his residence despite his wife's possible fear of it, so his wife's aversion to firearms would not legally impact Mr. Boone's ability to possess a gun.  In fact, Mr. Boone testified that he would simply hide the gun from her, or keep it in a lockbox.  *See* Boone Dep., 25:2-10; *see also City of Columbus*, 152 F.3d at 528-29 (discussed *supra*).  Additionally, WHA property extends beyond a resident's actual apartment or bungalow, including "common areas."  Mr. Boone certainly did not testify that his wife would have a problem with him carrying a weapon in a "common area"—even though her position would not impact his standing.

Finally, Mr. Boone's testimony makes clear that he does not approve of the New Policy in all circumstances.  While Mr. Boone may have testified that he agreed it would not be a "good idea to have people walking around with guns open in the community room," he also expressed concerns about the need for self-defense in a location constituting a "common area," testifying:

███████████████████████████████████████████████████

███████████████████████   Boone Dep., 26:16-20.

Moreover, while Mr. Boone testified that he is "okay" with the Common Area Provision, the phrasing of the question posed makes it clear that Mr. Boone is "okay" with this restriction as to ***community rooms*** (which are not a feature of the housing units where he lives), not necessarily all common areas.  The common area outside of Mr. Boone's townhouse is a courtyard or plaza.  The question Defendants' counsel posed to Mr. Boone was an objectionable

9

question, which reads as follows: ██████████████████████████

████████████████████████████████████████████████

████   Boone Dep., 30:14-17.  Prior to this question being posed, no line of questioning at the

deposition involved "common areas."  The only questions posed by Defendants' counsel up to

that point in the deposition pertaining to "community rooms," not "common areas."  The

following exchange occurred briefly before the leading question above in the deposition:



Boone Dep., 26:14-27:6 (emphasis added).  From this testimony, it is evident that Mr. Boone

was previously asked about ***community rooms***, and he did not focus on the subtle, yet distinct

question regarding ***common areas***.[14]

Without ever once defining "community rooms" or "common areas," Defendants'

counsel confused Mr. Boone with this line of questioning, shortly thereafter in the deposition, to

make him believe that common areas had the same meaning as community rooms: ██████████

████████████████████████████████████████████████

---

[14] This distinction is relevant when considering the layout of the Southbridge Apartments.  Southbridge
Apartments has an open layout, with courtyards surrounded by rows of bungalows or small townhouses
or rowhomes.  Unlike The Park View, which is a large high-rise building, there is little, if anything,
precluding non-WHA residents from walking upon this courtyard from neighboring, non-WHA owned
areas.  Defendant Purnell's deposition testimony made clear that this courtyard constitutes a "common
area" pursuant to The Common Area Provision.  *See* Purnell Dep. 82:3–84:14, Jan. 24, 2011.

████████████████████████████████████████ Boone Dep., 30:14-17.   No

questions had previously been asked of Mr. Boone regarding *common areas*.   In fact, when Mr.

Boone attempted to discuss a previous shooting that occurred ████████████—a location that

could constitute a "common area" under the New Policy—Defendants' counsel quickly

narrowed his testimony to community rooms.   Accordingly, given the lack of any meaningful

definition of "common area" to Mr. Boone, the leading nature of the question, and the confusion

presented by Defendant's counsel in using the terms "community room" and "common area"

interchangeably, this Court should not deprive Mr. Boone of standing based upon this

mischaracterized testimony.[15]

Further testimony later in Mr. Boone's deposition provides additional support for this

distinction.   After WHA's counsel completed his questioning, in response to Plaintiffs' counsel's

question: ███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████ Boone Dep,

50:14-51:51:6 (emphasis added); *see also* Boone Dep., 51:23-53:10 (testifying that he would

want to be able to carry a gun around in common areas if he had a permit to do so); *see also*

Boone Dep., 55:11-24 (testifying that if he either stayed at his current location, or moved to

another WHA location, he would want to be able to carry a gun around the common areas if he

had a permit).   Accordingly, Mr. Boone clearly does not approve of the unconstitutional

restrictions of the New Policy.

---

[15] Also of note, Mr. Boone never testified that he agreed that any portion of the New Policy was "constitutional," which is the central point of this case.  Mr. Boone has not benefitted from many years of higher education, and he was easily manipulated when questioned on these finer points and their significance.

In sum, for the reasons set forth above, it cannot be disputed that Plaintiffs have suffered an "injury in fact" which is (a) concrete and particularized and (b) "actual or imminent," in connection with the Policies, and Defendants' attempts to dispute Plaintiffs' standing should be rejected by this Court. *Lujan*, 504 U.S. at 560-61.

## II.  THE COMMON AREA PROVISION OF THE NEW POLICY VIOLATES THE SECOND AMENDMENT

As explained in Plaintiffs' Opening Brief, the Common Area Provision of the New Policy makes it impossible for Plaintiffs and other WHA residents to exercise the full measure of their fundamental right to possess and use a firearm for the core lawful purpose of self-defense in the common areas in and around their own residential buildings.  The Common Area Provision therefore imposes a burden on conduct falling within the Second Amendment's guarantee.  Finally, the Common Area Provision fails constitutional muster under both strict and intermediate scrutiny, and thus violates the Second Amendment.

### A.  The Common Area Provision

The provision of the New Policy which Plaintiffs are challenging on constitutional grounds—the Common Area Provision—provides that "[r]esidents, members of a resident's household, and guests . . . [s]hall not display or carry a firearm or other weapon in any common area, except where the firearm or other weapon is being transported to or from the resident's unit, or is being used in self-defense. . . ."  (*See* Ex. C to D.I. 87, at ¶ 3.)

Defendants Purnell and WHA describe the New Policy as follows:

> The New Policy, in essence, permits residents to possess weapons in their residences for the purpose of self defense, but prohibits the possession or display of weapons in common areas.  There is an exception that allows residents to transport firearms into and out of the building.  In the course of such transportation, a resident may use a weapon in self-defense.

(*See* D.I. 89 at 4).  Defendants—who are in the best position to know what acts the New Policy

does and does not permit—correctly point out that a resident may use a firearm in self defense

under the New Policy <u>only</u> when transporting a firearm to and from her unit.[16]

### B.      The Common Area Provision Imposes a Burden on Conduct Falling Within the Scope of the Second Amendment's Guarantee

The Common Area Provision, as a practical matter, as the WHA admits, prohibits

Plaintiffs from carrying or possessing a firearm in common areas of WHA property for self

defense.  It therefore imposes a burden on conduct falling within the scope of the Second

Amendment's guarantee.  Accordingly, in keeping with the Third Circuit's ruling in *United

States v. Marzzarella*, 614 F.3d 85, 92 (3d Cir. 2010), some form of means-end scrutiny must be

applied.

As discussed further below, the Common Area Provision severely burdens protected

Second Amendment activity.

### 1.      *The Second Amendment's text recognizes a right not just to "keep," but also to "bear arms," and does not restrict the right to one's house*

Defendants and Brady each express an overly narrow reading of *Heller*.  Defendants state

in their Opening Brief that the *Heller* Court "only addressed the possession of firearms in the

home, nowhere else."  (D.I. 89 at 11, citing *Heller*, 554 U.S. at 635.)  Not so.  Defendants further

state that "*Heller* only establishes a right to bear arms in one's home, not in common areas of the

---

[16] Brady describes the New Policy in a much different manner, as follows: "The regulations at issue only require [Plaintiffs] to refrain from discharging, or carrying and using [firearms] in common areas, for non-defensive purposes."  (*See Amicus* Br. at 22.)  That description is inaccurate and misleading; it implies that residents may carry firearms in common areas for self-defense even if they are not in the process of transporting the firearm to and from the building.  That is not true.  Defendants Purnell and WHA make clear that WHA residents may use a firearm in self defense only "in the course of" "transport[ing] the firearm into and out of the building," and <u>at no other time</u>.  (*See* D.I. 89 at 4.)  In other words, residents may not possess or carry firearms in the common areas while carrying out everyday tasks, such as doing the laundry or preparing a meal in the communal kitchen or lounging, and, thus, it is effectively impossible for them to use a firearm in self defense while engaged in those activities—within the residence building in which they live.

13

building shared with other residents." (D.I. 89 at 12, citing *Heller*, 554 U.S. at 635). Wrong again. Brady endorses a similarly narrow view of *Heller*, stating that the Supreme Court has never "recognized a constitutional right to use or discharge firearms on state property, or *anywhere*, for reasons *other* than self-defense." (*Amicus* Br. at 1); *see also Amicus* Br. at 4 ("[T]he Court did not extend the Second Amendment right beyond self-defense in the home."). These arguments are not supportable, as we will demonstrate.

Those myopic assessments of *Heller* overlook the "central holding" of *Heller*—that "the Second Amendment protects a personal right to keep and bear arms for <u>lawful purposes, most notably</u> for self-defense within the home." *See McDonald v. Chicago*, 130 S. Ct. 3020, 3044 (2010) (emphasis added); *see also Heller*, 554 U.S. at 599 ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting."); *see also Marzzarella*, 614 F.3d at 92 ("And certainly, to some degree, [the Second Amendment] must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes."). The right is guaranteed "most notably for self-defense within the home," which necessarily implies a right to bear arms outside the home (even if not quite as "notably" as in the home). Certainly, *Heller*'s central holding is broad enough to protect the lawful purpose Plaintiffs are seeking to exercise: the right to possess a firearm in the common areas of their residential property in anticipation of needing to use it in self defense.

In arguing that there is only a right to keep arms in the home, Defendants and Brady would cross out the words "bear arms" from the Second Amendment. The Second Amendment provides in part that "the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. This guarantees not only the right to "keep" arms, such as in one's house, but

also to "bear arms," which simply means to carry arms without reference to a specific place. When the Framers intended that a provision of the Bill of Rights related to a house, they said so. *See* U.S. CONST. amend. III and IV.  They did not limit the right to one's house.

(a)    *Heller recognized the general right to carry arms*

Recognition of the right to bear arms was integral to the decision in *Heller*, which found: "At the time of the founding, as now, to 'bear' meant to 'carry.' . . . When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose – confrontation." 554 U.S. at 584.[17]

Moreover, given that "the inherent right of self-defense has been central to the Second Amendment right," the fact that the home is where "the need for defense of self, family, and property is most acute" does not imply that the need is non-existent outside the home.  *Id.* at 628.

(b)    *McDonald recognized that the right to bear arms is infringed by laws restricting the right to persons with licenses not available to law-abiding citizens generally*

In *McDonald*, the Court stated that in *Heller*, it "*held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense*, and [the Court] struck down a District of Columbia law that banned the possession of handguns in the home."  130 S. Ct. at 3026 (emphasis added).  *McDonald* continued: "Self-defense is a basic right, . . . and in *Heller,* we held that individual self-defense is 'the *central component*' of the Second Amendment right."  *Id.* at 3036 (citation omitted).  Obviously, the need to defend one's life may arise outside the home.

---

[17] The term includes to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed. . . ."  *Id.* (citation omitted).  *Heller*'s lengthy opinion regarding the meaning of the right to "bear arms" is every bit as binding as its brief reference to "presumptively lawful regulatory measures."

*McDonald* specifically addressed prohibitions on the carrying of firearms without a license.  In discussing the infringements the Fourteenth Amendment was designed to remedy, *McDonald* discussed state laws which required a license to carry a firearm, which was not available to all law-abiding citizens.   Typical was the Mississippi law providing that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind. . . ."  *Id*. at 3038 (quoting Certain Offenses of Freedmen, 1865 Miss. Laws at 165, § 1, in 1 *Documentary History of Reconstruction* 289 (W. Fleming ed. 1950)).[18]

*McDonald* also rejected the argument that "the Second Amendment differs from all of the other provisions of the Bill of Rights because it concerns the right to possess a deadly implement," noting that "to keep and bear arms, however, is not the only constitutional right that

---

[18] *McDonald* described a petition from black citizens in South Carolina who petitioned Congress complaining of a law "to deprive us [of] arms" as violative of "the right to keep and bear arms."  *Id*. at 3038 n.18.  Rep. George W. Julian condemned that law in urging the adoption of the Fourteenth Amendment as follows:

> Florida makes it a misdemeanor for colored men to carry weapons without a license to do so from a probate judge, and the punishment of the offense is whipping and the pillory.  South Carolina has the same enactments . . . .  Cunning legislative devices are being invented in most of the States to restore slavery in fact.

Cong. Globe, 39th Cong., 1st Sess., 3210 (June 17, 1866).

 "The most explicit evidence of Congress' aim" regarding the Fourteenth Amendment, *McDonald* continued, appeared in its recognition in the Freedmen's Bureau Act of 1866 of "the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms* . . . ."  *Id*. at 3040 (emphasis in original).  *McDonald* rejected the argument that the above Act and the Fourteenth Amendment sought only to provide a non-discrimination rule.  The Act referred to the "full and equal benefit," not just "equal benefit."  *Id*. at 3043; *see also* Stephen P. Halbrook, Securing Civil Rights: Freedmen, the Fourteenth Amendment, and the Right to Bear Arms 95 (2010 ed.) ("By passing the [second Freedmen's Bureau Act of 1868], Congress reaffirmed, during the same period in which the States would complete ratification of the Fourteenth Amendment, that the rights of personal security and personal liberty included 'the constitutional right to bear arms.'").

 In his concurrence, Justice Thomas referred to states that "enacted legislation prohibiting blacks from carrying firearms without a license," *id*. at 3082, and quoted Frederick Douglass as stating that "the black man has never had the right either to keep or bear arms," which would be remedied by adoption of the Fourteenth Amendment.  *Id*. at 3083 (Thomas, J., concurring).

has controversial public safety implications."  *Id*. at 3045 (noting "the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes").[19]

2.  *Brady apparently misunderstands Plaintiffs' position and the Common Area Provision*

It is evident from various unsupported statements in the *Amicus* Brief that Brady simply does not understand Plaintiffs' position.  Brady's arguments do not squarely meet the substance of Plaintiffs' position in this case, and, thus, they deserve little if any weight.

For example, Brady states: "Plaintiffs ask this Court to prohibit the state from restricting the carry, use, and even *discharge* of guns on public housing property for reasons other than self-defense."  (*Amicus* Br. at 1) (emphasis in original); *see also Amicus* Br. at 2 ("An extension of the Second Amendment to fashion a new right to carry and use firearms, *for non-defensive purposes* on *government property* defies logic and legal precedent.") (emphasis in original).

It must be concluded from these statements that Brady thinks that Plaintiffs are challenging Paragraph 2 of the New Policy, which provides that WHA tenants "[s]hall not discharge or use any firearm or other weapons on WHA property except when done in self-defense."  (*See* Ex. C to D.I. 87, at ¶ 2.)  Brady is mistaken.  Plaintiffs have never argued that they should be allowed to use or discharge guns on WHA property for non-defensive purposes. As explained in Plaintiffs' Opening Brief, Plaintiffs are only challenging the New Policy's Common Area Provision (Paragraph 3) on constitutional grounds; they are not seeking to carry

---

[19] The persons such as Defendant Purnell who made the policies here are subject only to applicable state and federal law regarding the possession of firearms, but they enacted a more restrictive policy for residents of public housing.  *McDonald* responded to a similar form of paternalism: "If, as petitioners believe, their safety and the safety of other law-abiding members of the community would be enhanced by the possession of handguns in the home for self-defense, then the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials."  *Id.* at 3049.  On disenfranchising disfavored classes from the right to bear arms, *see Watson v. Stone*, 4 So.2d 700, 703 (Fla. 1941) (Buford, J., concurring) ("the Act [requiring a carry license] was passed for the purpose of disarming the negro laborers. . . . The statute was never intended to be applied to the white population. . . .").

"any weapon . . . in any manner whatsoever and for whatever purpose," as Brady appears to suggest. (*See Amicus* Br. at 7, quoting *Heller*, 554 U.S. at 626.)

In addition, Brady misconstrues the Common Area Provision, stating that "the WHA regulations expressly permit residents to carry and use guns . . . in common spaces open to others, in self-defense." (*Amicus* Br. at 7.)  Brady later asserts that "[t]he regulations at issue only require [Plaintiffs] to refrain from discharging, or carrying and using [firearms] in common areas, for non-defensive purposes." (*See Amicus* Br. at 22.)  As explained below, that is not true.

The Common Area Provision is not nearly as broad as Brady suggests.  Indeed, Defendants WHA and Purnell explain that the Common Area Provision (which was drafted by Defendants' own litigation counsel in this case), "prohibits the possession or display of weapons in common areas" except when residents are "transport[ing] firearms into and out of the building," and that "[i]n the course of such transportation, a resident may use a weapon in self-defense." (*See* D.I. 89 at 4.)

Thus, Defendants Purnell and WHA confirm that a resident may use a gun in self defense in the common areas only during an exceedingly narrow window of time—while transporting the gun into and out of the building, *period*.  This limited exception ensures that it is practically impossible for WHA residents to keep and bear arms for self defense in the common areas while doing the laundry, preparing meals in the communal kitchen, or watching television in the communal TV room, for example.

Brady's cited statistics should be disregarded for at least two reasons: (1) *Heller* and *McDonald* rejected the notion that sociologic studies can be used to override a constitutional right; and (2) there is ample evidence that violent crime actually decreases as gun ownership increases, particularly in high crime inner city neighborhoods.

3.      *Neither Defendants nor Brady has established that "common areas" of WHA property constitute "sensitive places"*

Defendants' and Brady's argument that the common areas of WHA-owned residential buildings are "sensitive places" beyond the reach of the Second Amendment's protections lacks merit.  Unlike public schools, post offices, and courthouses, public housing is, fundamentally, a home.  Thus, there is no basis for Defendants' and Brady's assertion that common areas are the types of "sensitive places" contemplated by *Heller* simply because they are a part of buildings that are owned or managed by the government.  Indeed, The Park View is not even a government building—it is privately owned by Electra Arms Senior Associates, LP.  (*See* D.I. 89 at 3 n.2.) Defendants' and Brady's arguments therefore do not apply to The Park View.

In arguing that common areas are "sensitive places," Defendants point out the *Heller* majority's ruling that "nothing in our opinion should be taken to cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings."  (D.I. 89 at 12, quoting *Heller*, 554 U.S. at 626-27).  Then, citing *Marzzarella*, Defendants state that "laws forbidding the carrying of firearms in [such] sensitive places . . . are entirely outside the ambit of the Second Amendment. . . ."  (*See* D.I. 89, citing *Marzzarella*, 614 F.3d at 91.)  Defendants proclaim without support that "WHA's regulation of the possession of weapons in common areas must certainly fall within this ['sensitive place'] exception" because "the residents most affected by the New Policy—those who may be intentionally or accidentally injured by another's possession or use of firearms in common areas," such as children and elderly people, have a "particular vulnerability."  (D.I. 89 at 13.)  The law does not support this type of analysis here.

That children and elderly people may frequent the common areas does not, by itself, automatically establish that the common areas are a "sensitive place."   Indeed, neither

19

Defendants nor Brady cited to any authority that endorses such a broad construction of the phrase "sensitive place," and Plaintiffs are unaware of any such authority.  Defendants' failure to explain <u>why</u> the common areas of WHA property should not be treated as the personal residences that they are—and not work spaces open to the public—is a fatal flaw in their argument.

For its part, Brady cites to *United States v. Dorosan*, 2009 WL 3294733 (5th Cir. 2009), stating that "courts post-*Heller* have specifically recognized the government's power to restrict gun use on its property." (*Amicus* Br. at 1.)  Brady then points out that the court in *Digiacinto v. George Mason Univ.*, 705 S.E.2d 365 (Va. 2011) "held that regulations restricting the carrying of firearms in sensitive places are 'presumptively legal.'" (*See Amicus* Br. at 13).  Neither case lends meaningful weight to Brady's argument, however.

For instance, the court in *Dorosan* held that a post office is a "sensitive place" and that the federal regulation which criminalizes handgun possession on U.S. post office property (39 C.F.R. § 232.1(l)) does not violate the Second Amendment.  *See Dorosan*, 2009 WL 3294733, at *1.  Important to the court's conclusion was the fact that "the Postal Service used the parking lot for loading mail and staging its mail trucks."  *Id.*  The court thus concluded that "[g]iven this usage of the parking lot by the Postal Service as <u>a place of regular government business</u>, it falls under the 'sensitive places' exception recognized by *Heller*." *Id.* (emphasis added).

Here, by contrast, the common areas of WHA property are not used "as a place of regular government business"; they are an essential part of residential buildings which are home to thousands of low-income Wilmington residents, and WHA residents use them for everyday residential activities.  There is simply no support (and neither Defendants nor Brady have cited any) for the view that in Second Amendment challenges, common areas such as laundry rooms

of government-owned or managed residential complexes should be treated identically to post offices.[20]

Digiacinto is likewise inapposite.  Noting that "parents who send their children to a university have a reasonable expectation that the university will maintain a campus free of foreseeable harm," the court in *Digiacinto* held that George Mason University is a "sensitive place" <u>because it is a school</u> whose buildings are owned by the government.  *See Digiacinto*, 705 S.E.2d at 370 (emphasis added).  There is no sound justification to apply this reasoning to common areas of <u>residential complexes</u> simply because they are managed by the government. The analysis should not, and cannot, be that simple.

In sum, there is no basis for Defendants' and Brady's assertions that common areas of government-owned residential buildings should be treated just like sensitive places such as schools and post offices in Second Amendment challenges.  Notably, neither the Supreme Court or other authority have indicated that public housing is included in the definitions of "sensitive place" or "government building" as those terms are used in *Heller*, and there are no federal statutes that regulate the possession and use of firearms in public housing.  *See* Jamie Wershbale, *The Second Amendment under a Government Landlord: Is There a Right to Keep and Bear Legal [Fire]arms in Public Housing*, 84 ST. JOHNS L. REV. (forthcoming)[21], at §§ III.A and B (explaining that no legislation has yet been passed relating to regulation of firearms in public housing, and further stating that "[a]t present, HUD does not have an official position either for or against tenant possession of legal firearms in public housing developments.")

---

[20] Moreover, the *Dorosan* opinion is particularly weak support for Brady's position, given that it is an unpublished Fifth Circuit opinion that "is not precedent. . . ."  *See id.* at *1, n.* (citing 5th Cir. R. 47.5.4) ("Unpublished opinions issued on or after January 1, 1996, are not precedent, except under the doctrine of res judicata, collateral estoppel or law of the case (or similarly to show double jeopardy, notice, sanctionable conduct, entitlement to attorney's fees, or the like).").
[21] *Available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1555405.

21

In light of: (1) Defendants' and Brady's overly narrow reading of *Heller*; (2) Brady's misapprehension of Plaintiffs' position and mischaracterization of the New Policy; and (3) Defendants' and Brady's inability to establish that the common areas of government-owned residential buildings constitute "sensitive places," it is clear that Defendants and Brady have failed to show that the Common Area Provision does not impose a burden on protected Second Amendment activity. On the contrary, the Common Area Provision severely burdens Plaintiffs' Second Amendment rights, as it restricts their ability to possess a firearm <u>for self defense</u> in the common areas of their <u>residential buildings</u>. Accordingly, further analysis under the appropriate level of scrutiny is required.

## C.   Strict Scrutiny, or, in the Alternative, Intermediate Scrutiny, is the Appropriate Level of Scrutiny

"Under any of the standards of scrutiny that [the U.S. Supreme Court has] applied to enumerated constitutional rights, banning from the home [a handgun] for protection of one's home and family would fail constitutional muster." *See Heller*, 554 U.S. at 628. Because the Common Area Provision severely restricts Plaintiffs' ability to use a lawfully-possessed firearm to defend themselves in the common areas of their own residential buildings, it does not pass constitutional muster under strict or intermediate scrutiny.

### 1.   *Strict Scrutiny*

In *Marzzarella*, the Third Circuit implicitly concluded that strict scrutiny review may be appropriate where the challenged law "severely limit[s] the possession of firearms," such as the D.C. law that the Supreme Court struck down in *Heller*. *See* 614 F.3d at 97; *see also See United States v. Skoien*, 587 F.3d 803, 812 (7th Cir. 2009) (vacated on other grounds) (same). The court in *Marzzarella* then concluded that laws that "regulat[e] . . . the manner in which persons may lawfully exercise their Second Amendment Rights" "should merit intermediate, rather than strict,

scrutiny." *See Marzzarella*, 614 F.3d at 97.  For the reasons stated in Plaintiffs' Opening Brief, this Court should apply strict scrutiny in this case, which would require Defendants to show that the Common Area Provision is "narrowly tailored to serve a compelling state interest." *See id.* at 99 (citation omitted).  As explained in Plaintiffs' Opening Brief, the Common Area Provision does not pass constitutional muster under strict scrutiny, and should therefore be invalidated.

2.      *Intermediate Scrutiny*

If this Court were to conclude that strict scrutiny is not warranted in this case, then intermediate scrutiny unquestionably would be appropriate.  To withstand intermediate scrutiny, Defendants must establish that the New Policy serves an "important," "significant," or "substantial" government interest, and that there is a "reasonable fit" between the New Policy and the asserted governmental interest.  *See id.* at 98.  As explained in Plaintiffs' Opening Brief and below, the Common Area Provision does not pass constitutional muster under intermediate scrutiny.

Defendants' Opening Brief asserts that "ample deposition testimony in this matter" reveals that "Defendants were motivated by significant government interests in designing the New Policy."  (D.I. 89 at 15, citing deposition transcripts.)  In addition, Defendants claim that they were "driven by the unique circumstances[22] of many WHA properties," protecting the elderly and children, and addressing the "concerns of WHA residents as expressed at the October 14, 2010 public hearing."  (*See* D.I. 89 at 15.)  While it is true that some WHA commissioners were able to articulate merely generic reasons for adopting the New Policy, others simply drew a blank when asked whether they knew the purpose behind the New Policy.[23]

---

[22]  Defendants notably do not explain what is so "unique" about the particular public housing in this case.
[23]  *See* Griffiths Dep. 14:3-8, Jan. 31, 2011 (unable to recall any discussions by WHA Board of Commissioners regarding reasons why New Policy was adopted); *see also* Grober Dep. 20:18-19, Jan. 31, 2011 (when asked about the WHA's rationale behind prohibiting guns in the common area, testifying: ■

In any event, Plaintiffs do not contest that safety is an important governmental interest. As explained below, however, there is no "reasonable fit" between the Common Area Provision and WHA's asserted goal of promoting safety, health, and welfare.[24]

> i.  *There is no "reasonable fit" between the Common Area Provision and the government's asserted interest in promoting safety, as required by intermediate scrutiny*

Defendants and Brady both have failed to demonstrate that there is a "reasonable fit" between (1) Defendants' asserted governmental interests of promoting "health, welfare and safety" and (2) the restrictions on firearm possession and use as set forth in the Common Area Provision.  In fact, well documented statistics show that such restrictions on lawful firearms possession are often correlated with an <u>increase</u> in violent crime, particularly in urban areas with high crime rates.  Accordingly, the Common Area Provision does not pass constitutional muster under the intermediate scrutiny standard.

---

████████████████████████████████████) (*See* deposition excerpts attached as Exhibit H to D.I. 87)

[24] Brady, for its part, explains that courts have "repeatedly upheld states' constitutional authority to enforce terms of use of their public housing facilities in the interests of safety."  *See Amicus* Br. at 10-11 (citing *Thompson v. Ashe*, 250 F.3d 399, 407 (6th Cir. 2001); *Daniel v. City of Tampa*, 38 F.3d 546, 550 (11th Cir. 1994); *see also Chavez v. Hous. Auth. of El Paso*, 973 F.2d 1245, 1248-49 (5th Cir. 1992)). Brady then asserts that this "authority includes the right to enforce specific gun restrictions."  *See Amicus* Br. at 11 (citing *Richmond Tenants Org. v. Richmond Redev. & Hous. Auth.*, 751 F. Supp. 1204, 1214 (E.D. Va. 1990)).  However, the case law cited by Brady in support of this position is far from being on point, and is, at best, only remotely analogous.  For example, *Thompson* held that a public housing authority's "no trespassing" list did not violate the plaintiff's constitutional rights under the Fourth and Fourteenth Amendments.  *See Thompson*, 250 F.3d 399.  *Daniel* held that a Florida statute which prohibits people from entering or remaining on public housing property after having received a trespass warning does not violate the First Amendment, and that the statute is a "reasonable means of combating drug and crime problems on the property."  *See Daniel*, 38 F.3d at 551.  And *Chavez* held that a public housing authority's policy of evicting tenants for the criminal acts of their adult children does not violate the First Amendment right of association or the due process clause.  *See Chavez*, 973 F.2d at 1248-49.  Finally, the case cited by Brady in which a public housing authority's firearms regulation was upheld—*Richmond Tenants Org.*—predates *Heller* by 18 years and applies a level of scrutiny resembling the "rational basis" test which *Heller* explicitly rejected.  *See Richmond Tenants Org.*, 751 F. Supp. at 1214 ("The prohibition on the use and/or possession of various firearms is <u>rationally related</u> to the <u>strong RRHA interest</u> in reducing crime and violence.") (emphasis added).

Defendants' Opening Brief notably does not say, and depositions did not reveal, that WHA's commissioners considered crime statistics or other data in deciding whether to adopt the New Policy; it is therefore fair to conclude that no such information was considered.  Indeed, the most Defendants can say is that the New Policy "is narrowly tailored to protect the rights and interests of all WHA residents, including Plaintiffs," because Defendants allegedly considered the following issues: "concerns of WHA residents as expressed at the October 14, 2010 public hearing,"[25] "the constitutional rights of Plaintiffs, and the health, welfare and safety of all WHA residents, staff, and the general public who access WHA's properties," and "the unique circumstances of many WHA properties, which include various community spaces such as daycare facilities, libraries, and community rooms. . . ."  (*See* D.I. 89 at 15.)

Defendants' unsubstantiated assertions that the Common Area Provision is "narrowly tailored" to serve Defendants' asserted governmental interests, merely because Defendants were motivated to promote the safety, health, and welfare of WHA residents, is plainly insufficient to establish the "reasonable fit" required by the intermediate scrutiny standard.  Courts have held that "[t]he government 'bears the burden of justifying its restrictions, [and] it must <u>affirmatively</u>

---

[25]   Defendants omit that WHA residents voiced concern at the public hearing regarding the (then) proposed Common Area Provision (<u>and that concern was ignored in the final Common Area Provision</u>):

> <u>Ms. Dorn</u>:  My question is:  I'm sitting here.  Somebody comes in to attack me with a firearm.  What do I do?  And my firearm is upstairs.
>
> <u>Mr. Willoughby</u>:  Obviously, the proposed policy is there shouldn't be firearms in the common areas at all.
>
> <u>Ms. Dorn</u>:  I walk through the common area in my building and people carry firearms, period.
>
> <u>Mr. Willoughby</u>:  Okay.
>
> <u>Ms. Dorn</u>:  If I'm attacked or in that situation, what do we do?  And us older people, what do we do?
>
> <u>Mr. Willoughby</u>:  I guess the proposed policy would say there shouldn't be firearms there at all.  And that needs to be enforced so there doesn't have a gunfight break out in the common areas.
>
> <u>Ms. Dorn</u>:  A lot of young people in our area, in our building carry guns.  They do carry them.  I have seen them.  What do we do?  Do we run and hide in our apartments?

Oct. 14, 2010 Public Hearing Tr. at 19:22-20:20.

25

<u>establish</u> the reasonable fit' that the test requires." *Skoien*, 587 F.3d at 814 (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)) (emphasis added). "[T]he public benefits of the restrictions must be <u>established by evidence</u>, and <u>not just asserted</u>[;]. . . lawyers' talk is insufficient." *Id.* (quoting *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009)) (emphasis added). Thus, Defendants have fallen far short of satisfying their burden to show a "reasonable fit" between the Common Area Provision and their asserted goal of promoting health, welfare, and safety on WHA property.

Brady, for its part, states that public housing authorities such as WHA are authorized to implement policies "to prevent crime and protect residents." (*See Amicus* Br. at 10.) Brady then cites to studies which report a positive correlation between gun ownership and crime, and argues that the New Policy meets the more stringent levels of scrutiny. Brady's positions fail for at least two reasons.

First, Brady's argument, and the statistical data proffered in support thereof, are premised on Brady's fundamental misunderstanding of the "do's and don'ts" under the New Policy, and thus should be given little weight. As explained earlier, Brady incorrectly states that "[t]he regulations at issue only require [Plaintiffs] to refrain from discharging, or carrying and using [firearms] in common areas, for non-defensive purposes." (*See Amicus* Br. at 22.) That statement is misleading because it implies that the Common Area Provision permits residents to possess firearms in common areas while engaged in ordinary activities, such as doing the laundry, preparing meals in the communal kitchen, or watching television in the community room. In truth, however, the New Policy most certainly prohibits residents from possessing a firearm for self-defense in the common areas except when transporting the firearm into or out of the building. This narrow exception effectively prevents residents from using firearms for self

26

defense in the common areas of WHA property.  While the New Policy <u>as mischaracterized by Brady</u> might be a "reasonable restriction[] designed to ensure that individuals who carry concealed weapons can do so safely and responsibly" (*see Amicus* Br. at 22-23), the Common Area Provision, <u>as written (and as described by its creator, WHA)</u>, is an unreasonable restriction on Plaintiffs' right to keep and bear arms for the core lawful purpose of self-defense.[26]

In sum, the *Amicus* Brief should be given little weight because it is premised on Brady's fundamental misunderstanding of Plaintiffs' position and of the mechanics of the New Policy's Common Area Provision.

Second, the Supreme Court in *Heller* and *McDonald* rejected the notion that statistical data and sociological studies such as the ones relied upon by Brady can be used to override a constitutional right.  Specifically, the *McDonald* majority specifically rejected Justice Breyer's proposed reasoning that "determining the constitutionality of a particular state gun law requires finding answers to complex empirically based questions of a kind that legislatures are better able than courts to make."  *McDonald*, 130 S. Ct. at 3126 (Breyer, J., dissenting).  The Court rejected such analyses, reiterating that "[i]n *Heller*, . . . we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing. . . ."  *Id.* at 3047.[27]  Brady's attempt to justify the curtailment of Plaintiffs' constitutional rights by citing sociological studies and crime statistics should be rejected.

---

[26] Further, as mentioned earlier, Brady misapprehends Plaintiffs' position, and the force of Brady's arguments is therefore greatly diminished.  Contrary to Brady's repeated assertions, Plaintiffs are not asking this Court to allow them to carry, use, or discharge firearms for non-defensive purposes.  Instead, Plaintiffs are challenging the New Policy because it does not afford them the full scope of their fundamental right to keep and bear arms for self defense as articulated in *Heller* and *McDonald*.

[27] *McDonald* continued:

> Justice Breyer is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise.  As we have noted, while his opinion in *Heller* recommended an interest-balancing

Moreover, and nonetheless, the information cited by Brady conflicts with well-established studies which conclude that there is a <u>negative correlation</u> between gun ownership and crime.  *See* JOHN R. LOTT, JR., MORE GUNS, LESS CRIME 117-18 (3d ed. 2010) ("Indeed, the effect of gun ownership on crime is quite large: a 1 percent increase in gun ownership reduces violent crime by 4.1 percent."); *id.* at 184 ("[T]hose who are relatively weaker physically (women and the elderly) and those who are most likely to be crime victims (blacks and those living in urban areas) tend to benefit the most from the passage of right-to-carry laws."); *id.* at 21 ("While the support for the strictest gun-control laws is usually strongest in large cities, the largest drops in violent crime from legalized concealed handguns occurred in the most urban counties with the greatest populations and the highest crime rates."); *id.* at 164 ("Allowing citizens without criminal records or histories of significant mental illness to carry concealed handguns deters violent crimes and appears to produce an extremely small and statistically insignificant change in accidental deaths.").[28]

Finally, Defendants argue that requiring WHA tenants to abide by Delaware and Federal gun laws, without further restrictions such as those imposed by New Policy, would "sacrifice the rights of the many for those of the few."  (D.I. 89 at 16.)  But allowing Plaintiffs and all other

---

test, the Court specifically rejected that suggestion. . . . The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon.

*Id.* at 3050 (citations omitted).

[28]  The statistical evidence and crime studies reported by John Lott are sobering indeed.  Even though the Supreme Court rejected a statistical analysis of Second Amendment rights, if considered, the statistics support Plaintiffs.  If <u>safety</u> was indeed the main reason why WHA promulgated the New Policy, WHA's ostensibly noble purpose tragically may be frustrated by the realities of urban life.  In other words, the New Policy's Common Area Provision might end up accomplishing the very opposite of what it was designed to do.  Therefore, the Common Area Provision cannot be "reasonably" or "narrowly" tailored to fulfill a substantial government interest.  *See* Stefan B. Tahmassebi, *Gun Control and Racism*, 2 GEO. MASON U. CIV. RTS. L. J. 67, 83, 88 (1991) ("Reducing gun ownership among law-abiding citizens will do almost nothing to reduce violent crime directly, since such behavior is virtually nonexistent among persons without previous records of serious violence and criminal behavior.").

WHA residents to possess firearms in the common areas at all times for self defense would promote the constitutional rights of <u>all</u>.  WHA residents would be sacrificing their safety if they were required to abide by the unconstitutional New Policy.

**D.    The "Reasonable Regulation Test" Does Not Apply in the Third Circuit and Should Be Rejected**

Brady boldly requests that this Court adopt the "reasonable regulation test," a standard of review which has not been embraced by the federal courts, let alone the Third Circuit.  What is more, all of the cases applying the "reasonable regulation test" cited by Brady are selected state cases that pre-date *Heller*.

Endeavoring to square the "reasonable regulation test" with controlling Third Circuit precedent, Brady points out that "[i]n virtually every . . . post-*Heller* case, the court adopting intermediate scrutiny was evaluating a particular provision of 18 U.S.C. § 922, the federal firearms statute that imposes restrictions on broad classes of individuals and types of arms." (*See Amicus* Br. at 19.)  Brady then observes that "[b]y contrast, the WHA regulations do not bar any types of legal weapons or prohibit any category of person from possessing a firearm.  They merely require that those who use and carry guns on public housing property, including common spaces, do so for self-defense." (*Id.* at 19-20.)  Thus, according to Brady, intermediate scrutiny "is less appropriate here." (*See id.* at 20.)

Brady's argument must fail.  Critically, Brady simply asserts *ipse dixit*, and without any analysis whatsoever, that regulations which restrict <u>places</u> where an individual may carry a firearm should be reviewed under a less stringent standard of review than regulations which restrict <u>types of firearms</u> and <u>classes of individuals</u>.  Brady provided no explanation for <u>why</u> the New Policy should not be reviewed under intermediate scrutiny as are regulations on classes of individuals and types of firearms.  Brady merely highlights a distinction without a difference.

Defendants even agree that this Court should apply intermediate scrutiny.  Indeed, Defendants' Opening Brief points out that "[t]o date, a majority of cases citing to *McDonald* and employing some form of heightened scrutiny . . . have employed intermediate scrutiny.  The trend prior to *McDonald* was intermediate scrutiny."  (D.I. 89 at 11, quoting *Peruta v. County of San Diego*, 2010 WL 5137137, *7 (S.D. Cal. Dec. 10, 2010) (citing cases)).  There is simply no sound reason to depart from this federal jurisprudence and the now well-known standard announced by the Third Circuit in *Marzzarella*.

### E.   The "Government as Proprietor" Doctrine Advocated By WHA and Brady Should Not Be Applied In This Case

The "government-as-proprietor" doctrine advocated by Defendants and Brady has not been embraced by the courts in Second Amendment challenges, and it certainly has no place in cases involving firearms restrictions in public housing authorities.  Citing *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992), a <u>First</u> Amendment case, Defendants argue that WHA "must be granted greater latitude in regulating the possession and use of firearms on its property than would a government entity operating in a legislative capacity" because WHA is "act[ing] only in the capacity of a proprietor and landlord" and not as a sovereign.  (D.I. 89 at 14-15.)   In further support of their "government-as-proprietor" argument, Defendants rely on numerous cases which hold that government employers have more latitude to restrict the First and Fourth Amendment rights of their employees than the government does when acting as a sovereign.

Those cases are too far afield to be helpful here.  This case does not involve an employer-employee relationship, and the cases cited by Defendants do not involve the restriction of a

fundamental constitutional right to protect oneself against violent crime in the very building where one lives.[29]

Finally, it is worth noting that Defendants rely on a law review article authored by noted constitutional law scholar Eugene Volokh to support their "government-as-proprietor" argument, yet fail to explain that the courts have not yet "work[ed] out a government-as-proprietor doctrine for the right to bear arms . . . as they have done for the freedom of speech." *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. REV. 1443, 1533 (2009).   Volokh also suggests that it may <u>not</u> be appropriate to apply the government-as-proprietor doctrine to firearms regulations promulgated by public housing authorities.  *See id.* ("Public housing might be treated specially, because it is a home as well as a government building, or because it is the sort of government benefit that is unusually important to those who use it.").

In sum, the government-as-proprietor doctrine has not been applied to restrict firearms possession and use in common areas of government-owned residential buildings, and there are sound reasons not to extend the doctrine wholesale to Second Amendment challenges.  Chiefly,

---

[29] Brady also relies on the "government-as-proprietor" doctrine, citing *Adderly v. Florida*, 385 U.S. 39 (1966) and several other cases for the proposition that "[t]he United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose."  (*See Amicus* Br. at 8, citing *Adderly*, 385 U.S. at 48; *Greer v. Spock*, 424 U.S. 828 (1976); *United States v. Bjerke*, 796 F.2d 643 (3d Cir. 1986); *Knolls Action Project v. Knolls Atomic Power Lab*, 771 F.2d 46 (2d Cir. 1985)). None of those cases involve application of the government-as-proprietor doctrine to a regulation which curtails the fundamental constitutional right to defend oneself with a lawfully possessed firearm, and they are therefore not helpful here.  *See Adderly*, 385 U.S. at 48 (upholding Florida's enforcement of state trespass laws); *Greer*, 424 U.S. at 838 (holding that there is no generalized constitutional right to make political speeches or distribute leaflets on military reservation); *Bjerke*, 796 F.2d at 649 ("At bottom, this is a simple case in which the Postal Service, as owner of the property in question, has barred certain activities immediately adjacent to post office entrances.  The Supreme Court has directed repeatedly and emphatically that governments must be permitted reasonable control over such nontraditional <u>public forums</u>.") (citing cases) (emphasis added); *Knolls*, 771 F.2d 46 (upholding ban on leafleting on premises of Knolls Atomic Power Lab).  Brady's reliance on *Dorosan* for its point that "[g]un owners bear no special exemption from this authority" (*Amicus* Br. at 8) is equally misplaced.  As explained earlier, Defendants' and Brady's assertion that the common areas of WHA's residential buildings are "sensitive places" just like schools and post offices is simply untenable.

the government-as-proprietor doctrine should not be used to deprive a law abiding citizen of the full measure of her fundamental right to use a lawfully possessed firearm in self defense in the common areas of her residential building, even if the building is owned by the government.[30]

### III.   A JUDICIAL DETERMINATION ON THE CONSTITUTIONALITY OF THE ORIGINAL POLICIES IS WARRANTED

As explained in Plaintiffs' Opening Brief, the Original Policies violate the Second Amendment and Article I, § 20 of the Delaware Constitution (*see* D.I. 87 at 8-10 and 17-18), and Plaintiffs' arguments regarding the constitutionality of the Original Policies are not moot.  (*See id.* at 15-17.)

Defendants assert that this Court "has . . . limited this matter to the New Policy, denying review of the [Original Policies]."  (*See* D.I. 89 at 5.)  That statement is not accurate, as it implies that this Court dismissed Plaintiffs' claims regarding the constitutionality of the Original Policies with prejudice.  The Court did no such thing.  (*See* Scheduling Conference Tr., D.I. 37 at 7:22-8:6.)  While the Court may have indicated a preference for adjudicating only the New Policy, the Court did not explicitly "deny[] review of the [Original Policies]"; it permitted briefing on this issue, which was only addressed previously in short letters to the Court.  (*See* D.I. 89 at 5.)  For the reasons stated in their Opening Brief, Plaintiffs respectfully request that this Court make a determination as to the constitutionality of the Original Policies, and hold that the Original Policies violate the Second Amendment.

---

[30] Moreover, it would be unfair to allow the government to invoke the government-as-proprietor doctrine to trump the "unconstitutional conditions" doctrine—i.e., the principle that the government cannot condition receipt of a government benefit (here, the benefit of living in low-rent facilities operated or monitored by WHA) upon relinquishing a constitutional right (here, the right to keep and bear arms under the Second Amendment).  (*See* D.I. 87 at 14-15 and cases cited therein.)

32

## IV.   THE ORIGINAL POLICIES AND THE COMMON AREA PROVISION VIOLATE THE DELAWARE CONSTITUTION

As Plaintiffs explained in their Opening Brief, the Original Policies and the New Policy violate Article I, § 20 of the Delaware Constitution.  The text of Article I, § 20[31] is significantly broader than the text of the Second Amendment, and, thus, it follows that the Defendants' policies run afoul of the Delaware Constitution given that they violate the Second Amendment.

Defendants' Opening Brief does not even attempt to address the broadly worded text of Article I, § 20.  Instead, Defendants simply point out the lack of Delaware case law interpreting this provision[32] and urge this Court to "look to Second Amendment case law for guidance. . . ." (*See* D.I. 89 at 17.)  Thus, Plaintiffs fully incorporate their arguments regarding the Second

---

[31]  "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use."  DEL. CONST. art. I, § 20.

[32]  Only four cases have cited to Article I, § 20, and none of them are helpful here because they do not address the issue presently before this Court—whether, in light of *Heller* and *McDonald*, a public housing authority may prohibit its tenants from possessing or using a lawfully possessed firearm in the common areas of their residential buildings (except for self defense during the limited circumstance in which the tenant is transporting the firearm into or out of the building), which effectively renders it impossible for tenants to use firearms for self defense in the common areas when using the common areas, by way of example, for recreational purposes.  *See Dickerson v. State*, 975 A.2d 791, 796 (Del. 2009) (declining to decide the issue of whether "the Delaware Constitution permits carrying a concealed deadly weapon inside one's home without a license. . .") (emphasis in original); *Smith v. State*, 882 A.2d 772 (table), 2005 WL 2149410, *3 (Del. Aug. 17, 2005) (acknowledging that "Article I Section 20 confirms the constitutional right to keep and bear arms," and holding that that provision does not confer the right to carry a concealed deadly weapon; rather, that is a privilege conferred by statute (11 *Del. C.* § 1441)); *Short v. State*, 586 A.2d 1203 (table), 1991 WL 12101 (Del. Jan. 14, 1991) ("[T]he right to bear arms as guaranteed in various state constitutions and the federal constitution may be subject to reasonable restrictions for the public safety, including limitations on possession by persons with criminal records."); *In re: Application of McIntyre*, 552 A.2d 500, 501 n.1 (Del. Super. 1988) ("The court notes that 'the right to keep and bear arms' does not of necessity require that such arms may be kept concealed.").  To the extent that these cases can be construed to limit the right of an individual to possess or carry a gun outside of the home, they should not be afforded deference here, as *Heller* and *McDonald* clearly recognized that the Second Amendment does not confine the right to possess a firearm to the home.  *See Swift & Co. v. Wickham*, 382 U.S. 111, 120 (1965) ("[I]f a state measure conflicts with a federal requirement, the state provision must give way.").  Further, these cases are not helpful, as Delaware does not ban the open carry of firearms.  *See* www.opencarry.org, last visited on March 22, 2011.  Delaware prohibits the carrying of a concealed firearm without a license.  *See* 11 *Del. C.* §§ 1441, 1441A, 1442 (requiring a license to carry a concealed weapon).

33

Amendment, and respectfully request that this Court hold that the Original Policies and the Common Area Provision violate Article I, § 20 of the Delaware Constitution.

## V.    DEFENDANTS' POLICIES ARE PREEMPTED BY STATE LAW

Defendants' assertion that Count Three of the Second Amended Complaint—the preemption cause of action—should be dismissed, is entirely baseless.  As Defendants cite to no authority in support of their contention that preemption is not a separate cause of action, their unsupported argument should be rejected.

Further, Defendants' conclusion that WHA's actions are not preempted by relevant state law lacks merit.  Delaware recognizes state preemption of local laws.  *See Cantinca v. Fontana*, 884 A.2d 468, 473 (Del. 2005) ("where [a] conflict exists between a state statute and a municipal ordinance, the statute must always prevail") (quoting *State v. Putnam,* 552 A.2d 1247, 1249 (Del. Super. 1998)).  The test for determining whether a state statute preempts a local regulation is whether the General Assembly intended the state statute to be exclusive of any regulation of the same subject.  *See id.* (citations omitted).

Legislative intent to preempt local law may be express or implied.   *See id.*  Implied intent exists where the state and local regulations are inconsistent; or where the legislature has enacted a comprehensive regulatory scheme "in such a manner as to demonstrate a legislative intention that the field is preempted by state law."  *See id.* at 473 n.23 (quoting *Goodell v. Humboldt County,* 575 N.W.2d 486, 493 (Iowa 1988)).  Express intent "exists where the statutory text or legislative history explicitly . . . demonstrates that the state statute is intended to replace or prevail over any pre-existing laws or ordinances that govern the same subject matter."  *See id.*  Through both implied and express intent, the Delaware General Assembly intended for the challenged provisions of Defendants' Policies to be preempted by state law.

### A.   Implied Preemption: The Delaware General Assembly has Passed a Comprehensive Regulatory Scheme in the Field of Firearm Possession

The comprehensive regulatory scheme comprised of many statutes governing the possession and use of firearms demonstrates the General Assembly's intent to occupy the field of gun control.  Some of the numerous statutes are listed in Plaintiffs' Opening Brief.  (*See* D.I. 87 at 18-19.)  This comprehensive regulatory scheme demonstrates that the General Assembly impliedly intended to occupy the field of gun control within the state, thus not allowing state agencies to contradict such law.

Defendant's unsupported assertion that the General Assembly's preemptive intent cannot be inferred from the statutes identified by Plaintiffs, because those laws do not specifically address landlord-tenant relationships (Title 25) or public housing authorities (Title 31) is without merit.  In implementing the Policies, Defendants have specifically attempted to enact forms of gun control.   Through the comprehensive regulatory scheme, the General Assembly has demonstrated its intent to occupy the field of gun control.  Accordingly, it is irrelevant whether the General Assembly enacted its implied intent in Titles 11 and 24 of the Delaware Code, or in Titles 25 and 31: Defendants have enacted forms of gun control in a field that was intended to be occupied by the General Assembly.  Thus, this Court should rule that the General Assembly has impliedly preempted the field of gun control, and hold that WHA is preempted from enacting regulations concerning the possession and usage of firearms.

### B.   Express Preemption:  The General Assembly has Reserved its Own Exclusive Authority to Regulate in the Field of Firearm Possession, by Specifically Prohibiting Municipal Governments from Regulating in this Field

The General Assembly has expressly preempted "municipal governments" from regulating firearm possession:

> The municipal governments shall enact no law, ordinance or regulation prohibiting, restricting or licensing the ownership, transfer, possession or transportation of firearms or components of firearms or ammunition except that the discharge of a firearm may be regulated.

22 *Del. C.* § 111; *see also* 22 *Del. C.* § 835(a)(6) (prohibiting municipalities from passing laws restricting possession and use of firearms).   These express statutes demonstrate the General Assembly's intent to occupy the field of firearm possession restrictions within the state, thus not allowing "municipal governments" to contradict such law.[33]   *See Massie v. United States HUD*, 620 F.3d 340, 352 (3d Cir. 2010) (citing *United States v. Turkette*, 452 U.S. 576, 580 (1981) ("[A]bsurd results are to be avoided.")).   Such a narrow reading of this section should be rejected by this Court.

In the context of firearm regulation, court decisions and Attorney General opinions from other jurisdictions have held that public housing authorities are "municipal governments" or the equivalent thereof, and that their attempts to regulate firearm usage are preempted by state or local law where the legislature has demonstrated its exclusive intent to regulate the field.   *See Doe v. Portland Housing Auth.*, 656 A.2d 1200, 1204 (Me. 1995) (Maine's Supreme Court determined that the Portland Housing Authority was a "political subdivision" under state preemption statute, subject to preemption in the field of firearm regulation); *see also Tx. Op.*

---

[33] Although the Delaware courts have held that WHA is a "state agency," nowhere in Title 22 is a definition of "municipal government" provided, and Defendants cannot point to a statute or Court decision holding that a "state agency" was not intended to be encompassed by the definition of "municipal government" for purposes of 22 *Del. C.* § 111.  To the contrary, it is clear that the General Assembly intended for state agencies to be encompassed by section 111: the Defendants' narrow construction of section 111 would produce an absurd result by which state agencies would be free to enact a "law, ordinance or regulation prohibiting, restricting or licensing the ownership, transfer, possession or transportation of firearms …" yet "municipal governments" would not.  This is especially true in light of the fact that, as described in further detail in the following section, an agency has no authority other than that which is expressly conferred to it by the legislature.  *See Kreshtool v. Delmarva Power & Light Co.*, 310 A.2d 649, 654 (Del. Super. 1973) ("The powers of an administrative agency must be exercised in accordance with the statute conferring power upon it. An agency's authority to act depends upon compliance with the procedural provisions laid down in the statute").

36

*Att'y Gen.*, No. DM-71 (Dec. 31, 1991) (determining that public housing authorities are municipal subdivisions and are subject to the same rules as municipalities).

In *Portland Housing Authority*, the Maine Supreme Court was called upon to determine whether 25 M.R.S.A. § 2011, which is analogous to 22 *Del. C.* § 111, preempted the Portland Housing Authority ("PHA") from regulating gun control through its lease provisions. Maine's preemption statute provides that "[n]o political subdivisions of the State, including, but not limited to, municipalities, counties, townships and village corporations may adopt any order, ordinance, rule or regulation concerning the . . . ownership, use, possession . . . or any other matter pertaining to firearms. . . ." 25 M.R.S.A. § 2011. The Maine Supreme Court determined that the PHA was considered a "political subdivision" for purposes of Maine's preemption statute, and therefore held that 25 M.R.S.A. § 2011 specifically applied to the PHA, such that PHA's lease banning the possession of firearms on leased premises was invalid.[34] *See Portland Housing Authority,* 656 A.2d at 1205. Accordingly, this Court should interpret section 111 broadly to prohibit state agencies from enacting forms of gun control, and likewise hold that WHA is expressly preempted from doing so pursuant to this statute.

## VI.    WHA HAS EXCEEDED THE SCOPE OF ITS AUTHORITY

Defendants' assertion that Count Four of the Second Amended Complaint should be dismissed is entirely baseless. To start, Defendants cite to no statutes or case law in support of their contention that Title 31 does not provide a cause of action for exceeding the scope of authority. Specifically, 31 *Del. C.* § 4308(a)(5) <u>does</u> provide a private cause of action against WHA, stating that WHA may "sue and be sued." 31 *Del. C.* § 4308(a)(5).

---

[34] The term "municipal government" in section 111 is not defined anywhere in the Delaware Code, and therefore the plain meaning of that statute is ambiguous as to whether state agencies are subject to the statute. This Court should follow the reasoning of the Maine Supreme Court in *Portland Housing Authority*, and hold that this State's preemption statute precludes WHA from engaging in forms of gun control.

The phrase "sue and be sued" gives WHA the ability to sue, and also establishes a vehicle through which Plaintiffs can sue the WHA.[35]   Defendants' argument that Title 31 does not provide a cause of action against WHA for exceeding its scope of authority should therefore be rejected by this Court.

Additionally, while WHA may have been granted "all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this chapter," no provision of Chapter 43 provides WHA with the power to enact gun control regulations, nor does the purpose of Chapter 43 have any relation to the field of gun control.   Indeed, an agency has no authority other than that which is expressly conferred to it by the legislature.[36]

Accordingly, Title 31, Chapter 43 <u>does</u> specifically grant a private cause of action against WHA, but given that Chapter 43 provides no mechanism by which WHA may enact gun control rules, WHA has exceeded the scope of its authority in adopting such rules, especially in an area where the legislature has demonstrated an exclusive intent to regulate the field.   Therefore, this Court should not dismiss Count Four of the Second Amended Complaint, but should instead find that WHA has exceeded the scope of its authority under Title 31, Ch. 43 of the Delaware Code.

---

[35] *See Wilmington Hous. Auth. v. Williamson,* 228 A.2d 782, 786 (Del. 1967); *see generally, Jackson v. Wilmington Hous. Auth.,* 1986 WL 630317 (Del. Super. Feb. 6, 1986).

[36] *Kreshtool*, 310 A.2d at 654 ("The powers of an administrative agency must be exercised in accordance with the statute conferring power upon it. An agency's authority to act depends upon compliance with the procedural provisions laid down in the statute"). "It is well established that administrative agencies . . . derive their powers and authority solely from the statute creating such agencies and which define their powers and authority." *Wilmington Vitamin & Cosmetic Corp. v. Tigue*, 183 A.2d 731, 740 (Del. Super. 1962) (citations omitted) (finding an agency may not decide matters that are not justified under the statute creating the agency).   WHA has acted outside the scope of its authority in enacting rules pertaining to gun control.   No authority has been granted to WHA, through Chapter 43 of Title 31, to enact forms of gun control, because nowhere in that Chapter is WHA specifically granted such a power.   This is especially significant in light of 22 *Del. C.*   § 111, which expressly prohibits "municipal governments" from enacting gun control laws or rules, and the implied intent of the General Assembly to occupy the field of gun control through its comprehensive scheme of gun control statutes.   Had the General Assembly intended to grant WHA the authority to enact forms of gun control, it would have specifically included a provision in Chapter 43 giving WHA that power.

38

## VII.   COUNT FIVE, SEEKING DECLARATORY RELIEF, SHOULD NOT BE DISMISSED

This Court should reject Defendants' assertion that Count Five of the Second Amended Complaint, which seeks declaratory relief under 10 *Del C.* § 6501, should be dismissed. Defendants do not dispute that Plaintiffs are entitled to declaratory relief; they simply make a flawed argument that Count Five should be dismissed because 10 *Del. C.* § 6501 does not provide for an independent cause of action.  In support of this argument, Defendants rely upon a Fifth Circuit case, *Smith v. BCE, Inc.*, 225 Fed. App'x 212, 216 (5th Cir. 2007), construing the Texas Uniform Declaratory Judgments Act, in arguing that section 6501 does not provide an independent cause of action.  However, Defendants cite to no Delaware case law interpreting 10 *Del. C.* § 6501.

Plaintiffs are clearly entitled to declaratory relief pursuant to the express language of section 6501, given that this section provides Courts with the ability to "declare rights, whether or not further relief is or could be claimed."  Section 6501 specifically provides that "courts of record . . . shall have power to declare rights," and that "[n]o action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for."  10 *Del. C.* § 6501; *see also Falcon Steel Co. v. HCB Contractors*, 1991 WL 166120, at *2 (Del. Super. July 31, 1991) (section 6501 provides for an additional or alternative form of relief which may be granted on a cause of action within the jurisdiction of the Court).

Through Count Five of the Second Amended Complaint, Plaintiffs do not assert declaratory relief as an independent cause of action, but instead as an "additional or alternative form of relief" to the other causes of action asserted in the Second Amended Complaint.  *See id.* Specifically, Plaintiffs seek a declaratory judgment that "Defendants' lease provisions . . . are unlawful because they violate the Second and Fourteenth Amendments to the United States

Constitution, as well as Article I, § 20 of the Delaware State Constitutions; and are preempted by existing Delaware law, and/or exceeded the statutory scope of authority granted to Defendants." *See* Second Amended Complaint (D.I. 40), ¶ 69.  Such a declaration is available as an additional or alternative form of relief pursuant to 10 *Del. C*. § 6501.

Finally, the fact that Plaintiffs have sought declaratory relief through a separate count of the Second Amended Complaint has no bearing on this analysis.  Nothing in the statutory language of section 6501, or in relevant Delaware case law, prevents a plaintiff from presenting a request for declaratory relief in a separate count of the complaint.  Accordingly, this Court should reject any argument by the Defendants that Plaintiffs are not entitled to declaratory relief, and should grant Plaintiffs declaratory relief as requested in Count Five of the Second Amended Complaint.

## CONCLUSION

For the foregoing reasons and the reasons stated in Plaintiffs' Opening Brief, Plaintiffs respectfully request that Defendants' motion for summary judgment be denied and that Plaintiffs' motion for summary judgment be granted.

FOX ROTHSCHILD LLP


By:____*/s/ Francis G.X. Pileggi*_____
     Francis G.X. Pileggi (Del. Bar No. 2624)
     Carl D. Neff (Del. Bar No. 4895)
     919 North Market Street, Suite 1300
     Wilmington, Delaware  19801
     (302) 655-3667
     *Attorneys for Plaintiffs Jane Doe*
     *and Charles Boone*


Dated:  March 25, 2011

WM1A 996694v1 04/01/11