```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     JANE DOE and CHARLES BOONE,
 4                                      :    CIVIL ACTION
                 Plaintiffs,           :
 5                                      :
                   v.                   :
 6                                      :
     WILMINGTON HOUSING AUTHORITY,      :
 7   and FREDERICK S. PURNELL, SR.,     :
                                        :    NO. 10-473 (LPS)
 8           Defendants.
                               - - -
 9
                          Wilmington, Delaware
10                        Friday, July 15, 2011
                          ORAL ARGUMENT HEARING
11
                               - - -
12
     BEFORE:      HONORABLE LEONARD P. STARK, U.S.D.C.J.
13
                               - - -
14   APPEARANCES:

15

16           ECKERT SEAMANS CHERIN & MELLOTT, LLC
             BY:  FRANCIS G.X. PILEGGI, ESQ., and
17                JILL K. AGRO, ESQ.

18                Counsel for Plaintiffs

19

20           YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
             BY:  BARRY M. WILLOUGHBY, ESQ., and
21                LAUREN E. MOAK, ESQ.

22                Counsel for Defendants

23

24
                          Brian P. Gaffigan
25                        Registered Merit Reporter
```

```
 1                        - oOo -

 2                P R O C E E D I N G S

 3              (REPORTER'S NOTE:  The following hearing was

 4      held in open court, beginning at 10:03 a.m.)

 5              THE COURT:  Good morning, everyone.

 6              (The attorneys respond, "good morning, your Honor.")

 7              THE COURT:  Let's begin by having you note your

 8      appearances on the record, please.

 9              MR. PILEGGI:  Francis Pileggi for the plaintiff,

10      your Honor; and my colleague, Jill Agro.

11              THE COURT:  Welcome.

12              MR. WILLOUGHBY:  Your Honor, Barry Willoughby

13      for both defendants; and my associate, Lauren Moak.

14              If I may, if I could introduce Mr. Fred Purnell,

15      the executive director, a defendant in his official

16      capacity.  He is back in the courtroom.  We also have two

17      summer interns from the Brady Center, Jeffrey Golimowski,

18      and Sarah Piazza who are here to watch the arguments today.

19      Thank you, your Honor.

20              THE COURT:  Thank you very much.

21              Have you all conferred about how you would like

22      to proceed?  There are multiple motions, and there is the

23      Brady Center, although I don't know that they have counsel

24      here today.  Have you all talked about how you would like to

25      proceed?
```

1          MR. WILLOUGHBY:  We have not, your Honor.  I

2   assume the plaintiffs would go first because they're the

3   plaintiffs, but I would be happy to go first, if the Court

4   would prefer.

5          MR. PILEGGI:  I would assume since we're the

6   plaintiffs, we would go first, but we can toss a coin or

7   however your Honor wants to do it.

8          THE COURT:  No, no.  I'm fine with the

9   plaintiffs going first to be heard on all of the issues, and

10   then defendants, but since you are both moving parties, I'll

11   give you each a chance to rebut one another, which, by my

12   count, Mr. Willoughby will have the last word.  Okay?

13          MR. PILEGGI:  That's fine with me, your Honor.

14          THE COURT:  Then you may proceed.

15          MR. PILEGGI:  Thank you.

16          May it please the Court, your Honor, my name is

17   Francis Pileggi.  I represent the plaintiffs.

18          This is a civil rights case, your Honor,

19   prohibiting the plaintiffs from keeping a firearm for

20   self-defense in their residential building, what amounts to

21   a deprivation of their Second Amendment rights and their

22   rights under the Delaware Constitution.

23          The United States Supreme Court recently said in

24   McDonald, "Our central holding in Heller was that the Second

25   Amendment protects a personal right to keep and bear arms

1    for lawful purposes; most notably, for self-defense within

2    the home."

3              The Supreme Court said that the Second Amendment

4    codified pre-existing rights to keep and bear arms for

5    self-defense.  There are very few rights that are so basic and

6    natural that the Constitution codified them instead of

7    granting them.  It's a privilege for me to be advocating for

8    the poorest minorities in our society, to seek protection for

9    their rights that are so basic and fundamental that they're

10   considered natural rights according to the U.S. Supreme Court,

11   that the Constitution did not grant and simply codified.  Of

12   all the many rights in the Constitution, and the perhaps

13   millions of state and federal statutes, case law and ordinances,

14   there are very few laws or rights in our country that enjoy

15   such an exalted position.

16             According to the U.S. Supreme Court, in order to

17   understand the American jurisprudence regarding the Second

18   Amendment, it's necessary and helpful, as the Court did in

19   Heller, to refer to the post-Civil War efforts in the South

20   to restrict Second Amendment rights.  The Fourteenth

21   Amendment was passed in part to address the declaration by

22   Southern states during Reconstruction of the Second Amendment

23   rights of freed slaves.

24             We're not in any way suggesting that the WHA has

25   any motive similar to the Southern states during Reconstruction.

1    What we suggest is that there is a similar net result here,

2    that the poorest minorities that are least able to defend

3    themselves are being deprived of their natural right of

4    self-defense.

5            About two months ago in <u>State v Griffin</u>, the

6    Delaware Superior Court said that, "If the constitutional

7    right to keep and bear arms for security is to mean

8    anything, it must, as a general matter, permit a person to

9    possess, carry and sometimes conceal arms to maintain the

10   security of his private residence."

11           Your Honor, in this case, I realized that the

12   original policy that the Wilmington Housing Authority had

13   that prohibited the possession of any firearms in any homes

14   or their residences has been amended, but the only record in

15   this case is that the defendants have continued to deny in

16   filings with the Court, even after the <u>McDonald</u> decision,

17   they have continued to deny their original policies were

18   unconstitutional.  So I would like to address briefly,

19   because I think it's fairly simple, why the original

20   policies violate the federal and state constitutions.

21           THE COURT:  I will let you do that, but I'm

22   unclear on whether it has been conceded it is unconstitutional

23   or not.  There are places in your briefs where you say it is

24   concededly unconstitutional, but I am not sure where they have

25   conceded it, and then you also argue they have not conceded

1   it.  What is your view on whether they have conceded it is not

2   constitutional?

3              MR. PILEGGI:  Thank you, your Honor.  They have

4   filed -- and I can provide the exact dates, but for now, I

5   will just refer to them without the dates.

6              After the McDonald case was decided, we filed an

7   amended complaint alleging again that the original policies

8   were unconstitutional.  They filed an answer denying, even

9   after McDonald, denying that the original policies were

10   unconstitutional.

11              They later amended their policies.  We filed a

12   second amended complaint, and the second amended complaint

13   was still, of course, after McDonald.  They again denied

14   that their original policies were unconstitutional.

15              So as far as their pleadings, my understanding

16   is, in terms of the answer to our complaint, that they have

17   denied any unconstitutionality.

18              Mr. Willoughby is more articulate than I am, and

19   he will explain his position, but as I understand his position

20   in the briefs, they said that because they changed the policy,

21   it doesn't need to be ruled on.  So maybe "conceding" is not

22   the correct word, it's not as accurate.  If we said they

23   conceded that they were unconstitutional, that might be

24   inappropriate.  It might not be the most accurate way to

25   describe their position.

1           There might be some ambiguity, and maybe that is

2      the right word to use, because in their pleadings in answer

3      to our complaint, they denied unconstitutionality.  In their

4      briefs, they might suggest otherwise.

5           THE COURT:  They have repeatedly stated that

6      they have no intention of reinstating the old policy.  Why

7      isn't that good enough?

8           MR. PILEGGI:  Well, your Honor, I think it's not

9      good enough for at least three reasons.  The first is that

10     is not binding.  I don't think we should be required to take

11     their word for it.  We're not doubting their word, but it's

12     a public institution.  Next week or next month or next year,

13     they could have a new board of commissioners, they could

14     have a new executive director, and there is nothing binding

15     that new director or the new board from adopting another

16     policy that they continue to say was not -- they continue to

17     deny was unconstitutional.  So there is nothing prohibiting

18     them from reverting back to their original policies if all

19     we have to rely on is their word.  They refused to enter

20     into a stipulation.

21          There have been cases across the country, for

22     example, in New Orleans, where there was a statute that was

23     held to be unconstitutional, and the mayor said, well, I

24     just won't enforce it.  In that case, it's not a reported

25     decision, but there was a stipulation where the parties

1    entered into a stipulation that the Court signed off on saying,

2    okay, now it's official, so next week or next year you can't

3    decide that you will enforce it or you will revert back.

4            So the short answer, your Honor, is there is no

5    protection.  We have no protection to stop them from, next

6    week or next year, going back to the original policy, in

7    which case we would have to spend the time and money to come

8    back into a court again to prevent them from enforcing the

9    original policy.

10           THE COURT:  Well, that is where I was going to

11   go next.  How is that an undue burden?  As I understand it,

12   under HUD regulations, it would take a minimum of 30 days

13   for them to adopt the old policy, were they to try to do

14   that.  The court is still here.  Presumably, you could run

15   in and file a new suit.  Let's assume that this one is over

16   with.  Why is that not sufficient protection for your client?

17           MR. PILEGGI:  Well, because it requires an

18   additional expenditure of time and money that I respectfully

19   suggest would be a waste not only of judicial resources but

20   a waste of our resources to have to tee up, so to speak, the

21   same issue that is now before the Court.

22           I understand why there is an argument that it

23   might be moot, but there are exceptions to the concept of

24   mootness.  Two things:  First, it's a matter of public

25   importance.  I think this is a matter of public importance.

1  We're dealing with a core fundamental right.  Secondly, if

2  there is a possibility that the challenged behavior will

3  be repeated.  There is at least a possibility that the

4  challenged behavior will be repeated if there is nothing

5  from this Court or otherwise that restricts the defendants

6  in the future from reverting back to the old policy.

7           THE COURT:  Well, you mentioned judicial economy.

8  That is something I have to be concerned with.  I'm concerned

9  that if I rule on the constitutionality of a policy that has

10 been repealed, and that the policy maker says that it has no

11 intention of reinstating, merely on the fact that there is a

12 possibility that those things could change, the Court could

13 become overwhelmed with what are effectively requests for

14 advisory opinions about policies that aren't actually in

15 place.  Can you help me not be afraid of that?

16          MR. PILEGGI:  Your Honor, I certainly respect

17 that concern.  I understand the Court is very busy and

18 should not about spending time deciding issues that it

19 doesn't need to decide, but there is case law and there are

20 policies that address similar situations where someone sued

21 and, after the lawsuit, the defendant changed their position

22 and argued that the Court no longer needed to decide the issue.

23          There are at least two or three different policies

24 that the courts have recognized where the Court can still make

25 a decision:

1              That is, if it is a matter of public importance.

2      This is certainly a matter of public importance.

3              If it is a situation where the challenged

4      conduct can reoccur.

5              There are also situations where, for example,

6      here, in a perfect world, I suppose, the defendants would

7      agree to stipulate, but for some reason the defendants have

8      refused to stipulate on the record that they are not going

9      to revert back to their old policy.

10              There are cases where, in similar situations,

11      the defendant has changed its position in response to a

12      lawsuit but the Court has still ruled on.

13              I certainly respect your Honor's concern that

14      it doesn't want to decide an issue that it doesn't need to

15      decide, but for the reasons I have explained, I think if

16      nothing else, an independent basis to do that would be

17      because it's a matter of public importance that could find

18      us back here again in the future.  I think it would be less

19      wasteful of judicial resources and our resources if we had a

20      decision on an issue that is teed up now instead of filing a

21      complaint at some point in the future which would have to be

22      briefed again and argued again.

23              THE COURT:  You wanted to explain to me why the

24      old policy is unconstitutional.  It's well set out in your

25      briefs.

1          MR. PILEGGI:  Well, I can skip over that if you

2     like.

3          THE COURT:  Why don't you address standing,

4     because there is a concern there.

5          MR. PILEGGI:  Your Honor, as far as standing,

6     there are a couple of points that I would like to highlight.

7          First, I'd like to refer the Court, and I can

8     give my argument without referring to it, but I'd like to

9     supplement the argument by referring to a decision last week

10    by the U.S. Court of Appeals in the Seventh Circuit.

11         I have copies of the decision, if you would

12    like, but the name of the case is Ezell v City of Chicago,

13    which involved a standing issue in connection with the

14    Second Amendment.  That's why I thought it would be helpful

15    to bring it up in addition to what we have in our briefs.

16         In that case, the Court described it as a

17    pre-enforcement challenge, which is what we have here

18    because they haven't enforced the new policy, so it's a

19    pre-enforcement challenge.  In the Ezell case, the Court

20    said, "There is no need for the plaintiffs to violate the

21    policies in order to challenge them."

22         In that case, it involved a statute, and the

23    Court said, "The very existence of a statute implies a

24    threat to prosecute, so pre-enforcement challenges are

25    proper because of probability of future injury counts as

1    an injury for purposes of standing.  And when a matter

2    involves threatened action by the government, the law does

3    not require a plaintiff to expose himself to liability

4    before bringing suit to challenge the basis for the threat."

5         So I think one of the arguments by the

6    defendants is at least threefold:

7         That as far as standing goes, we haven't been

8    evicted so why can we challenge it.

9         The second is that we haven't been injured yet,

10   so why should we have standing if we haven't been injured.

11        There are a couple other arguments.  One is that

12   you need a permit in order to carry a gun in the common area.

13   I think in the Ezell case, the argument that the Court --

14   well, it is not an argument, but the decision and the

15   reasoning of the Court was that you do not have to actually

16   do everything that is necessary to violate a statute or a

17   restriction in order to have standing to challenge them.

18   That is the argument that we are making here.

19        There is also something that I am sure your

20   Honor has heard called the Doctrine of Futility.  Here,

21   even if the plaintiffs had a permit to carry a firearm in a

22   common area, it would be a futile act because they would be

23   risking eviction.  Because they're in, by definition, low

24   income housing, if they're evicted, the likelihood is they

25   will be homeless, so it's a very big risk to take, to go

 1   through the process of getting a permit and then violating

 2   this policy and being evicted in order to have standing.  So

 3   as I understand the case law that is summarized not only in

 4   Ezell but in the case we cite in our brief, it's not necessary

 5   to have actually violated a challenged restriction in order

 6   to have standing.

 7          THE COURT:  But is it necessary to actually

 8   subjectively be opposed to the policy?  If so, is the

 9   record before me satisfactory to show that your clients are

10   actually opposed to this policy?

11          MR. PILEGGI:  Your Honor, I think that the best

12   answer to that question is that the clients have authorized

13   us to challenge the policy.  During the deposition of both

14   of the parties, there was some, for lack of a better word,

15   ambiguity about their position on this policy, but I think

16   a fair reading and the specific passages of the deposition

17   that we quoted was that the defendants wanted the right,

18   wanted the ability to exercise the right to carry a gun in

19   the common areas.

20          I understand that the deposition isn't a model

21   of clarity, but the plaintiffs in this case did not have the

22   benefit of a lot of formal education.  It was not difficult

23   to, for lack of a better word, confuse them about what their

24   position was on the policy, but I don't think it should

25   prohibit their rights to challenge the constitutionality of

1    a policy because they aren't the most articulate and they

2    weren't able to express their position on the constitutionality

3    of a policy in the deposition by a very skillful lawyer.

4              THE COURT:  What about Ms. Doe's affidavit or

5    subsequent affidavit that is being challenged as a sham?

6              MR. PILEGGI:  That is a good point, your Honor.

7    Let me address it in three major ways.

8              My understanding of the concept of a sham

9    affidavit in the context of a motion for summary judgment

10   is when it is presented by someone who wants to prevent the

11   summary judgment from being decided.  We filed the motion

12   for summary judgment.  We would like the Court to decide the

13   motions for summary judgment.  We didn't present the affidavit

14   for purposes of avoiding summary judgment.  We didn't present

15   the affidavit for purposes of creating a fact.  We don't think

16   that the affidavit prevents the entering of a summary judgment

17   motion.

18             If there is an issue about whether she owns a

19   gun, there is case law that says only one plaintiff needs to

20   have standing.  There are two plaintiffs here.  There is no

21   question that Mr. Boone owns a gun.  One way to deal with

22   that, your Honor, since there is no question that Mr. Boone

23   owns a gun, we only need one of the plaintiffs to have

24   standing in terms of a gun in our view.

25             The bottom line is it doesn't fall into the

1    category of a sham affidavit because it's not preventing the

2    Court from proceeding with ruling on the summary judgment

3    motions.

4              If your Honor wants me to address the issue

5    between the difference in the affidavit and the deposition,

6    I'd be happy to do that.

7              THE COURT:  Yes, why don't you do that.  And

8    also clarify, I think it's clear, but your challenge is just

9    to paragraphs 3 and 4 now of the new policy I'm talking

10   about.  You challenged the entirety of the old policy, but

11   in the new policy it's just paragraphs 3 and 4.

12             MR. PILEGGI:  That's correct, your Honor.

13   Paragraph 3 prohibits using a gun, prohibits carrying a gun

14   in the common area unless you happen to be walking through.

15   Paragraph 4 allows a WHA employee to require from a resident

16   proof of the right to carry a gun.

17             THE COURT:  And you claim that both of them are

18   unconstitutional under the Second Amendment and the Delaware

19   Constitution?

20             MR. PILEGGI:  Yes, your Honor.  Paragraph number

21   4 is a little trickier, but the short answer is yes because

22   it restricts the right under the Second Amendment and the

23   Delaware Constitution.

24             THE COURT:  Then do address --

25             MR. PILEGGI:  The deposition?

```
 1              THE COURT:  -- the affidavit of the deposition.

 2              MR. PILEGGI:  Your Honor, first of all, let me

 3    address it in categories.  First of all, we were correcting

 4    a factual inaccuracy in the deposition.  The reason why it

 5    wasn't corrected during the deposition is because, quite

 6    frankly, the deponent was afraid if she admitted she had a

 7    gun, she would be subject to eviction.

 8              Now, I realize that at the time shortly before

 9    the deposition was taken, they had changed the policy, but

10    this is someone who, if she were evicted, would be homeless.

11    In the past, they had told her if she owned a gun, she would

12    be evicted.

13              In the past, they had also -- I'm try to use my

14    words carefully.  They had also given her a hard time for

15    expressing her displeasure with their policy about guns.  The

16    third or fourth person in command at the WHA came to her door

17    and basically interrogated her as you would for a person

18    charged with some crime.  They made out a written statement

19    and asked her to sign it.  And they had additionally charged

20    her -- started to charge her for costs that they had never

21    previously charged her for.

22              So this person, Jane Doe, was very concerned

23    based on prior behavior about whether she would be evicted

24    for admitting that she owned a gun.

25              This is a person who, in the 1960s, actually was
```

1   marching with Martin Luther King when she was jailed for

2   expressing her rights.  So she has, in my view, a valid

3   concern about whether or not, by saying that she had a gun,

4   she was going to be treated fairly.

5               Now, there is no excuse for her not saying on

6   the record that she had a gun, but I'm convinced that it

7   couldn't have been corrected there because I actually had to

8   do a lot of work to convince her that she had to correct the

9   record.  I don't think it could have been corrected during

10  the deposition.

11              THE COURT:  As I understood the affidavit, she is

12  saying that she currently owns a gun, but it is not, at least

13  at the time of the affidavit, in her unit here in Delaware.

14  It is with a relative in another state.  Is that correct?

15              MR. PILEGGI:  That is correct.

16              THE COURT:  And that was the state of affairs as

17  of the time of her deposition as well.

18              MR. PILEGGI:  Correct.

19              THE COURT:  But yet you're acknowledging that

20  her testimony and her deposition was untruthful to the extent

21  she denied owning a gun, but to the extent she testified she

22  did not have a gun in her unit at WHA, that was truthful

23  testimony.

24              MR. PILEGGI:  Correct.

25              THE COURT:  Okay.

1              MR. PILEGGI:  So we're not condoning the fact

2       that she was not accurate.  I am just trying to explain why

3       she said what she said and why it took a lot of work on my

4       part to require her to correct the record.

5              THE COURT:  The alleged retaliation with

6       respect to the new fees that she had been billed for, did

7       that all happen after the deposition or does that predate

8       the deposition?

9              MR. PILEGGI:  That predates the deposition, but

10      it all occurred after she became vocal about, complaining

11      about the policy under the original policy.

12             THE COURT:  But I think she testified at the

13      deposition that she had not been retaliated against in any

14      way.

15             MR. PILEGGI:  Well, your Honor, I know the

16      deposition is not a model of clarity, but whether she used

17      the word "retaliate" or not, the deposition makes clear that

18      they came to her apartment, and after she expressed her

19      objections about the original policy, they made her come

20      down to the office, and they asked her a lot of questions,

21      and actually someone at the WHA wrote out a statement and

22      asked her to sign it.  She is not very well educated, so

23      whether or not she understood everything she was signing, I

24      don't know.  They also started to charge her for things --

25      and this is someone on a very limited income -- charge her

1    for things that they had not previously charged her for

2    before she started complaining.

3              Now, is that just a coincidence?  I don't know.

4    She had been living there for several years and they weren't

5    charging her for storage.  Now, all of a sudden, they start

6    charging her for storage.

7              Now, is that retaliation?  For someone who is

8    running the risk of being homeless if she is evicted, that

9    is not something that gives you a lot of confidence that

10   the landlord is going to be treating you fairly.  So it is

11   somewhat subtle, it is not as overt as threatening her but

12   it is behavior that is not typical and just happened to

13   occur after she started expressing herself.

14             THE COURT:  If I find Doe does not have standing

15   and only Boone does, does that limit the scope of your

16   challenge to the one facility and not the other?

17             MR. PILEGGI:  Well, your Honor, if you find

18   that Boone has standing for the reasons we explained in our

19   brief, I think that the Court can still rule.  He still has

20   standing for the Court to rule that the policies weren't

21   constitutional.  So even if, for whatever reason, Jane Doe

22   does not have standing, it is our position it is sufficient

23   for the Court to find that Boone has standing.  So whatever

24   the issue is about the affidavit compared to the deposition,

25   I don't think it is a fatal flaw in terms of standing for

1    the whole case.

2              THE COURT:  Why don't you move on to the

3    constitutionality of the new policy.

4              MR. PILEGGI:  With the new policy, your Honor,

5    again, we're focusing on the two parts of the new policy

6    that prohibit the carrying of firearms in a common area.

7    The way the new policy is written is somewhat contradictory

8    or inconsistent.

9              In their depositions, the defendants acknowledged

10   that under the new policy, one cannot sit or stand or lounge

11   in a common area.  Let's use the example of a TV room.  They

12   cannot sit or stand in the TV room while in possession of a

13   firearm.  They can only be in possession of a firearm if

14   they're walking through a common room to or from their

15   apartment.

16             To the extent that it prohibits someone from

17   carrying a firearm in a common area, that is a violation of

18   the Second Amendment and Section 20, Article 1 of the

19   Delaware State Constitution.

20             To explain that, I'll focus on first the U.S.

21   Supreme Court decisions in _Heller_.  _Heller_ did not limit the

22   core right to possess firearms for self-defense to the home.

23   It said that right is most notably for self-defense in the

24   home but did not limit it to the home.  The _Heller_ court

25   recognize the right to bear arms for purposes other than

1    self-defense in the home and for other lawful purposes even

2    if they might not have been as notable as self-defense in

3    the home.

4              It's clear that the WHA conditioned the provision

5    of public housing on the surrender of a constitutional right.

6              Your Honor, in connection with whether or not

7    the new policy is constitutional, the question arises what

8    standard of scrutiny applies, whether it's strict scrutiny

9    or intermediate scrutiny.  In the <u>Heller</u> decision, the Court

10   said that because there was a complete prohibition in the

11   statute that that case was challenging that under no

12   standard of review could the statute be upheld.

13             So to the extent that the common area provision

14   prohibits the possession of firearms while sitting or

15   standing in the common area, the argument can be made that

16   under no standard of review is that policy constitutional.

17             If the Court decides to use a strict scrutiny

18   standard which would apply if the lease provision for the

19   common area policy is severely limiting the possession

20   of firearms, then the Court has to find that there is a

21   compelling state interest and that the provision is narrowly

22   tailored.

23             We will concede that there is a compelling state

24   interest in safety.  That is the stated goal.  But there are

25   other means to provide the same results without infringing

1    on Second Amendment rights.

2            We use the example of the San Francisco Housing

3    Authority case where they had a similar provision that

4    prohibited all firearms in all of their housing.  They

5    changed the policy to simply require that the residents

6    comply with all applicable federal and state law, which is a

7    fairly extensive and comprehensive framework of state and

8    federal laws that applies to residents, and they left it there.

9            If the WHA followed that example and just

10   required their residents to comply with all applicable

11   federal and state law and regulations, then we wouldn't be

12   here body.  The WHA went further and imposed additional

13   restrictions that are not imposed by federal and state law.

14   For that reason, our position is that it is not narrowly

15   tailored, so it does not satisfy the strict scrutiny test

16   because there are other means to provide the same results.

17           THE COURT:  If they had stopped and just

18   followed federal, state and local law, what practical

19   difference would that make for a resident in the common area?

20   That is, do you concede you would still need a concealed

21   weapon license to carry your gun in the common area?

22           MR. PILEGGI:  Yes, your Honor.  So the

23   difference is that if they stopped as the San Francisco

24   Housing Authority did, and just required --

25           THE COURT:  Basically, paragraph 1 of the new

1    policy.

2              MR. PILEGGI:  Right.  If they stopped there,

3    then we would not be here today, and a resident would have

4    to have a permit to sit or stand or lounge in the common areas.

5              THE COURT:  So by conceding that, though, aren't

6    you conceding that the common area is not part of the home

7    or hearth of the individual residents?

8              MR. PILEGGI:  Well, that is only not part of the

9    hearth, but because it is a residential building and the

10   homes for these people, I think one could argue it is not

11   just the confines of their apartment, it is the whole

12   residential building.

13             But I acknowledge and agree that once they

14   stepped outside of their apartment, I think in going to the

15   common area, I think at that point they would need a permit

16   as you would if you were in any other common area.  But I

17   don't think the residential building conceptually should be

18   treated in the same way as if they were in Rodney Square or

19   out in a public place.  I mean it is their residential

20   building.  However, I acknowledge they would still need a

21   permit if they were in the common area.

22             THE COURT:  The common areas in the two

23   buildings that the two plaintiffs live in are not identical;

24   correct?

25             MR. PILEGGI:  Correct, your Honor.

1           THE COURT:  Might it be that there is a

2    material factual dispute and the Court needs to get into

3    the nitty-gritty details of what actually happens in the

4    particular parts of the common area of each of these

5    buildings?

6           MR. PILEGGI:  Well, your Honor, I think that

7    that's a possible approach, but I'm not aware of any -- even

8    though the depositions of the commissioners created some lack

9    of precision about exactly what the common area was, I don't

10   think there is a dispute about whether or not the restrictions

11   under paragraph 3 of the new policy are unconstitutional and

12   whether or not it would have been constitutional or preferable

13   that they just stopped at paragraph 1.

14           So the question in my view is not whether there

15   is a precise contour of what the common area is; in the

16   Southbridge area, it's different than what it is in the

17   Park View area; but the question is whether WHA should be

18   regulated more so than the existing framework of state and

19   federal laws.  So whether there is a dispute about what

20   the common area is in the Park View as opposed to what the

21   common area is in the Southbridge apartments, the point is

22   they shouldn't be regulating at all the common areas to the

23   extent that it is more extensive than what already exists

24   under the federal and state framework of gun control.

25           THE COURT:  Address the defendants' argument

1    that the common area is a sensitive place in which the

2    government has an extra ability to regulate.

3                 MR. PILEGGI:  Your Honor, I will refer to

4    certain cases that address that, but before I do, I will

5    just address the conceptual approach that we acknowledge

6    there are certain sensitive areas where the government is a

7    landlord, such as the courthouse, such as the post office,

8    which are public places which are appropriate for the

9    government to restrict things like Second Amendment rights.

10                But this is a situation where there is no case

11   law or regulation that I'm aware of that describes a

12   federal housing project or a building that is financed and

13   is considered a public housing building, treats that as a

14   sensitive area.  I think someone's home or residential

15   building should not be treated in the same way as a school

16   or a courthouse or a post office where the public at large

17   is doing the government's business as opposed to a home

18   where someone lives.

19                To the contrary, I think there are statutes and

20   regulations which I'm happy to refer to that do describe

21   sensitive areas and do not include, in those definitions of

22   sensitive areas, housing, residences.  For example, there

23   is a federal statute that talks about restricting certain

24   activities in school zones.  There are other statutes that

25   refer to sensitive areas about post offices.

1          The U.S. Department of Housing and Urban

2     Development, by the way, does not have an official position

3     on the possession of firearms in public housing developments.

4          There are cases which specifically refer to

5     schools and post offices and courthouses as sensitive places,

6     unlike homes.  So we acknowledge Your Honor, that there are

7     situations where governments are landlords and there are

8     sensitive places.  I'm not aware of any authority that regards

9     a house or a residence that should be categorized in the same

10    way as a post office or a courthouse.

11         I don't know if your Honor has ever been to

12    Southbridge, but since we're talking about sensitive areas,

13    I will quickly refer to the way it is laid out.  In essence,

14    it is similar to townhomes, facing each other, and there

15    is a plaza in between them.  So if you didn't know it was

16    public housing, it looks like any other housing development.

17         Why that would be considered a sensitive area in

18    the same way a courthouse or a post office or a legislative

19    hall in Dover would be, I don't think there is a rational

20    explanation for why you would lump all of those places into

21    the same category.

22         THE COURT:  If it was private housing, completely

23    owned and run by private entities, they could have whatever

24    gun restriction policies they wanted, couldn't they?

25         MR. PILEGGI:  Your Honor, that's a good question.

1    We certainly wouldn't be able to file a Section 1983 action

2    against them because they wouldn't be a government actor, but

3    you raised a good point.

4              I don't know if that was your Honor's point, but

5    if I can mention quickly in response.  My understanding is

6    there are certain houses where they just look like private

7    homes and the WHA provides rental assistance for them.

8              The other actual thing that I should emphasize,

9    your Honor, is one of the buildings involved in this case,

10   the Park View, isn't even owned by the government.  It is

11   acknowledged in the pleadings that it is privately owned but

12   it is managed by the WHA.  I think I should have responded

13   initially to your Honor's question of sensitive areas that it

14   doesn't even apply to the Park View because the government

15   is not even a landlord of the Park View, it is a manager.

16             Because it is a manager, there is plenty of

17   authority for the position they are still treated as a

18   government actor because they manage it and they are the ones

19   who determine what the policies are for the residents.  But

20   to the extent there is an argument that the government, as

21   landlord, should be able to restrict certain rights because it

22   is a sensitive area, that shouldn't apply to the Park View.

23             THE COURT:  If that is the case, then do not we

24   have to answer the question whether a private landlord has

25   the ability to, let's say, completely forbid firearms on

1    their private property?

2          MR. PILEGGI:  Except, your Honor -- I am happy

3    to answer that question, but as a preface to the question,

4    I am not sure that is an issue in this case because the

5    private landlord is not the entity that is making the

6    decision to prevent firearms, it is the WHA, and, in its

7    sole discretion, is making the decision to restrict firearms.

8          So I am happy to address it if your Honor wants

9    me to, but in this particular situation, and the facts in

10   this case, the private landlord is not making the decision

11   to restrict firearms.  It is the WHA as a manager of the

12   building that is making that decision.

13         THE COURT:  Well, then if that is the case, it

14   seems to me I have to potentially decide, if it is a sensitive

15   area, if the government is the one making the decision and the

16   government is arguing it is a sensitive area.

17         MR. PILEGGI:  Well, I would never want to suggest

18   what your Honor can and cannot decide, but my understanding of

19   the cases that talk about the government as a landlord talk

20   about the government as the landlord that owns the building.

21   Now, maybe it is a distinction without a difference, but it

22   is my understanding -- I haven't seen a case that talks

23   about categorizing a building as a sensitive area where the

24   government is simply the manager of a property as opposed to

25   the owner of the property.

1          Now, maybe that is too subtle a distinction, but

2    I don't think it is an issue that was raised.  I am happy

3    to do supplemental briefing on it, but I do not think that

4    issue was raised in any of the briefs about whether or not

5    this should be treated as if a private landowner is

6    restricting.

7          THE COURT:  Put aside all those distinctions

8    for the moment.  Address the idea that, as in the First

9    Amendment context, where there can be situations where there

10   are reasonable time, place and manner restrictions exercised

11   with the First Amendment.  Why should the same regime not

12   govern here with respect to reasonable time, place and

13   manner restrictions on Second Amendment rights?

14         MR. PILEGGI:  Your Honor, the best answer I have

15   for that question goes to the nature of this right.  This

16   is more than just a time, place or manner restriction in

17   terms of the common area.  It is a complete prohibition in

18   terms of allowing a resident to either sit or stand or

19   lounge in a common area.  So it is more than just a time,

20   place or manner restriction.  In our view, it should be

21   treated as a complete prohibition in terms of exercising the

22   rights in that common area.  So it is not, in our view, just

23   regulating.  It is more than just regulating the time,

24   manner and place.

25         Your Honor, I was going address the Delaware

1  State Constitution and preemption arguments.

2            THE COURT:  That's fine.

3            MR. PILEGGI:  Article 1, Section 20 of the

4  Delaware Constitution provides that a person has the right

5  to keep and bear arms for the defense of self, family, home

6  and state and for hunting and recreational use.

7            Notably, after this case was filed but before

8  the U.S. Supreme Court decision in McDonald, defendant

9  Purnell actually stated in an e-mail to all the Delaware

10  Housing Authority commissioners that the existing gun

11  policies would have to be changed to comply with Delaware

12  state law.  This was even before the McDonald case.

13            I know that in their papers, they argue that

14  once the U.S. Supreme Court decision in McDonald was handed

15  down, they changed their policy.  But our position all

16  along in this case has been that before McDonald was even

17  decided, there was a separate and independent state law

18  basis to invalidate their original policies.  There is still

19  a separate and independent state constitutional basis and

20  state statutory basis to defeat their new policies.  They

21  acknowledge that in an e-mail that was circulated, and we

22  attached to our papers, before the McDonald decision was

23  even handed down.

24            I don't know if it's an irony or not, but if you

25  look at the wording of Article 1, Section 20 of the Delaware

1    Constitution, the wording is actually much broader than the

2    Second Amendment because it talks about the right to defend

3    not just oneself but one's family and the state and for

4    hunting and recreational use.  Unless your house is very

5    big, you are probably not going to be hunting inside your

6    house.  So the language, just on its face, is very much

7    broader than the Second Amendment.

8         THE COURT:  Although the Second Amendment

9    does not expressly limit itself to self-defense, so in that

10   regard, maybe it is narrower.

11        MR. PILEGGI:  That is possible.  I mean that is

12   a good point.  I wouldn't disagree with you, your Honor.

13        But the point I was going to make was that so far

14   at least, the U.S. Supreme Court has interpreted the Second

15   Amendment more broadly than the Delaware courts have inter-

16   preted the analog in Section 20.  So if you are just looking

17   at the wording on the face of the Delaware Constitution, it

18   seems to be broader than the wording of the Second Amendment.

19        Then when you look at the case law, the U.S.

20   Supreme Court has interpreted the Second Amendment in a way

21   that seems broader than the actual words of the amendment.

22   The Delaware Constitution so far has not been interpreted

23   as broadly, although two months ago, the Superior Court in

24   State v Griffin has said, "Delaware courts have recognized

25   that Article 1, Section 20's protections are more explicit

1   and extensive than many other state counterparts."

2           I'm not trying to confuse things even more, but

3   Delaware is one of those states that actually allows for open

4   carry, which is probably another issue that the Court does not

5   want to get into today, but there are also restrictions on how

6   you can openly carry a firearm.

7           So the point I wanted to make was even though the

8   state case law in Delaware has not developed the interpretation

9   of Section 20 as robustly as the U.S. Supreme Court has

10  interpreted the Second Amendment, there is a separate and

11  independent basis for us to challenge the constitutionality.

12          THE COURT:  You do agree, though, that the

13  Second Amendment decisions are at least instructive in

14  understanding the scope of the Delaware constitutional

15  provision?

16          MR. PILEGGI:  Yes, absolutely.  I'm sure your

17  Honor knows this better than I do.  The U.S. Supreme Court's

18  interpretation of the Second Amendment right sort of

19  establishes a minimum.  So the state constitution, of course,

20  can grant more rights, but I do not think it is permissible

21  for the state to detract from or to provide fewer rights than

22  the Second Amendment.

23          THE COURT:  That open carry, which if I don't

24  have to I won't get into, but I just want to make sure.

25  That you had said earlier I believe that you concede that

1    some sort of permit is necessary to carry the firearm in

2    the common areas of the WHA properties.  What you have just

3    mentioned about Delaware being open carry law, that is the

4    not inconsistent with what you conceded earlier, is it?

5              MR. PILEGGI:  I don't think it is inconsistent,

6    although I recognize there is a tension there because under

7    Delaware law, you need a permit to carry a concealed deadly

8    weapon.  There is also another part of Delaware law that

9    says that you do not need -- that you can openly carry a

10   gun, but there are restrictions on when and how and where

11   you can openly carry.

12             So I am not here to try to create issues.  I am

13   just acknowledging that looking at both of those provisions

14   and the law, there seems to be a tension.  But I do not

15   request the Court to resolve that tension, and I am not

16   trying to create additional issues for the Court.

17             I just want to mention in passing there is a

18   cite in one of our footnotes in the briefs.  I just thought

19   it was helpful to acknowledge that there is that other

20   provision in the Delaware statute.

21             THE COURT:  Why don't you go on to preemption

22   then.

23             MR. PILEGGI:  Your Honor, the Delaware General

24   Assembly has developed a very comprehensive regulatory

25   scheme regarding gun control.  In fact, just this week with

1    the Delaware General Assembly -- well, just this week, the

2    governor signed gun legislation that the Delaware General

3    Assembly recently passed.  That is just another example of

4    the almost annual effort of the Delaware General Assembly to

5    update and to continue to develop their comprehensive

6    regulatory scheme about gun regulation.

7           The Delaware General Assembly specifically

8    preempted municipal or county regulations regarding firearms.

9    Although they do not specifically mention the Wilmington

10   Housing Authority, there is no, in our view, reasonable

11   explanation for why the General Assembly would prohibit

12   counties and municipalities from entering the field and

13   regulating firearms but allow housing authorities to do so.

14          If the General Assembly preempts the field,

15   the intent is not to allow anyone other than the General

16   Assembly to regulate this area.  It would not make much

17   sense if the General Assembly wanted to preempt the field

18   and prohibit anyone else from regulating an area except for

19   housing authorities.  That is just inconsistent with the

20   whole concept of preempting a field.

21          There is case law in Delaware that treats the

22   Wilmington Housing Authority, in particular, as a state

23   agency.  So based on that analogy, if the position of

24   Wilmington Housing Authority prevails, presumably not only

25   any housing authority but any state agency could decide

1   that they wanted to implement regulations and restrictions

2   regarding gun control that were supplemental to or different

3   than what the Delaware General Assembly decided is going to

4   be part of their whole comprehensive framework.

5          It does not have to be inconsistent in order to

6   be contrary to the preemption doctrine because they decided

7   they want to be the only players in this field.  They do not

8   want anyone else on the field other than them.  And so even

9   though the statute doesn't specifically exempt or preempt

10  the Housing Authority like it does counties and municipalities,

11  it certainly would be inconsistent to allow WHA to do so.

12         That sort of ties in to our argument that WHA has

13  exceeded its authority because it is a creature of statute.

14  It was created by state statute, and it would be inconsistent

15  to interpret one part of the state statute inconsistently

16  with another part of it.  If one part of the state statute

17  says this field is preempted, it would be inconsistent

18  to interpret another part of the state statute that created

19  the WHA to be inconsistent with that.

20         If defendants are correct that there is no remedy

21  for the plaintiffs where authority has exceeded its statutory

22  power and infringed on plaintiffs' core constitutional rights,

23  what avenue would one have to vindicate rights that are

24  violated when a statutory creature exceeds its statutory

25  authority.

1          It is not quite the same as preemption but it is

2     related to the extent that the Wilmington Housing Authority

3     only has the authority to do what the statute that created

4     it allows it to do.  The statute that created it does not

5     say anything about regulated firearms.

6          Your Honor, I would like to just quickly say

7     something about paragraph 4 of the policy that talks about

8     reasonable cause.  We refer to it as the reasonable cause

9     provision that requires residents of WHA facilities to have

10     available for inspection upon request any weapons permit or

11     license when there is reasonable cause to believe that the

12     law or the new policy has been violated.

13          So what this policy has done is it has basically

14     given law enforcement authorities to private citizens like

15     WHA employees.  I am not aware of any other situation where

16     a private citizen can require of another private citizen

17     proof of the right to exercise a certain privilege.

18          For example, would a private person be entitled

19     to ask for a driver's license as a condition to allow

20     someone to drive?  I am not aware of a situation similar to

21     this where, in a private residence, another private citizen

22     can ask someone for proof of their right to exercise a

23     certain privilege.

24          THE COURT:  But you do not believe a private

25     landlord could ask the tenant of a unit in a private

1    apartment building, you shall meet the burden for the gun

2    that you have here in your unit?

3            MR. PILEGGI:  That is a good question.  That is

4    one that wasn't briefed, and I am happy to do a supplemental

5    brief on it, but I certainly wouldn't be able to file a 1983

6    action against the landlord.

7            Whether or not a private landlord would be

8    allowed to force an individual to show proof of his right to

9    exercise that particular privilege, I am not aware of any

10   authority, but we have not briefed that issue.  I would be

11   happy to address it in a supplemental filing, if you want.

12           Your Honor, I think the only issue we have not

13   discussed yet is the declaratory judgment issue.  I will

14   just briefly refer to that as maybe being a distinction

15   without a difference.

16           Section 6501 clearly entitles -- "entitles" is

17   not the right word.  It clearly provides the Court with the

18   power to declare rights and provides a cause of action where

19   there is an actual controversy between the parties.

20           Section 6501 says, "No action or proceeding

21   shall be open to objection on the ground that a declaratory

22   judgment or decree is prayed for."

23           So whether it is described as an alternative

24   form of relief or cause of action, I am not sure it is

25   productive to spend a lot of time on drawing the line

1    between those two statuses, those two categories.  The

2    statute clearly allows us to ask for declaratory judgment.

3    Whether that is a cause of action or a form of relief, I am

4    not sure it is useful to spend a lot of time to -- unless

5    the Court wants me to -- to make that distinction.

6              THE COURT:  No, that's fine.

7              MR. PILEGGI:  Unless there is anything else,

8    your Honor, I think those are the highlights.

9              THE COURT:  I will give you a chance on rebuttal.

10             MR. PILEGGI:  Thank you very much.

11             THE COURT:  Let's hear from Mr. Willoughby.

12             MR. WILLOUGHBY:  Thank you, your Honor.  Good

13   morning.

14             May it please the Court, as I have already

15   been introduced, I am Barry Willoughby.  I represent the

16   defendants in this case, WHA and Frederick Purnell who is

17   joined in his official capacity only.

18             Your Honor, this is a case of first impression

19   in this court and really around the country.

20             The question presented is whether or not a

21   public housing authority is going to be in a situation where

22   it can impose reasonable time, place and manner restrictions

23   on weapons in public housing authorities in the context

24   where they are effectively the landlord.

25             The ramifications of this case go well beyond here

1    in Wilmington.  They really are on a litigation nationwide

2    basis.  I am not aware of any other case where we had this

3    issue come up.

4              From our perspective, the plaintiffs are taking a

5    very extreme position to say that the Housing Authority, in a

6    role of landlord, cannot impose some kind of a reasonable

7    time, place and manner restriction, as is common in other

8    constitutional rights, such as the First Amendment.  It seems

9    to be a very, very extreme position to say we are limited only

10   to what the state law is in the state where the authority is.

11   It is really beyond the scope of reasonableness in our view.

12             We look at this case from a constitutional

13   standpoint on two different levels.  The first is, your Honor

14   referred to earlier in the discussion, whether or not the

15   Housing Authority common areas are a sensitive place under

16   the doctrine announced in Heller.

17             Heller was a very limited decision, as the Court

18   is aware.  It was a 5 to 4 decision, deeply divided court.

19   It made clear that at least the core right is the right to

20   have a gun in the home for purposes of self-defense, and

21   most cases have not gone much beyond that.

22             Given the fact it's a 5 to 4 decision, I think

23   there is serious doubt whether or not Heller will be expanded

24   beyond, though.  Certainly, I would not argue it is something

25   like a right to go hunting.  The Court has indicated that

1    certainly is something they would consider within a number

2    of rights under the Second Amendment; but in terms of a

3    situation like this, I do not think there is any authority

4    to go beyond self-defense in the home.

5              So the starting point for us is, is there an

6    impingement on the Second Amendment at all?  Our answer is

7    no.

8              If you look at these common areas, these are

9    television rooms, there are day-care centers, there are

10   administrative offices.  There are any number of different

11   kinds of facilities that are open to residents generally, in

12   some cases to the public, that are totally distinct from

13   the residents' right to have a weapon in their own personal

14   unit, which we treat as being in the home.

15             If you look at the cases that have been developing

16   after Heller around the country, I think they all support

17   the view that the Sensitive Area Doctrine would apply to the

18   Housing Authority.  If you look at the George Mason University

19   case in the State of Virginia, the Virginia Supreme Court said

20   that; in very similar circumstances really, that the right

21   to regulate weapons in areas where students and others may

22   congregate; they were particularly vulnerable in those

23   situations, same thing in the classroom; that is a sensitive

24   area.  Therefore, it is completely outside the scope of the

25   whole Second Amendment regime.

1                    That is not unlike the First Amendment area where

2     we have got this distinction between protected and unprotected

3     speech.  We have an area, for example, pornography is purely

4     unprotected by the First Amendment.  We're trying to predict

5     where the Court will go, but if you look at that regime, I

6     think you would say that the Court has laid out an area that

7     this is just not a Second Amendment issue.  That is our first

8     position.

9                    If you look at some of the other cases, there

10    is a case where the Park Service, for example, prosecuted

11    someone for having a weapon on the premises.  That decision

12    says plainly that is a sensitive area.  People congregate

13    like they do in the common areas of the WHA.  The need for

14    the Park Service in that case and for WHA in this circumstance

15    to regulate is paramount.  It is an important governmental

16    interest.

17                   I think if you look at those cases that are out

18    there, I think that consistently you are seeing that areas

19    like this are considered sensitive areas and really completely

20    outside the Second Amendment regime.

21                   THE COURT:  Is it undisputed that all of what we

22    referred to as the common area in both buildings that are at

23    issue here are areas where people congregate?

24                   MR. WILLOUGHBY:  Yes.  There are hallways, for

25    example.  I don't know if they would congregate, but you are

1    going from the entrance of the building to your unit.  That

2    is a common area.

3              We have been very careful in our policy to say

4    that a resident could take their weapon from outside and

5    vice versa and, if necessary, they could use it if there was

6    a confrontation where that became appropriate.  So whether

7    that would be a congregation area or not, it is certainly an

8    area open to residents generally, not just the particular

9    resident who has the weapon.

10             THE COURT:  I am just trying to understand what

11   in your view is the defining characteristic of a sensitive

12   area.  You seem to emphasize the congregating.

13             MR. WILLOUGHBY:  Yes.

14             THE COURT:  Is it that it is open to others?

15             MR. WILLOUGHBY:  Yes, it is an area where

16   residents and their guests -- first of all, the residents

17   are elderly and disabled in many cases.  They have guests

18   who are children and grandchildren.  So, for example,

19   the television rooms, the community rooms where people

20   congregate, certainly, that would be a sensitive area that

21   would be outside the entire regime of the Second Amendment.

22             There are laundry rooms.  There are day-care

23   facilities.  There are administrative offices down the

24   street here where the WHA staff works.  So there are any

25   number of different areas like that.

```
1              But I think if you look at the cases like the

2      Postal Service case and the National Parks case and the

3      George Mason University case where you are dealing with

4      the university, all of those would suggest that where the

5      entity, the government entity is doing business or the

6      patrons, so to speak, are congregating would be considered

7      sensitive areas who are completely outside of this whole

8      Second Amendment doctrine.

9              THE COURT:  Has any court addressed or identified

10     something that is not a sensitive area?

11             MR. WILLOUGHBY:  I don't think so, your Honor.

12     What I found in reading the cases is, quite frankly, the

13     courts tend to do an either/or analysis, in all the cases I

14     have read, except for the GMU case where they just stopped

15     and said it is a sensitive area and that is the end of the

16     analysis.  The other cases have said we are not really sure.

17     We think it is a sensitive area, but even if it is not, it

18     passes the intermediate scrutiny.  So there is not a lot of

19     authority on that except for the George Mason University

20     case where the Court just basically stops with the analysis

21     on the university being a sensitive area.

22             The Postal case, I have to go back and look at

23     it.  I think they did the either/or analysis there.  They

24     may have stopped with the sensitive area analysis there as

25     well.
```

```
1              THE COURT:  On the idea of stopping in
2   Marzzarella, the Third Circuit opinion, it seems the Third
3   Circuit is cautioning expressly District Courts from finding
4   that the Second Amendment does not apply to certain areas.
5   Are not you inviting me to do something that the Third Circuit
6   has told me I should not do?
7              MR. WILLOUGHBY:  I certainly would not do that,
8   your Honor.  But I think it goes more to what I was saying
9   in doing an either/or analysis because the case law is
10  developing.  I'm not sure if the GMU case came after the
11  Marzzarella case or not, but certainly the courts have been
12  cautious in saying we think it is a sensitive area, but even
13  if it is not, it passes intermediate scrutiny.  I would
14  agree that is the approach most courts have taken.
15             Before I forget, I want to clear one point that
16  was raised on the Southbridge area.  Mr. Pileggi is correct,
17  it is like a townhome setup.  That courtyard he is referring,
18  though, is not owned by the WHA.  That is City of Wilmington
19  property.  It is in the deposition of Ms. Spellman and others.
20  We do not contend that is a common area.  We do not enforce
21  the policy there.  So we want to make that very clear.
22             THE COURT:  I take it from the fact that you are
23  also moving for summary judgment, you don't think that the
24  Court needs to or has before it material factual disputes
25  over what is a common area, what isn't, and what the
```

1   differences among the various common areas are?

2           MR. WILLOUGHBY:  I do not believe so, your

3   Honor.  I think the record is fully developed.  I am not

4   sure the testimony would add anything to what the Court has,

5   so we are not contending there is a factual dispute there.

6           To move on to the Marzzarella issue and the

7   intermediate scrutiny standard.  The courts that have looked

8   at the issue have really adopted, Marzzarella in particular

9   has adopted what I referred to earlier, the First Amendment

10  case law as being a model to apply to the Second Amendment.

11  It's a natural analogy.  Marzzarella specifically adopts it.

12          Basically, it says that there are all kind of

13  levels of scrutiny in the First Amendment.  The content ban,

14  for example, is going to be given a strict scrutiny, but

15  other kinds of restrictions, like reasonable time, place and

16  manner, are generally set forth as intermediate standards

17  for any type of means and tests.

18          That is the regimen we think would be applied

19  here if the Court did not find the authority to be a

20  sensitive area or the Court made an alternative finding.

21  That simply requires there be a reasonable connection

22  between the goals of the policy and the ends of the policy.

23  Certainly, there are reasonable goals of safety here.  If

24  you look at the other decisions I referred to, you know, the

25  University case, the Postal Service case, the National Park

1    case, all of those recognize that safety is a valid concern.

2    So that was the goal.

3            We were very, very cautious and very careful

4    about trying to protect what we thought was the core right

5    of the Second Amendment, and that is the right to have the

6    weapon in the home.  So we wrote the policy in a very

7    informed way.  That is, to protect the resident's formal

8    right to have a weapon in their home for self-defense, but

9    to ensure safety for everyone else, including elderly

10   residents, disabled, children, and others who may be

11   visiting there.

12           The restriction under Marzzarella and other

13   cases does not have to be the least restricted measure here.

14   It only has to bear a reasonable relation in the end.  I

15   think certainly here, we have adopted a very middle of the

16   road type of policy.  We have been very careful to try to

17   preserve Second Amendment rights where they apply but also

18   to protect our residents and others from potential

19   accidental injury or personal violence.

20           One of the things that struck me -- and it goes

21   kind of with the standing issue -- is that both plaintiffs

22   basically agree with all provisions of the policy.  Mr. Boone,

23   outright in his deposition, down the line.  I asked him very

24   carefully each provision of the policy, and in each case, he

25   agreed it was appropriate.

1          Ms. Doe, who has since submitted an affidavit we

2    consider to be a sham, the only issue she had was whether

3    she could carry a concealed deadly weapon in a common area.

4    She agreed -- and it is clear in the testimony because I

5    asked her several times -- that the display of a weapon in

6    the community room would cause alarm to other people, and

7    she would not want to see that.  So the only right that she

8    claims, if any, is that she should be allowed to carry a

9    concealed deadly weapon in the community room.

10          The problem with that is that she had never

11    applied for a license.  She does not have such a license,

12    and just saying, I'm entitled to, that I could get a

13    license, does not suffice.  That is like me saying, if I get

14    stopped by a police officer on the highway and I don't have

15    a license:  Well, I could have one if I wanted it.  Well,

16    that does not apply.  I think that she really does not have

17    standing to challenge that issue.

18          Really, when that is put aside, both plaintiffs,

19    everything that the Housing Authority has done, I think it

20    is important for two reasons:  One, standing certainly.

21    Secondly, it shows the reasonableness of our policy.  Here

22    are two individuals that they, quite frankly, went out and

23    sort of found to be the plaintiffs, and neither of them,

24    when they are actually seeing the policy, has any serious

25    problems with what we are doing.

1              So I think it is very important.  I think it

2      ties both to standing and to the issue of the means/end test

3      that shows that public safety alarm, that sort of thing.

4              THE COURT:  They are both subject to eviction,

5      though, if they don't comply.  Why does not that create

6      enough of a dispute?

7              MR. WILLOUGHBY:  If they do not comply with the

8      policy?

9              THE COURT:  With the policy.

10             MR. WILLOUGHBY:  Sure.  Anyone would be.  I do

11     not contend that they would have to actually test the policy

12     by brazening violating it in order to have standing.  That

13     is not what we are arguing.  We are saying if you look at

14     those two individuals, neither opposes the policy.

15             THE COURT:  Well, this may be splitting the

16     metaphysical hairs.  I don't know.  They sued you.  They

17     persisted in the lawsuit even after you took their

18     deposition.  You have the declaration now from Ms. Doe.

19             I am not sure, in order to have standing, you

20     have to in your mind subjectively be opposed to something.

21     Your actions may speak louder than the your inner, deepest

22     thoughts.

23             How do I find that there is no injury to them

24     just because they told you, hey, it is a reasonable policy.

25     I might not be opposed to it, but I am suing you over it

1    anyway.

2            MR. WILLOUGHBY:  Well, neither of them has

3    requested, for example, the right to have a concealed deadly

4    weapon in Ms. Doe's case, or another weapon, unconcealed, in

5    Mr. Boone's case.  So they have not ever raised the issue

6    with us at any time as being something that is material to

7    them.

8            I do not want to get into an approach where I

9    am sounding like I am attacking the plaintiffs and their

10   supporters, but I think when you look at deposition

11   testimony, the Court cannot leave its common sense behind.

12   It shows that the NRA was out there recruiting these people.

13   I do not think they were very well informed about what they

14   were signing up for.  When we took their depositions and

15   they were confronted with the policy, with the exception of

16   Ms. Doe having a complaint about the concealed deadly weapon

17   piece, they agreed with the policy.

18           So I think that that certainly goes to standing.

19   I do not know that that it would deprive the Court in a

20   constitutional sense.  The Court has discretion whether or

21   not these are the right plaintiffs, but it certainly seems

22   to me someone who does not, in fact, oppose the policy

23   should not be the person challenging it in court.

24           So I think I put it out there; and I think it

25   is not just standing, though.  I think where I started with

```
 1    before I got a little sidetracked, it really goes to the

 2    point that this is a narrowly tailored, reasonable policy.

 3    Plaintiffs themselves have indicate in their depositions

 4    they agreed with the purpose of safety behind it.

 5              THE COURT:  You do some employment law.

 6              MR. WILLOUGHBY:  Yes.

 7              THE COURT:  In the employment context, if you

 8    depose the plaintiff, and the plaintiff says I did not

 9    disagree with my firing but I am not going to drop the

10    lawsuit, I can see how that comes in on the merits, but

11    would your argument be the plaintiff does not have standing

12    because he or she thinks they were fired legitimately?

13              MR. WILLOUGHBY:  I would think so.  I would not

14    think there would be any material fact in dispute about

15    whether the firing was, in fact, illegal.  There have to be

16    grounds on which they are challenging the suit.  If they

17    concede that the stated grounds were not a pretext and they

18    were appropriately fired, I do not know how that gets beyond

19    summary judgment.

20              THE COURT:  It may not get beyond summary

21    judgment on the merits, but I am not sure that the plaintiff

22    lacks standing.

23              MR. WILLOUGHBY:  Understood.  I do not know what

24    the answer is.  I sort of digress with that because I wanted

25    to cover the standing point.  I think it is a serious issue,
```

1   and I think there are reasons to doubt whether these two

2   plaintiffs are really subjectively challenging this because

3   of the way they were frankly recruited to be plaintiffs in

4   the case.

5            So I think from that perspective, certainly,

6   that is another issue for the Court to consider, but really

7   the point that I wanted to make was that there is no need

8   for any kind of statistical analysis of violence, that has

9   been argued by the plaintiffs.

10           I think that all the cases, going back to the

11  George Mason University case, the Park Service case, all

12  of those, the Postal Service case, they all say that the

13  entities' understanding and fear what could happen with

14  weapons on their property is a legitimate concern and does

15  not need to be backed up by any type of statistical study

16  to support.  It is an obvious kind of concern, and the

17  plaintiffs themselves agreed with that.  But I do not think

18  there is a whole lot of basis for them to say we have not

19  had a reasonable relationship or reasonable fit between what

20  the policy and goals are.

21           THE COURT:  Well, there is obviously a factual

22  dispute between one side that says greater gun possession

23  and ownership will lead to reduced crime and reduced

24  violence, and the other side says the opposite, more gun

25  ownership will lead to greater crime and more violence.  Is

```
 1    that a material factual dispute that this Court needs to

 2    resolve?

 3              MR. WILLOUGHBY:  My point is it is not material.

 4    I think based on those cases, that is not a material point.

 5    The test is, on the intermediate scrutiny, it has to be a

 6    reasonable fit to the end goal.  It has to be the least

 7    restrictive alternative, for example.  So, yes, there is a

 8    factual dispute there.  I do not think it makes any

 9    difference.

10              Really, a lot of that factual dispute is really

11    information the NRA has developed to support their cause.  I

12    am not sure it makes any difference in terms of the ultimate

13    policies that are being able to be adopted by various

14    entities around the country.

15              THE COURT:  Let's talk about the very specifics

16    of the policy in paragraph 3 because you are facing the

17    argument that it is absurd and nonsensical.  That basically

18    nothing is added by the phrase "self-defense."  I want to

19    understand what is the position of the WHA.  Does the

20    addition of the word "self-defense" do anything to broaden

21    the scope of the right to carry a weapon?

22              MR. WILLOUGHBY:  That was added, your Honor,

23    because of the concern we wanted to make sure we could not

24    be challenged in having a resident say I have a right to

25    have a gun in my unit but you won't let me take it to or
```

1    from, or you won't let me take ammunition to or from my

2    unit.

3              What we are saying is if you are enroute from

4    the outside or another location, certainly, you have to have

5    the right to -- if you are going to have a right to have the

6    weapon in your unit, you have to have the right to transport it.

7              But I think Mr. Pileggi is correct, the testimony

8    shows that with respect to common areas, for example, the TV

9    room, you cannot go lounge around the room with your weapon.

10             That raises another important point that I think

11   he is wrong about.  That is, he suggests that there has to

12   be a permit of some kind to have a weapon in that common

13   area.  That is not Delaware law.  Delaware has very limited

14   restrictions.  That is only if you are concealing a weapon.

15   But if you want to take your gun out and carry with it with

16   you and slide it down the table in the community room, that

17   is lawful under Delaware law, and that is why we need to,

18   and have a right to, regulate, on the premises, weapons.

19             It certainly is true.  You can walk down the

20   street at Rodney Square openly carrying a weapon.

21             THE COURT:  And you do not need an open carry

22   permit?

23             MR. WILLOUGHBY:  I do not think there is such a

24   thing.  I think the only thing there is, is a concealed

25   deadly weapon permit.  So I do think that is a real critical

1   difference.  That was frankly one thing we were very concerned

2   about when we developed the policy the potential for alarm to

3   residents:  the potential for accidental discharge, potential

4   for there to be a fight and somebody has a weapon available,

5   bystanders could be injured.  So I think it is a very

6   important distinction.

7           That language perhaps could have been written

8   more clearly, but it was intended to make clear that we are

9   not trying to backdoor restrictions.  Frankly, I think in

10  the Heller case, the District of Columbia was trying to do a

11  backdoor way to support its law by saying if you do have a

12  gun in your home, it has got to be disassembled or there has

13  to be a lock of some type on it.  We want to be very clear

14  we are not doing that.  We are not trying to find some

15  backdoor way to take away a person's right to have a weapon

16  in their home for self-defense purposes.

17          THE COURT:  What are you doing, though, after

18  paragraph 3, after the comma in that last phrase, "or is

19  being used in self-defense."  What, if anything, does that

20  add?

21          MR. WILLOUGHBY:  That came out in the testimony

22  that if you are transporting the weapon to or from, going

23  inside or outside the building, that kind of thing, you have

24  your weapon on you because you have got to take it when you

25  leave.  If you were to be assaulted during that time, we

1    would not contend you could not use your weapon at that point.

2                THE COURT:  But other than that, that is all

3    that is added.

4                MR. WILLOUGHBY:  That is what is intended.  Yes,

5    your Honor.  That's correct.

6                THE COURT:  Okay.

7                MR. WILLOUGHBY:  Now, with respect to paragraph

8    4, I think it is a reasonable provision, your Honor.  It

9    does not give an unlimited right for a Housing Authority

10   representative to ask an individual for a permit, CCD,

11   concealed deadly weapon permit.  It only comes up if, and

12   when, there is to be some kind of a situation where there

13   is a reasonable grounds for that request to be made.

14                I think it is important to point out that WHA,

15   like any landlord, is subject to the Delaware housing.  You

16   do not just willy-nilly evict somebody, get the sheriff to

17   pick up the stuff and go.  You have to go through the

18   process in the Justice of the Peace Court.  There is a

19   hearing.  Certainly, the reasonableness could be challenged

20   there as well as any other basis.  There is due process.

21   There is an appeal to the Superior Court which may be de

22   novo.  I would have to check, but I think it is de novo, but

23   certainly though there is more than adequate due process if

24   the concern is some type of arbitrary selecting people out.

25                The policy is very clear there has to be some

1    type of reasonable basis to believe, in fact, there has

2    been a violation of policy.  I cannot, quite frankly,

3    understand why that is an issue but that is something that

4    they have raised.

5              I did want to address, if I could for a few

6    minutes, the mootness argument.

7              I think the original policies are moot.  They were

8    adopted and in effect at a time when the Second Amendment did

9    not apply to the Housing Authority.  Immediately, the Court

10   will recall that we had -- the case started in Chancery Court.

11   We moved it to Federal Court.  We had a status conference, and

12   we basically stayed the case pending the decision of McDonald.

13             Immediately upon McDonald, we suspended the

14   policies both at the Housing Authority, at Park View.  They

15   have never been enforced in the past.  There never has

16   been an occasion in the past where there was a need for it

17   to be enforced, so there has not been an injury in factoring

18   in the circumstances in which it has been necessary to raise

19   the policy.

20             We represented on the record, I think your Honor

21   asked me at one of the earlier conferences, to put in our

22   answer so that there is not question about, that we are, in

23   fact, saying we are not enforcing the policy.  We have a

24   judicial representation to that effect.  I think we have

25   said that.  I think we made very clear we have no intention

1    of reinstituting that policy.

2              As the Court pointed out, we have to go through

3    the HUD process.  They are going to have plenty of time to

4    raise the issue if they really, for some reason, somebody

5    tried to change it at a future date.

6              So I think it is definitely a moot point with

7    respect to the original policies.  I do not think there is

8    any case law to the contrary.

9              They cited in the reply brief the case from

10   Florida, the U.S. Supreme court, where the City of

11   Jacksonville adopted a new minority set-aside ordinance

12   while the one at the Supreme Court was being challenged.

13   The Court said in that circumstance, the voluntary cessation

14   of the practice did not make the case moot.  But there, they

15   replaced one policy that was the Court ultimately found was

16   a violation of the Fourteenth Amendment.  There was another

17   one that was a violation of the Fourteenth Amendment.

18             Here, again, if the Court finds that we have a

19   reasonable time, place and manner right, and that we have

20   appropriately adopted a new policy, it would be pretty

21   ironic decision to reach back and say the Court is now going

22   to have to rule hypothetically on a policy that has been

23   withdrawn and that the defendant says is not going to be

24   reinstituted.  So here is a very important distinction, and

25   I do not see there is any basis to go forward with claims on

1    the original policy.

2         Now, if the Court found against us on the new

3    policy, would that be an issue for the Court to consider on

4    remedy?  I would say it probably would be, but unless there

5    is a new violation under the new policy, it is certainly a

6    moot point and should not be gone into as a hypothetical

7    type of issue.

8         THE COURT:  Has your client conceded that the

9    old policy is unconstitutional?

10        MR. WILLOUGHBY:  My client is relying on me,

11   your Honor.  Here my view on that.  I think under the

12   current law, post-McDonald law -- this is my opinion -- it

13   probably would be a violation of the Second Amendment to say

14   no weapons in your unit for a self-defense.  I think it

15   would be a strained argument to say a that a public housing

16   resident who is treating his apartment as his home would not

17   have that Second Amendment right.  That is really part of

18   where we came from when we developed this policy.

19        The fact is, however, that the Second Amendment

20   did not apply to the states.  In fact, I know the Supreme

21   Court went a different way in its analysis when three prior

22   Supreme Court cases affirmatively ruled that the Second

23   Amendment did not apply to the Housing Authority.

24        So I don't know how you could reach back and say

25   that at a prior time, that would have been a violation of

1   the constitution.  I would say, as I said before, if we try

2   to adopt that policy now, my personal opinion would be that

3   it would be a violation of the Second Amendment to say you

4   cannot have a weapon in your home for self-defense.

5          THE COURT:  Is not Mr. Pileggi right that you

6   may not the lawyer a year from now, the board at WHA may

7   turn over.  The issues are fully briefed.  Clearly, it is in

8   front of me.  Why should not the Court just go ahead and

9   declare that the old policy is, and was, unconstitutional?

10          MR. WILLOUGHBY:  Well, first of all, then the

11   Court has to decide whether or not it was unconstitutional

12   at a time when the constitution did not apply to the entity

13   and decide those kind of issues unnecessarily.  We have

14   briefed that, but why should the Court go back and look at

15   those kind of issues, particularly when there has never been

16   any enforcement of the policy.

17          Even back before the history of the Housing

18   Authority, they never evicted somebody for a violation of the

19   old policy.  They never threatened anybody.  The plaintiffs

20   came forward and asked for a weapon, and they made very clear,

21   going forward, they are not going to enforce it.

22          So the Court has got some knotty issues to deal

23   with if it wants to reach back and look at the original

24   policy at a time when the Second Amendment did not apply to

25   the Housing Authority.

 1              It seems to me from a practical standpoint,

 2    given the representations we made and given the practical

 3    realities, this is not a circumstance where the Housing

 4    Authority just kind of pulled the light switches and said we

 5    have a new policy.  There was this whole process to go

 6    through.

 7              The plaintiffs had more than ample opportunity to

 8    come back to court and say this is a violation of the law, if

 9    that were to occur, which I think is purely speculative and

10    purely hypothetical because there is no indication that it is

11    ever going to be the case.

12              THE COURT:  Is the mootness argument the same

13    with respect to the Delaware Constitution, which, of course,

14    did not need to be incorporated.

15              MR. WILLOUGHBY:  The only difference would be

16    then the Court would have to decide, is there a difference in

17    scope between the two, the Second Amendment and the Delaware

18    constitutional provision, and how that might apply in this

19    circumstance.  The Court would be reaching into deciding

20    whether or not, under the Delaware Constitution, that right

21    would apply to a weapon anywhere on the premises.  That,

22    again, seems to me to be a purely hypothetical situation given

23    the circumstance and given the representations that we have

24    made, but that is correct that with respect to that one issue,

25    the Court would not have to go back and decide effectively,

1    given the law was different before, would it somehow apply

2    retroactively.

3              Your Honor, with respect to the other issues on

4    the state court level, we do view the Delaware constitution as

5    being the same as the federal Second Amendment right.  There

6    is not any material difference in the language.

7              The state constitution refers to recreational

8    hunting uses.  I am sure hoping the plaintiffs are not saying

9    they want to have weapons within the Housing Authority for

10   recreational and hunting purposes.  I don't think that makes

11   any sense.  But if you look at the Second Amendment, for

12   example, the Heller decision and certainly others, there is

13   certainly an implication that something like hunting would be

14   implicitly included in the Second Amendment.

15             So we see them as being the same scope.  There

16   is no prior authority in Delaware, obviously.  There is the

17   Virginia Supreme Court case and the GMU case where the Court

18   confronted that issue where the Court said, okay, if you are

19   looking at the original 13 states, it dealt with kind of a

20   pre-existing right.  The right to bear arms was something

21   that was being preserved by the Second Amendment, and this

22   is really coextensive, at least the Court found with respect

23   to the Virginia statute, and I would urge the Court to say

24   that is the same thing here in Delaware.

25             With respect to preemption, your Honor, I am

1    frankly a little bit of a loss to follow the argument.  The

2    statute they are relying on refers explicitly to counties

3    and municipalities.  This is a state agency.  It is not

4    passing a law.  It is adopting a policy, its premises.

5             Certainly, the Delaware General Assembly knows

6    how to enact a law, if it wants to, that says that public

7    housing authority cannot regulate anything with respect to

8    weapons.  So I do not see that as being a real legitimate

9    argument.  I think it is pretty of a stretch.  There is

10   nothing explicitly or implicitly about that statute that

11   would lead one to conclude the General Assembly to take

12   away the right of the landlord effectively to regulate the

13   property in a reasonable way.

14            In fact, if you look at the arguments that are

15   being made on the other side, there is this reference to all

16   these statutes that are being referred to that regulate

17   guns, none of which affects that open carry issue we talked

18   about, but most of which are criminal statutes.

19            Certainly, that shows the General Assembly knows

20   how to enact laws that deal with guns.  If they were going

21   to take away the rights regulating guns in their premises,

22   they know how to do it and they did not.  So I do not think

23   it is a very compelling argument.

24            I am trying to think of the other issues, on

25   the state front, if there is anything I missed.  The

1    declaratory judgment issue I think is, I think we are

2    probably in agreement.  We just want to make it clear that

3    is not an independent cause of action.  Certainly, if there

4    is another violation, the Court has the authority to enter a

5    judgment on a declaratory basis.

6              THE COURT:  I got into some questions with

7    Mr. Pileggi about the rights of the private landlord,

8    whether the Constitution essentially would apply.  It came

9    up also in the context of the challenged paragraph 4.  Could

10   you address that?

11             MR. WILLOUGHBY:  Well, first of all, the Second

12   Amendment is like any other constitutional right.  It requires

13   state action or it does not apply.  The First Amendment, any

14   other constitutional right, there must be state action.  So a

15   private landlord is free to do whatever it chooses on its

16   property.  The Second Amendment simply does not apply.

17             Whether the state constitution would go into

18   that, I think that it would not.  I do not think there is

19   any indication that provision would be applied as against a

20   private entity, but that issue has not really been raised.

21             We conceded that the Park View is managed by the

22   Housing Authority, and that constitutes state action.  I

23   looked very hard at that issue when it came up, and I looked

24   at the state action cases, and we were convinced that

25   because, as the Court pointed out, the Housing Authority

1    was responsible for developing its policies, even though it

2    is managing on behalf of other investors, it is the one who

3    is determining the policies and has the right under the

4    agreements between the parties to do that.  That we consider

5    that to be state action.  We did not want to try to raise

6    that issue and suggest that was something that was beyond

7    the Court's reach for that reason.

8              I think, as the Court pointed out, there are

9    certain inconsistencies on the plaintiffs' behalf if they

10   try to say it is not state actions, it is purely private

11   conduct, because then at least the Second Amendment has a

12   new application and the Court has to decide does the

13   Delaware Constitution have any application.

14             On the issue with respect to paragraph 4, again,

15   it is a very limited provision.  There has to be some

16   reasonable basis for the Housing Authority representative to

17   ask to look at the permit.  There has to be some kind of an

18   actual reasonable basis the policy has been violated.  It

19   sounded to me like if there was an accident on the Housing

20   Authority premises that they were investigating, they wanted

21   to see if their tenants, in fact, had driver licenses, if

22   they were to get into an accident.

23             If there were reaction taken on that, as I said,

24   again, the Housing Authority does not convict someone

25   without due process.  The statute is very clear you go

1    through the state landlord/tenant code, and the judge would

2    have to independently view whether or not there was a

3    reasonable basis for the request to see the license or

4    permit.

5                THE COURT:  Is it your belief that a private

6    landlord could require their private tenants to show a gun

7    permit or license?

8                MR. WILLOUGHBY:  Yes, a private landlord could

9    say no weapons at all.  Certainly, if they wanted to go to

10   the point that you can have a weapon if you had a permit,

11   certainly they would have that right.  They are not restricted.

12               THE COURT:  Is there anything else?

13               MR. WILLOUGHBY:  Nothing else unless the Court

14   has any other questions.

15               THE COURT:  No, you have answered them.  I will

16   give you a chance to respond to anything new Mr. Pileggi

17   says, if you wish.

18               MR. WILLOUGHBY:  Thank you, your Honor.

19               THE COURT:  Mr. Pileggi.

20               MR. PILEGGI:  Thank you very much, your Honor.

21   I will just try to briefly rebut some of the things

22   Mr. Willoughby said instead of adding anything new.

23               Mr. Willoughby referred to the Heller decision

24   as a 5- 4 decision.  I do not think it is entitled to less

25   weight just because it is a close vote.  It was also

1    affirmed by the McDonald decision.

2              If I may, I would like to quote from a specific

3    page of the McDonald decision.  It is page 14 on the Lexis.

4    I would be happy to submit but because it is on the Lexis

5    version, it might not be easy to identify the specific page.

6              But the McDonald decision confirmed that the

7    central component of the Second Amendment right in Heller

8    was self-defense.  It did not say the central component was

9    self-defense in the home.

10             I know Mr. Willoughby suggested Heller is

11   limited to self-defense in the home, but I think a careful

12   reading not only of Heller but the explanation of Heller,

13   McDonald, emphasizes that the self-defense right is not

14   limited to the home.

15             Again, in McDonald, the Court refers to citizens

16   being permitted to use handguns for the core lawful purpose

17   of self-defense, period.  It doesn't say for the purpose of

18   self-defense in the home.

19             I'll give you the quote for that one.  It says,

20   "We concluded in Heller that citizens must be permitted to

21   use handguns for the core lawful purpose of self-defense,

22   period."  Quoting Heller at 128 Supreme Court 2783.

23             So I think a careful reading of Heller and

24   McDonald does not support the position that the Supreme

25   Court only recognized the right of self-defense for the

1     home.

2            Mr. Willoughby referred to the George Mason

3     University case, and a case involving the National Park.   I

4     don't think Heller should be put into the same category as

5     National Parks or of public universities, and I didn't hear

6     my friend refer to any authority that categorized any public

7     housing authority or public housing buildings as sensitive

8     areas.   I do not think there is any controlling authority

9     out there that would categorize them that way.

10           The Seventh Circuit last week in the Ezell case

11    made it clear that it was not necessary to violate a policy

12    to have standing and that the allegation of the constitutional

13    violation was sufficient.

14           The Court in Ezell also talked about the

15    intermediate test.   In order to establish the intermediate

16    test, there has to be some empirical evidence that supports

17    the restriction.   The only basis for the restriction in this

18    case that the defendants testified to was common sense.   They

19    said it was common sense that this policy was appropriate; and

20    the Ezell case made it clear that isn't enough.   You have to

21    actually have some empirical evidence.

22           I know that we referred to in our briefs specific

23    parts of the deposition that suggest that it is not entirely

24    clear that the defendants were enamored with the policy, but

25    I think the appropriate reliance should be on the legal

1    arguments for whether or not they are constitutional and not

2    whether or not the depositions of the plaintiffs had

3    particular problems with some aspect of the policy.

4            THE COURT:  I know we have all least excerpts of

5    the depositions.  Do we have the complete transcripts of Doe

6    and Boone?

7            MR. PILEGGI:  I'm not sure if the complete

8    transcripts were filed, but I would be happy to submit the

9    complete transcripts.

10           THE COURT:  We will talk about that when we are

11   done.

12           MR. PILEGGI:  As far as the open carry law, your

13   Honor, that really wasn't addressed in the papers.  We cited

14   to a footnote.

15           I am not going to disagree with Mr. Willoughby

16   if he thinks the Delaware state law allows someone to carry

17   a gun openly in the common area.  I would invite him to test

18   that out to see if it works.  But my suggestion is that if

19   you carried an open gun down the streets of Wilmington, it

20   might not be as simple as that.  But I would be very happy

21   to submit supplemental briefing on that if the Court thinks

22   that is an issue about the tension between the open carry

23   rights and whether or not a permit is needed, but I do not

24   think that was briefed.  I think it is an interesting issue,

25   though, and I am not here to present an argument on it, one

1   way or another.

2          I am going to try not to repeat things that have

3   already been discussed.  I just want to quickly follow-up on

4   something Mr. Willoughby said, that the policies were never

5   enforced.

6          The law that we have cited indicates that it is

7   not necessary for an unconstitutional policy to be enforced

8   in order for it to be challenged.  For example, if there

9   were a policy that prohibited the freedom of religion, I do

10  not think it would be necessary for them to enforce the

11  policy before someone could challenge it.

12          THE COURT:  But it is undisputed on this record

13  that it was not enforced.

14          MR. PILEGGI:  It was not enforced against our

15  clients.  I do not know if -- I do not have any evidence,

16  and there is no evidence in the record, that anyone was ever

17  evicted because of a violation of the policy, but cases we

18  have cited say it does not need to be enforced in order to

19  challenge it.

20          We with cited the State Constitutional Law

21  Treatise by Justice Holland that suggests that the Delaware

22  state constitutional provision regarding bearing arms does

23  go beyond the Second Amendment.  The decision by the

24  Superior Court a few months ago in State v Griffin describes

25  the state constitutional provision as much more specific and

1    broader than most other constitutional provisions.

2              In going over my notes, I want to make sure I do

3    not repeat things that I already discussed.  I think that

4    covers it.  Thank you very much.

5              THE COURT:  Let me just ask you just as sort of

6    housekeeping.  We still have pending on our docket several

7    motions that were filed by you last summer or maybe even

8    further back than that.  There was a motion to expedite,

9    motion for preliminary injunction, a motion for partial

10   summary judgment.  Are all of those moot at this point?

11             MR. PILEGGI:  Your Honor, all of those are

12   moot.  I think as you will recall, at various stages of the

13   process, various stages of the procedural history of this

14   case, the Court stayed the action.  During the pendency of

15   the stay -- I don't know if that sounds right.  During the

16   stay, different developments made those motions moot.  So,

17   yes, your Honor, the current motion for summary judgment

18   encompasses those.

19             THE COURT:  The two cross motions.

20             MR. PILEGGI:  Yes.

21             THE COURT:  Okay.  Well, we will be denying

22   those motions as moot.

23             Is there anything else?

24             MR. PILEGGI:  That is all, your Honor.  Thank

25   you.

1                 THE COURT:  Mr. Willoughby, is there anything

2    you wish to add?

3                 MR. WILLOUGHBY:  Just briefly.

4                 There is in the record an affidavit of

5    Mr. Purnell, Frederick Purnell, dealing with the issue of

6    the enforcement of the policy.  He states in his affidavit

7    that during his tenure, which goes back to 2001, I believe,

8    he has never been forced to evict anyone.  So I think there

9    is at least in the record, as far as back as 2001.

10                I did not address the scope of the Housing

11   Authority's role.  My associate, Ms. Moak pointed out I had

12   skipped that.  Again, looking at the statute, the Housing

13   Authority has a very broad authority to do anything it needs

14   to do to regulate its business.  Certainly, there is no

15   suggestion in any of the Delaware Code that the Authority

16   could not pass reasonable rules and regulations in connection

17   with its lease provisions.

18                For example, under their approach, if you had a

19   provision that said you could not have a gas grill on your

20   balcony because we think it is unsafe, they would say that

21   is beyond your authority.  Well, again, I think the statute

22   is very clear the Housing Authority has broad authority to

23   institute any of those kind of regulations.  The question

24   is whether or not this regulation is constitutional.  It is

25   not really whether they have the authority to adopt it.

1              So that is all I wanted to say on that unless

2    the Court had some questions.

3              I would add with respect to the depositions, I

4    think it would be a good idea for the Court to have the full

5    transcripts.  I would suggest that these are videotaped

6    depositions, so I would suggest we also send the videotapes

7    to the Court because there have been allegations that the

8    witnesses were confused.  I don't think they were.  I think

9    the videotape will show that.

10             There is an allegation Ms. Doe is not well

11   educated.  She has two years of college.  I think she is an

12   articulate, strong person.  I think that comes through in

13   the deposition.  I think it would be good to have the actual

14   videos sent over to the Court.

15             That is all I have, your Honor.

16             THE COURT:  Thank you.

17             Mr. Pileggi.

18             MR. PILEGGI:  Your Honor, I just wanted to

19   remind the Court that Ms. Doe's deposition is under seal for

20   attorneys' eyes only, so I am not sure if we file with the

21   Court how we would keep it under attorneys' eyes only.

22             THE COURT:  Well, that can be done with the

23   assistance of my staff.

24             MR. PILEGGI:  I just wanted to clarify that.

25   Thank you.

1          THE COURT:  Thank you.

2          Let me just say a few things in way of

3    housekeeping.  I do want to have the submission of the

4    complete transcripts of the Boone and Doe depositions as

5    well as the videotapes.  To make it easy, just submit them

6    together as a package and do it all as an under seal filing.

7    You can coordinate with my deputy if you have any questions

8    how to do that because I am not modifying the protective

9    order that is in place.

10          There have been a lot of offers of supplemental

11   briefing.  I do not want much additional from you.  You have

12   very thoroughly briefed all the issues, but I would like

13   your assistance in understanding there is a dispute as to

14   what the law is with respect to open carry and concealed

15   carry and whether any permitting or not is required, and

16   that would be under state and local and federal law,

17   whatever applied at the Wilmington Housing Authority.

18          Before we get to the policy, what is the status

19   in the common area as to whether you need any kind of permit

20   or not to carry a firearm, either concealed or openly, and

21   if either side thinks that that legal regime has any impact

22   on the legal issues the Court has to decide.

23          I'm directing you to meet and confer on that.

24   At least most of that, you ought to be able to agree on what

25   the law actually is right now.  If either side needs to add

1   a little bit of argument to what the law is, I'm fine with

2   that, but what I would want you to do is work cooperatively,

3   get me a joint letter that sets all that out, and let's get

4   that in to me by next Friday.

5                Are there any questions about that, Mr. Pileggi?

6                MR. PILEGGI:  None, your Honor.  Thank you.

7                THE COURT:  Mr. Willoughby?

8                MR. WILLOUGHBY:  No, your Honor.

9                THE COURT:  Other than that, I'm not looking for

10  any supplemental briefing.  If I want anything else, I will

11  reach out to you and let you know.  Okay?

12               Is there anything further we need to discuss,

13  Mr. Pileggi?

14               MR. PILEGGI:  No, your Honor.

15               THE COURT:  Mr. Willoughby?

16               MR. WILLOUGHBY:  No, your Honor.

17               THE COURT:  Thank you all very much.

18               (Hearing ends at 11:45 a.m.)

19

20        I hereby certify the foregoing is a true and accurate
    transcript from my stenographic notes in the proceeding.

21
                              /s Brian P. Gaffigan
22                            Official Court Reporter
                              U. S. District Court
23

24

25